# EXHIBIT B

**Tomas Espinosa, Esq.**
**Att. Id. No. 025691985**
**8324 Kennedy Blvd.**
**North Bergen, NJ 07047**
**Tel: (201)223-1803/ Fax: (201)223-1893**
**E-Mail te@lawespinosa.com**
**Attorney for Plaintiffs Isabella Wysocki, James Wysocki and  Racquel Wysocki**

| | |
|---|---|
| Isabella Wysocki, James Wysocki and  Racquel Wysocki <br><br> Plaintiffs <br><br> v. <br><br> The Wardlaw- Hartridge School, <br> Christine Cerminaro, <br> Robert M. Bowman, PhD <br> Andrew Webster <br> Austin Forsythe <br> Wagner College, <br> Nadia Valcourt, <br> John Does (a fictitious designation of 1-10 male persons) <br> Jane Doe (a fictitious designation of females 1-10) <br><br> Defendants | SUPERIOR COURT OF NEW JERSEY <br> UNION COUNTY- LAW DIVISION <br><br> CIVIL ACTION <br><br> **DOCKET NO. UNN-L- 002443-21** <br><br> CIVIL ACTION <br><br> **AMENDED** <br><br> **VERIFIED COMPLAINT** <br><br> **AND JURY TRIAL** |

Plaintiffs Isabella Wysocki, James Wysocki and  Racquel Wysocki, all residing at 986 Pierpont Street, Rahway, NJ 07605, through their attorney Tomas Espinosa, Esq. and by way of verified complaint against the defendants, states:

## **VENUE AND JURISDICTION**

1.  The claims under New Jersey Constitution Article 1, Paragraphs 5 and 6 and other applicable laws, on which this action is legally based are within the jurisdiction of the Superior Court of New Jersey as are the claims brought under New Jersey's statutory law and case law and other application statute, against The Wardlaw-Hartridge School and its

1

defendants employees who in violation of state law infringed and violated Plaintiff Bella Wysocki's rights to free speech and other rights guaranteed by the New Jersey State Constitution Plaintiffs seek a declaration that Defendants violated her clearly established constitutional rights under the New Jersey State Constitution as set forth in the Complaint; a declaration that Defendants' denial of free speech and other state constitutional as set forth in their complaint; and also the counts of torts committed against the plaintiffs, including the violation of her rights protected by the New Jersey Civil Right Act as well as breach of contract, for which plaintiffs seek the granting of permanent and temporary injunctions as well as temporary restraints, and damages for past and future losses , compensatory, consequential, and where applicable punitive.

### *JURISDICTION*

2.  The Superior Court of New Jersey has jurisdiction  because the matter arises under the United States Constitution and the constitution of New Jersey and the applicable federal and New Jersey's laws.

### VENUE

3.  Venue is proper in the Superior Court of New Jersey, Union County because of the residence of the plaintiffs in that county.

### PARTIES

4.  Plaintiff Isabella Wysocki (referred to hereafter as "Plaintiff Bella", or "Bella" or  "Bella Wysocki") is an adult resident of the State of New Jersey. Plaintiffs James Wysocki and Racquel Wysocki are her parents, and although the events subject matter of this litigation arose when she was a minor, she became on April 2, 2021, eighteen years old.

5.  Defendant The Wardlaw-Hartridge School ("Wardlaw") is a private school, located at 1295 Inman Avenue, Edison, NJ 08820, is a high school.  Wardlaw is where Bella was expected to graduate this year with ceremonies scheduled for June 11,  2021, June 16, 2021, and June 18, 2021.

6.  Defendant Robert M. Bowman ("Dr. Bowman" or "Bowman") is the principal of upper school at Wardlaw Hartridge and an employee of The Wardlaw Hartridge School, is a natural adult resident of the State of New Jersey with place of business and main office at the address of the said school.

7.  Defendant Christine Cerminaro ("Cerminaro") is the official teacher, on information and belief is the dean of students for the Upper School at The Wardlaw Hartridge School and an employee of The Wardlaw Hartridge School, is a natural adult person resident of the state of New Jersey.

8.  Defendant, Andrew Webster, ("Webster") Learning Director at The Wardlaw Hartridge School and an employee of The Wardlaw Hartridge School, is a natural adult person resident of the state of New Jersey.

9.  Defendant Organization and persons that are responsible person of the posting of the clip on the internet whether students or other related individual's that called themselves "Wardlaw Uncensored" that were at all times relevant to his or her actions students at the Wardlaw responsible on the broadcasting by posting on the internet the clip that resulted in the injuries and losses to plaintiffs for the sole purpose of bullying, harassing and sabotaging Bella. These persons other than those identified below are included in the fictitious designated defendants below.

10. Defendants Austin Forsythe and Nadya Valcourt are or were students at all times relevant to their actions at Wardlaw. They broadcasted the clip and caused and participated in causing the injuries of the plaintiffs with the sole aim of bullying, harassing and sabotaging Bella.

11. Defendant Nadya Valcourt is or was at the time a student of the events stated herein in this verified complaint. She engaged in the sending of the Clip to Wagner College that was one of the causes contributing to the loss of Bella's NIL and her scholarship with Wagner College.

12. Defendants John Doe (1-10) a fictitious designation and Jane Doe (1-10) a fictitious designation were persons that either at Wagner College or at Wardlaw participated as actors in the events stated in this verified complaint and who individually or jointly with the other defendants by their actions or omissions directly and proximately caused the damages to plaintiffs stated herein in this verified complaint.

## **FACTS**

13. On January 3, 2021, Christine Cerminaro ("Cerminaro") called plaintiff Bella's parents (also plaintiffs herein) saying they have to have a meeting with Robert M. Bowman, PhD ("Dr. Bowman") and Ms. Cerminaro regarding Plaintiff Bella on the same date at 5:30 P.M. Then Defendants started to tell Bella's parents what they allegedly had found out, but Cerminaro contacted plaintiff Racquel Wysocki ("Racquel") on her cell phone and then they had interviewed plaintiff Bella via zoom and taped it 2 hours before Bella's parents even knew about the situation. Bella was at the time a minor.

14. On January 4, 2021, Racquel had to do inquiries, digging, for information after she found out what Wardlaw, Dr. Bowman, and Cerminaro were not willing to give her, any

4

information on why Bella was questioned for, and by her much investigation, Racquel came to discover the following:

(a). An online account was created on Instagram called "Wardlaw Uncensored",  the website was created by a Wardlaw student (s), it was up for about 5 hours on January 6, 2021, and deleted on the same day. There was a screenshot of the page  (***Exhibit 1*** attached hereto). The student(s) who created the account took videos from Bella's Tic Tok created a two second clip  (IMG o293. Mov 542 KB) by way of their own editing for what was stated in the posting. (See ***Exhibit 2*** , the expert's  Forensic video analysis and report of Justin Rosander, IAOC, IAEC. Of JSM Studios, LLC).

(b). The students and persons in question on making the Wardlaw uncensored account are the fictitious part of the fictitious designation defendants stated above and Austin Forsythe of Princeton.

(c).  These person (s) who  made the " Wardlaw Uncensored" made a Tic Tok account in  plaintiff  Bella's name and called it ("BellaWycocky") with screen shots in the email that was not of Bella's account but were taken from it and the posting was not of Plaintiff's Bella's email account. The video went up on January 6, 2021, and it was deleted on January 6, 2021.

(d). On January 3, 2021, an email was sent to Wagner College in New York, and it was received by James Gibbons: Director jgibbons@wagner.edu and to the Soccer Coach philip.casella@wagner.edu., the email was sent from the email address NValcourt@wschool.org, a student at Wardlaw School who happened to be an African American. (See ***Exhibit 3*** attached hereto)  In the fabricated video  that was included along with the email, plaintiff Bella had braces which she hasn't had in 2 years, and it is a

2 second clip from snap chat which plaintiff Bella never had the video in her possession at all. When the coach called plaintiff Bella, plaintiff and her parents had never seen such a video.

(e).  Bella has indications that one of the persons behind the video is Austin Forsythe  ("Austin") for several reasons. First, plaintiffs have a recording from a child stating that it was Austin's plan "to do" her (Bella)

(f).  Second, on Nov 11, 2020, Austin Forsythe went through the AP room while Bella was signing for college saying how he was going to sabotage her with the video.  This was stated to her sister Gabby by Aum Mehta. Aum Mehta on information and belief may had been a participant in the posting of the clip, plaintiffs reserve the right to join him if upon discovery and further investigation this is confirmed.

(g).  Third, Bella called Austin on 1/4/2021 and asked him on speaker in front of Racquel why he would do  her.  He had nothing to say. Austin Brother Dillion goes to a college in PA and that's where the school is telling Racquel that the email came from when traced..

15. On January 4, 2021,  Wardlaw questioned plaintiff Bella via zoom and taped her without permission of her parents and before they contacted her parents and let them know what was going on.

16. On January 5, 2021, Bella's parents went to the police in their town, Rahway, to report the events and they called the parents on January 6, 2021, and said it was out of their jurisdiction. (***Exhibit 4*** attached hereto is the police report)

17. On January 7, 2021, Bella and her parents had a meeting with Dr Bowman the principal of the upper school at Wardlaw. He shared with Racquel at that time the actual email that was sent from their domain to Wagner College. At that point he had told Racquel that his

son was very upset and at that point Racquel showed him that page on Instagram where

Bella was bashed as a racist and her son was the first person that liked the internet picture

"exposed" Bella.   Racquel also asked Dr. Bowman why he and the school did not call

the police. He said they're a small school and that they do not call the police because they

thought they could handle it.  Racquel told him this was criminal and a Sabotage and that

it is someone in that school that did this to Bella. Dr. Bowman had no answers for

Racquel nor to why the school domain was used for this unlawful harassment and why

the school did not supervise  and control the use of its domain allowing criminal activity

to be conducted using its domain.  She repeatedly told him that this boils down to what

was promised by Austin Forsyte from the threats that he worded explicitly in the AP

room and to Simone Erachshaw,  telling her how he was going to ruin Plaintiff Bella's

life. There was harassment in the AP room, a crime, harassment by several students using

the domain  of the school and using matters that they perceived would negatively affect

and annoy as well as  to distress plaintiffs Bella, and her parents. Neither Dr. Bowman,

Cerminaro, Webster, did anything to remedy and discipline this criminal conduct of the

students that used the name of the Wardlaw to create the vehicle of harassment or used

the domains for that purpose to perpetrate and perpetrated the crime. All these committed

by Austin Forsyte, the fictitious designated person behind the "Wardlaw Uncensored"

broadcasting and Nadya Valcourt. There has been no discipline of this criminal conduct

of these students, no investigation of the students behind this criminal broadcast.

18. There was no disciplining of these students even in the face of the

"Wardlaw  uncensored" publication for which Dr. Bowman stated that it disturbed his

son  Henrey Bowman but, he was the first person to like the internet picture that

"exposed" Bella in the vehicle of the crime. On information and belief the school has done nothing to prevent these crimes and the perpetrators have not been disciplined. The persons behind Wardlaw Uncensored despite the use of the school domain had not been identified because a thorough and serious investigation would had discovered who were the culprit or culprits.

19. Bella is a student with good grades and with a promising brilliant future and an outstanding Soccer player that has been marred by the unjust violatory and illegal nature of the defendants' actions. (See ***Exhibits 5, Exhibit 6 and Exhibit 16*** respectively, attached hereto).

20. The plaintiffs, Bella Parents, told the officials of the school, Dr Bowman and Andrew Webster that the email two seconds clip looked to have been doctored, fabricated, but there was no action taken to examine the nature of that email message nor to investigate the source of it nor the motives of the broadcasters. There was no communication to plaintiffs of any such efforts. Prior to the J Hearing (Judging Board Hearing), the two hours interview of Bella all of which were without the presence of the parents and counsel for the family,  there was no investigation about the use of the school domain, the racist nature of the groups formed in the school, the harassment on Bella and the violations both by the school and the perpetrators of the provisions of the school handbook that is part of the enrollment contract of plaintiffs with the school.

21. On 1/14/2021 at 7:00 P.M. Cerminaro called plaintiffs James and Racquel and said Bella has to get punished, so she has to go in front of a Judging board of 4 teachers and 4 students.  There have been no Judging Board Hearing for Austin Forsythe and/or Nadia Valcourt.

22. There was no consideration about how long ago the alleged statements in the clip were made, evidence shows that it had to have been at least two years before since in the posting of the statements in the short clip, Bella was wearing braces that she only had worn two years before, there was no consideration of the aims of the fabricators, nor of the fact that they were committing a crime, nor was she ever confronted with the perpetrators and accusers that posted the clip or acted in broadcasting the clip beyond the school and continue broadcasting bullying and harassing remarks against Bella.

23. There was not showing that at the time in which the alleged statements were made there was any disturbance and disruption of school discipline attributed to the statements allegedly made two year before nor conduct in the soccer team where Bella was captain that had to do with any racial connotation that produced a disruption created by her alleged racist statements. There was no showing that she promoted a climate of hate because of race, nor a separation of blacks and others as the school has in its middle-closed groups for a particular race, and that one of these groups or group has identified itself as formed on a race segregation basis for admission into it, an organization for which there has been no disciplining in the school for the promoters and organizers of it. This organization precludes others from participating in it solely on the basis of race as to constitute segregation just for the color of your skin. There is nothing different between the association created and existing in the school and the segregation for riding in a bus that was a sign of ignominy in the south. There is nothing that has been done to prevent this type of conduct or association based primordially on the color of the skin as per their own criteria. Bella had been punished for statements that were doctored that at the time and for two years had no impact on the school environment, that were not spread by her

but by harassing persons associated with an email posting where a racist student organization posted its invitations to join.  The school in imposing degrading and stigmatizing "disciplining" on Bella had not given the consideration to the validity of the clip nor to the harassment nature of the clips.  (see *Exhibits 8 and 9* attached hereto).

24. The conditions of discipline imposed by defendants Webster, Bowman, Cerminaro and Wardlaw to Bella and ad fortiori to her parents. (see *Exhibit 22* attached hereto)  amounted to criminal coercion  and are in violation of Bella's constitutional rights under the First amendment to the US Constitution to the extend it is directly or indirectly applicable to the type of institution Wardlaw is and to the benefits that it receives from government and also violatory of the protection for freedom of speech under Article I, Paragraph  6, of the New Jersey State Constitution.

25. On 2/1/2021 a J Board meeting was set up for the week Friday, February 5, 2021. Mrs. Cerminaro called the plaintiffs and asked who would be coming with Bella to the meeting.  Bella answered that Brandon McCall and Gabby Bella's sister will be attending the J Board meeting.  The parents of Bella were expressly excluded from attending the meeting as was also Bella's legal counsel. On information and belief, the meeting only concentrated on getting Bella to admit wrongdoing, it was not a fact-finding meeting preceded by an investigation of the facts. Bella was present at that meeting under the threat of expulsion, no graduation, and already stigmatized and segregated from the school community.

26. On 2/2/2021 Brandon McCall called Bella at 6:00 PM and said that Mrs. Cerminaro called his mother and talked her out of letting him join Bella in the J Board meeting

. Bella was not permitted to come with anyone for her defense that could question any facet of the charges against her.

27. On 2/5/2021 -the school deterred the students to go to the J Board Meeting with Bella, so her sister Gabby had to go.  Plaintiffs have it all taped. They asked Bella questions and did not care that she never had the video nor did she ever post. This was done to her. Dr. Bowman and Mrs. Cerminaro said we would have a resolution within 2 to 3 days.

28. On  2/ 23/2021 Mrs. Cerminaro called and said Defendant Webster would like to have a zoom call so Mr. Webster can talk to Bella since he has not spoken to her about the whole situation.

29. On 3/7/2021 Plaintiffs received an email from Mr. Webster regarding the action of discipline that the school was going to take on plaintiff Wysocki. (see Exhibit 22 hereto). The impositions of discipline and the message constitute criminal coercion in which without a proper investigation, Bella was forced to accept punishments that were unrelated to her academic standing and the performance of academic standards required for graduation, nor to the performance of obligations undertaking by her nor to her outstanding achievement in athletics and other endeavors related to her education but penalized for alleged statement that were interpreted as her views, even if they were not, without consideration to her true views, and without consideration of the context and complete expression of the events surrounding the statements that led to the doctored clip.

30. The emailed letter of March 7, 2021, states that "Dr Bowman and Mrs. Cerminaro devoted a lot of time determining the facts of the case involving the video that was posted and distributed". There was no investigation about the integrity of the video or its

completeness nor about who prepared it , nor about who distributed it and the motive for

distribution, nor any effort of correlation of the statement with conduct both academically

and in the soccer team, nor of the language used nowadays among young people when

they address one another or how they designate themselves and other including self

referentially. This statement was simply untrue as to the views of Bella and the imposed

unjust punishment was also excessive and not commensurate with the alleged wrong.

There was no showing of any disruption, negative racial consequences, disparagement, or

disturbance occasioned by the alleged remarks in the clip in the two years from the date

that allegedly the statements were made.

31. The letter continues, " two years ago, you should have known better than to use that

profanity and racial epithet in a person in the AP room (or anywhere for that matter).

Now as a senior , you should have known once it was posted that you needed to

immediately come forward to an advisor, counselor, or administrator to acknowledge that

the video was real, that your words were hurtful and unacceptable.". The characterization

already has the force of a conviction for a bad deed without determining the context and

circumstances of the statement or if it was complete, what was the intention, to whom

was addressed, what was done or been done to Bella by the person addressed or if the clip

was doctored and why the clip was posted after two years and the consequences of the

statements during those two years and why the clip was broadcasted only when she was

to graduate with the calculated destructive impact of this  timing for the broadcasting of

it. ( note that blacks on occasion will call a friend "hey, you nigger come here" or on

some other context either in jest or friendly).

32. The duty to take the above into consideration and make a serious investigation was on Dr, Bowman, Ms. Cerminaro and the school officials, especially when there were family members involved or at least one official portrayed in the portal of dissemination. There was no statement in the letter of Webster referring to the conduct of Bella during the two-year period that showed that she engaged in any conduct that was the source of racial disruption, disruption, disturbance, motion, or turmoil. This doctored clip only surfaced on the occasion of graduation and her NLI with Wagner college posted by students of the defendants that had been permitted by them to continue with this conduct after the broadcasting and on occasion of it.

33. At the meeting with Dr. Bowman in which he expressed that his son was in the picture of the Wardlaw uncensored posting and that his son was upset because of the posting, Plaintiff Racquel asked Dr. Bowman why the police was not called because of the criminal nature of the harassment against Bella and he stated that he would not go to the police but try to investigate and resolved the issue with the parties, however,  Forsyte and Nadya Valcourt who had posted the clip and Valcourt sent it to Wagner with the express intent of bullying, harassing and sabotaging Bella were not disciplined and attended all of the ceremonies that were prohibited to be attended by Bella. None of the perpetrators had been disciplined.

34. Despite his repeated act of harassment to Bella including racist social or electronic media posting by him (see the racist attack on Bella in *Exhibit 12* attached hereto), Forsyte had not been disciplined, despite engaging in the crime of harassment, but Bella was, despite his recorded statement that the whole affair of the clip was a joke on Bella, was disciplined by Wardlaw in total failure to investigate, in willful disregard of their duties

to the plaintiffs, the defendants officers of Wardlaw in violation of duty toward Bella and her parents, and  intentionally, or in utter disregard to the said duties, and grossly negligently, inflicted  mental distress and psychological injuries the plaintiffs and caused directly damages and injuries resulting from their foul conduct including also financial and economic losses.

35. The coercive letter of Andrew Webster imposing penalties on Bella also stated, " you should have expressed deep contrition, and a desire to apologize meaningfully and repair the harm it caused".  The email nor any of the documents nor the J Hearing revealed any harm done during the whole two years for the actual statements made when made in the context in which they were made for the purposes they were made and the circumstances that they were made that were never investigated and now there is the speculative harm done for the spreading of the doctored  by unpunished perpetrators of the two second incomplete and doctored clip that was not done by Bella but by the group of students behind the Wardlaw uncensored posting, the conduit of a racist allegedly black group condoned by the no disciplining of them by Wardlaw even when the son of Dr. Bowman was "disturbed" by it and was one of the first to like the posting.

36. There has been no act of contrition nor has such act been demanded from them  and if there was an act of disruption was their harassing posting that waited two years to be revealed only on the event of Bella's graduation and scholarship to make an act of bullying harassment and outright destruction of her planned future with the connivance of Dr, Bowman, Webster, and the other participant in the Wardlaw scheme of the decision. These actions and omissions had caused emotional, mental distressed and psychological injuries to Bella.  (See *Exhibit # 7* attached hereto)    There has been no act of

disciplining and of conveying to colleges where they are applying for admission or scholarship  that the consequences follow them. Selective discriminatory unequal treatment of Wardlaw and the Wardlaw's associated defendants.

37. The plaintiffs reported the bullying and harassment to the Edison Police Department (see *Exhibit 4* attached hereto) and upon discovery by way of this action, since by Dr.  Bowman and Wardlaw's responsible staff  have not followed in their duty of disciplining, they will proceed parallel to this action to file criminal complaints for bullying, harassment, concealment of a criminal act, aiding and abetting, and accessories after the fact against all persons that discovery show participated and chose not to act.

38. Neither academically nor athletically the Defendant Wardlaw nor on the bases of excellence the defendant Wardlaw and its agents had  any legal ground to deny graduation, ostracize and follow up on the criminally coercive measures in violation of the state constitutional rights of Bella. Contrition is a religious term, the demands forced upon her under the threat of no graduation and no diploma is not only an invasion and violation of US Constitution First amendment and Article I paragraph 6 of the New Jersey constitution but even more profoundly to her interior silent freedom to entertain her own independent thought. This is the USA not the Old Soviet union where there was no freedom to think interiorly differently than authorities. (See *Exhibits # 5* and *# 6* the Grades of Bella and her soccer professes).

39. It was not only to the events that were listed above in *Exhibit # 15* that this criminally coercive measures aimed and deprived Bella to all of the rights to the awards and recognition that she won and were promised to her in the Rams awards of the school she was not even mentioned when she had broken every record possible in soccer for the

school, attended every practice without failing for four years, scored 106 goals  and broke

all records in Wardlaw ( see in *Exhibit # 15* the letter of her mother to Defendant

Webster and his lame answer to the GMC certificates and wanting to speak personally).

The hush, hush of Dr. Bowman to crime, the hush, hush response to failure to investigate

and coercive vindictive measures of defendant Webster are among the causes of Bella

that is receiving psychological and medical treatment as a consequence of the actions of

the defendants. The vindictive nature of Webster went to preclude the issuing of letter of

recommendation from teachers to Bella. (See *Exhibit # 18* attached hereto).

40. The letter of imposition of defendant Webster also stated " We understand that the initial

reaction when trouble arises is often to protect oneself and try to protect oneself and try to

deny responsibility. However,  you had a period of a month prior to the Judiciary Board

hearing and another month following it where you could have changed your initial course

and acknowledge you had not been truthful". There was no initial course, Bella did not

broadcast the doctored clip, there is no evidence of racist conduct by her and no evidence

of negative effects since the alleged date of edited  statements. The creators of any

negative impact that the school now after two years says that is the consequence of the

doctored statements, if any were not caused by Bella but by the broadcasters that are

condoned for their actions by the failure of the school to discipline them.

41. Defendant Webster did nothing to find the truth. He did not do any work to find the

persons that used the school's internet domain to disseminate the clip despite his avowal

statement of the damage that this would do to the school functioning and its community

and to the image of the school, he apparently did not hear the clip with keen ears because

the last sounds are cut indicating other words following it that should had alerted him of the possible doctoring and editing of the clip.

42. Defendant Webster failed in his duty; he owed this duty to Bella. Wardlaw and its personnel also failed on this same duty owed to Bella.

43. Defendant Webster owed this duty to her parents. Wardlaw and its personnel owed this duty to her parents.

44. Defendants Webster, Wardlaw, and Wardlaw's personnel owed this duty to all students and parents of Wardlaw.

45. Defendant Webster failed on his duty as an educator in respect to the culture to which the students of Wardlaw are exposed, a culture where black rappers used the N- word freely and where there is the double standard in its usage that permits black when referring to other blacks to use it but not others that are non-blacks. He failed in knowing and using these nuances not to be vindictive, coercive, and harsh, he failed in his duty as an educator. Defendant Webster and Wardlaw in not investigating context and bullying and harassment using race as a weapon, they failed in their duty to Bella and their parents in acting destructively not pedagogically. Wardlaw had failed in not disciplining reverse racism.

46. The Defendant Wardlaw and its agents, employees and servants, acted in total disregard of the injuries that it would cause Bella, recklessly, wantonly, gross negligent not fitting corrective measure to the alleged violation in the context of when, how and its effects that would be proportional to the alleged harm, but insisted and did not take into consideration the harm that such punitive non pedagogical recklessness would bring to Bella and her future since they communicated to the colleges where she applied this

single incident and magnified its importance while seeking to hush the bullying and

harassment that made the alleged statements to be spread in the electronic media using

school internet domain.

47. Bella has been treated as an incorrect thoughts and beliefs "criminal" while the actual

criminals that committed the bullying, sabotage and harassment had not been investigated

and disciplined including the bringing of criminal charges against them.

48. Defendant Webster decided that in what was expressed by Bella there was no truth when

she did not genuinely recall the events. Racquel expressed this in her e-mail of March 2,

2021 and brought to the attention of him that Bella had been targeted  and bullied. It

advised  that the actions of the school and addressed the blockage of recommendations

from her teachers that was promoted by the censorship of defendant Webster and the

resulting anxiety attacks, mental distress, post-traumatic effects, and psychiatric injury

caused by the careless, reckless, grossly  negligent, handling of these by the school and

the school's servants, employees, agents and officers, with the consequential damages of

such conduct. (See *Exhibit # 27* attached hereto).

49. Bella is undergoing treatment medical and psychological for the injuries directly and

proximately caused by the defendants wrongful actions and will continue receiving

treatment in the future and her parents together with her had suffered, economic losses

directly and proximately caused by the actions and omissions of the defendants.

50. In addition to the anxiety, post traumatic syndrome, mental distress, and psychological

injury the defendants caused her brilliant soccer career, academic scholarship and athletic

scholarship destruction, she has suffered compensatory damages and consequential

damages and to the extent that the action or omissions that caused these damages were

intentional and reckless she has suffer damages that deserve a punitive award. (see *Exhibit # 7* attached hereto).

51. The Wardlaw Hartridge Student and Parent's Handbook was made part of the enrollment contract with the parents that signed the enrollment contract which states that the parents had read the Handbook 2019-2020 (*Exhibit # 10*) and are made part of that agreement, the pertinent portion cited herein of the Handbook at page 16 bottom paragraph section on deportment and social expectations. Bella is an intended third-party beneficiary of the enrollment contract.

52. The same Wardlaw- Hartridge Student and Parent's Handbook in its section on disciplinary policy, at page 15 states "we believe that our internal punishment should be commensurate with the violation and that when good standing is renewed the incident is complete. The punishment imposed on Bella was not commensurate with the alleged offense and despite her graduation the incident was never complete as what under the contract it should have been in violation of its expressed provisions.

53. The Wardlaw Hartridge Student and Parent's Handbook has sections on Bullying, Cyber Bullying and Harassment at page 15 and 16 of the Handbook, the Defendant Wardlaw and its agents, servants, employees and officers have violated this sections of the handbook and are in breach of the contract of enrollment signed by the Plaintiffs James and Racquel and in breach of the same contract as to the intended third-party beneficiary of the contract Plaintiff Bella.

54. The Wardlaw Hartridge Student and Parent's Handbook has a section on Social Network Policy/ Cyber Bullying including texting, the conduct of the "Wardlaw Uncensored" affecting the school community by threats, bullying, or harassing a

community member or damaging the school reputation, the defendant Wardlaw school and its personnel are in breach of this section page 24. The actions and omissions in violation of this paragraph and pages  by the school and personnel in failing to investigate discipline and prosecute the perpetrators of these bullying  are in breach of the contract of enrollment with Plaintiffs where Bella is an intended beneficiary.

55. The Wardlaw Hartridge Student and Parent's Handbook prohibits the use of electronic devices that capture images, sound or video at page 25 without written permission from appropriate faculty or staff members, the school violated by the email of imposition of Webster all of the above and these provisions. The school, and its personnel are in breach of the contract of enrollment with the Plaintiffs, Bella is an intended beneficiary of the enrollment agreement.

56. The Wardlaw Hartridge Student and Parent's Handbook also has the provisions of the awards to be granted, the school failed to grant Bella the awards that were hers based on the failure to have a commensurate punishment to the alleged offense that were not conditioned on her alleged views but on her sports performance. The school and its personnel breached the enrollment contract in failing to grant the awards and recognition for Bella's outstanding performance damaging Plaintiffs and Plaintiff Bella as the intended beneficiary of the contract. (See *Exhibit # 28* attached hereto). The persecution of Bella by the Defendant Wardlaw and its personnel went to the no provision when requested transcripts and providing them without indication that she had graduated. (See *Exhibit # 28*) .

57. The Wardlaw Hartridge Student and Parent's Handbook (*Exhibit # 10*) at Page 15 states " In a learning environment, it is important to be able to have a free exchange of ideas",

section on academic honesty.  Free exchange of ideas is not possible without freedom of speech. In penalizing free speech the Wardlaw school violated the contract of enrollment and is in breach to plaintiffs and Bella as an intended beneficiary of the contract.

58. Freedom of speech is protected against the action violating or compulsorily oppressing it by private persons or institutions under Article I, Paragraph 6 of the New Jersey Constitution.

59. On 3/12/2021 The Plaintiffs had a zoom meeting with Coach Casella and Jennifer Sansevero of Wagner College where Bella has received an athletic scholarship, after the zoom meeting they said plaintiffs should have an answer by Sunday March 14, 2021, based on their investigation and the college investigation of the matter of the disciplining of Bella as transmitted to them by Wardlaw and as alerted to them by the message of  Nadia Valcourt to Coach Casella (see *Exhibit 14* attached hereto). The Plaintiffs audio recorded the conversation with Coach Casella and Sansevero. Nadia Valcourt is Black Senior Student and Jennifer Sansevero is married to a Black male.

60. On 3/18/2021 Isabella wrote the Coach Casella and Jennifer Sansevero an email concerned and wondering about the status since they did not hear from them.

61. On 3/19/2021 Bella received an email stating Wagner College was withdrawing the scholarship due to bad conduct at her high school . It was followed by a longer, more detailed email on 3/21/2021. (see *Exhibit 20*, that also contains the copy of the  National letter of intent granting her the scholarship that was withdrawn).

62. On 3/21/2021 Racquel sent a reply to Wagner College demanding how they came to such a harsh decision. (*Exhibit 20*)

63. On 3/21/2021 Racquel had to write Andrew Webster an email to ask why the school counselor was not sending transcripts that Bella requested to the college. (See ***Exhibit 13***)

64. Despite constant request for Bella's grades transcripts during her submission for colleges applications there was a constant delay in providing the transcripts to the college and the plaintiffs, it surfaced on 3/23/2021 when plaintiff Racquel got an email back from one of the colleges counselor Chris Teare stating Mr. Webster told him to hold off all communication to plaintiff Bella and to speak before with Mr. Webster about the disciplinary matter. (See ***Exhibit # 17 and # 21***) Mr. Webster also intervened to preclude letters of recommendation that had to be processed through him. (See ***Exhibit 18***).

65. Bella was rejected from athletic recruiting by Saint Peter's University. (See ***Exhibit 26*** attached hereto).

66. On Monday, May 10, 2021, Racquel received an email from Lynn Pandure stating seniors' signs with their names for graduation will be at the driveway for pick up Friday May 14, 2021. Plaintiff Racquel went up there, but Bella had no sign. It required her father and mother to protest for Bella's name to be included, the ill will was manifested.

67. On Friday 5/14/2021 Bella's father Plaintiff James Wysocki called Mr. Webster after Racquel went on Wednesday May 12, 2021, to see if Bella's sign was out there along with all the graduate's signs were.

68. On 5/18/2021 Racquel wrote an email following up on the conversation Mr. Webster had with plaintiff James of May 14, 2021. Racquel got a reply on Wednesday May 19, 2021, with pictures that Bella's sign was finally placed out where all the other Graduates signs were. This was a week later than the time it had to be initially placed and it would have never been placed without the plaintiffs' intervention. (See ***Exhibit # 29*** attached hereto)

69. On 5/19/2021 when Bella applied for selection in the soccer team of Saint Peter's University in Jersey City the selecting personnel inquired about the video and wanted to hear her side out of the blue. James Wysocki saw the assistant soccer coach Nina from Wardlaw Hartridge on 5/22/2021 and she said that Coach Romo from Wardlaw knew that Bella was talking to Saint Peters. This was the source of the questions about the video, Wardlaw as a consequence of Wardlaw's intervention, Bella was rejected by Saint Peters University.

70. On 5/19/2021 a coach from Union County called to inquire about the video, she had contact with the Wagner coach.

71. On 5/22/2021 Bella's sign above was damaged; someone was trying to pull it out of the ground and damaged it. (See *Exhibit # 29* attached hereto)

72. The punishment continued even after graduation by giving Bella's transcript that she requested for applications to colleges with no indication that she had graduated from Wardlaw High School.

73. The school had represented to plaintiffs that the punishment for the violation of the provisions for conduct of the student was to be commensurate with the violation not excessive and not vindictive in order to induce the plaintiffs to enroll in the school. This has been an ongoing representation during the time that plaintiffs enrolled Bella in the school. (*Exhibit # 10*)

74. The school also represented that there would be not permitted in the school image and voice of recordings of their children without the permission of the school authority and the consent of the parents, it also represented that the school would not permit cyberbullying and bullying of whatever nature of it, nor harassment, and that no groups

based on race will be permitted to be formed among the students of the Wardlaw, whether in the school or away from the school but with base on the school student population. The school represented to the plaintiffs that all students were to be equally treated in respect to discipline for violations of the provisions in the School handbook. The school also represented that the school internet domain would be closely supervised to prevent the misuse by students and staff of that domain. The school represented that it would defend and promote free speech and thinking among the students. It also misrepresented that it assured the awards for academic performance and athletic prowess and all these representations were false. (Exhibit # 10)

75. Those representations were false and had been shown to be false, the school had permitted the creation of a race-based group of black students, internet postings by this race-based group, the recording of images in the school and the publication by it of doctored edited clips broadcasted by use of the school domain. (See Exhibits # 8, 9 and 10) These representations were made and continued to be made to plaintiffs with knowledge of their falsity with the objective that plaintiffs rely on them and it by the failure to discipline the broadcasting of this group condone and accepted the doctored clip as true and complete and tainted as a racist the Bella for an statement made years ago without any inquiry about what were her beliefs and tenets at the time in which the perpetrators committed the crime of bullying and harassment against Bella. This had caused the plaintiffs damages directly and proximately.

76. The school and its personnel through Dr. Bowman, Andrew Webster and with the participation of the other defendants wrongfully interfered with the bestowal of the scholarship and NIL of Bella with Wagner College wrongfully causing the

withdrawal by this college of the already granted benefit. This was a wrongful

interference in a contractual relationship and a prospective benefit for the plaintiffs. This

wrongful interference was a compounding of the intentional, utter disregard, gross

negligent and/or negligent conduct of the defendants Wardlaw, its officer and personnel

against the plaintiffs causing damages proximately to the plaintiffs.

77. Defendants Nadia Valcourt harassed Bella, bullied her, wrongfully and maliciously

interfered, intentionally, with the agreement, NIL that Bella has entered with Wagner

College and participated together with the other defendants in the damages inflicted to

her, including the mental distress, psychological injuries, and all of her losses. Her

actions and are part of the causation together with the actions of the other defendants in

the overall damages caused to Bella in particular and to the Plaintiffs in their totality. (see

Exhibit 14).

78. Defendant Wagner College, without a proper investigation on the reliability of the

information provided by the Wardlaw connected sources, the motives of the sources, their

bias, interest, and corruption from which it made the decision and without an in-depth

investigation of the facts adopted as true the decision and faulty criteria of defendant

Wardlaw and its sources breaching its promises to Bella and causing proximately injury

and damages to Bella. The defendant Wagner College owed the duty to Bella and her

parents of a non-negligent investigation done by observing the duty of care of a college

as a learning institution to truth of which is essentially issues of truth, free thought, and

free speech. The withdrawal of the NIL stigmatized Bella and since its effects were in

New Jersey violated as also Wardlaw violated her rights under Article I, Paragraph 6 of

the New Jersey State constitution. The withdrawal of the NIL by Wagner constitutes a wrongful repudiation and rescission of the NIL. (see Exhibit 20)

79. Implicit in the enrollment contract with Wardlaw and in the NIL is the covenants of good faith and fair dealing that were violated by both Wardlaw and Wagner College.

80. Defendant Wardlaw exercised censorship on the speech of Bella in violation of the enrollment agreement and the free speech provisions of the New Jersey State constitution. (See **Exhibit 23**)

81. The defendant Wardlaw violated the statutory provisions of N.J.S.A 18A:35-4.27 thorough 18A:37-28 and the plaintiff Bella was intended to be protected by this statutory framework, whether in its direct application or in its intention as a matter of public policy applicable also to private schools.

82. On information and belief every other rejection of colleges for admission of Bella as a member of their Soccer teams was a consequence of information provided or cause by Wardlaw, its personnel, officers, and the perpetrators. This negative attitude to the talents of Bella was a veiled concern of the family that despite Racquel addressing it to coach, the school failed to respond and address violation of the enrollment contract that made the handbook part of it. (Exhibit # 11)

83. On information and belief, Wardlaw, its officers and personnel know or should know the identity of the members of the "Wardlaw uncensored" that posted the bullying and harassing and doctored clip and have either concealed or are involved in an effort no to discovered it because among other it is a criminal act.

84. The defendant Forsyte maliciously, wrongfully, criminally and with the intend to sabotage and frustrate Bella's college career both academically and athletically and also

to bully and harass her caused postings on the internet to achieve this aim in pursuit of the same aim as the poster of the doctored clip. He had admitted, on information and belief his authorship and actions.

85. Defendant Wardlaw, its officers, servants and personnel has engaged in cover up of criminal conduct of bullying, harassment, and fostering an organization or organizations that engaged in bullying and harassment and in not reporting this criminal activity to the proper authority, such as the police. Furthermore, there have been no measure to find the members of the racist organization of black students that is evidence of the festering racism of the school environment. (See Exhibit 25). Nor any efforts with results of disciplining the members. There has been selective and unequal treatment of the student as to the rules as expressed in the handbook also in violation of the equal treatment express or implicit in the handbook.

86. Defendant Aum Mehta was one of the disseminator or participant in the creation of the doctored clip and as such caused the injuries and damages to the Plaintiffs and particularly to Bella, maliciously, intentionally, and criminally.

87. All of Defendants are severally and jointly responsible and liable for all of the damages cause to the plaintiffs and more particularly to Bella that were caused directly and proximately by the wrongful actions and omissions.

## CLAIMS FOR RELIEF

## COUNT I

## (BREACH OF CONTRACT AGAINST WARDLAW)

88. Plaintiffs incorporate  paragraphs 1 through  87 of the complaint as if fully set forth herein.

89. Defendant Wardlaw breached the contract of enrollment with plaintiffs and the provisions of the School Handbook that are incorporated to the contract.

90. The plaintiffs suffered damages directly and proximately caused by the breach.

**WHEREFORE**, plaintiffs demand judgment against Wardlaw for damages, compensatory, consequential, expenses, cost of litigation and reasonable attorney's fees and such other remedies as the court may deem just and equitable.

## COUNT II

## ( VIOLATION OF THE PLAINTIFF'S BELLA RIGHT TO FREE SPEECH  AGAINST WARDLAW, DR BOWMAN, CERMINARO, AND WEBSTER, COLLECTIVELY THE WARDLAW DEFENDANTS FOR THE PURPOSE OF THIS COUNT)

91. Plaintiffs repeat and incorporate the allegations in each and every prior paragraph of this complaint as if stated herein at length.

92. The Wardlaw defendants in conscious disregard to Plaintiff Bella's right to freedom of speech censored and punished him for exercising her Article I, Paragraph 6 of the New Jersey State constitution  right to free speech, punishment her for such act that are part of the representation that the school and personnel were to observe in accord with the handbook, when such act was not an abuse of her rights to free speech.

93. By said conduct Defendants violated Plaintiff Bella's right to her constitutionally protected free speech and freedom of association so guaranteed by the New Jersey State Constitution.

94.  As a proximate consequence thereof Plaintiff Bella has been injured, continues to be injured, and will be permanently harmed.

95. Defendants' conduct was a substantial factor in causing proximately to Plaintiff Bella's harm.

**WHEREFORE,** Plaintiff Bella demands judgment against the Wardlaw Defendants jointly and severally for damages compensatory, consequential, punitive, cost of litigation and reasonable attorney's fees and such other remedies as the court deems just and equitable.

## COUNT III

## (INTENTIONALLY WILLFUL  DISREGARD, GROSS NEGLIGENCE, NEGLIGENCE)

96. Plaintiff incorporates each and every prior allegations in this complaint as if fully set forth herein.

97. Defendants intentionally, willfully, or, gross negligent, or negligently, wrongfully, capriciously, arbitrarily, and in conscious disregard abrogated the rights of Bella under Paragraphs 1, 5 and 6 of the guarantees of the Article I of the New Jersey State Constitution.in particular her right to freely speak, write and publish her sentiments on all subjects which no policy, regulation, code, or law may restrain or abridge as guaranteed by Article I, Paragraph 6 to the New Jersey Constitution, deprived her of her earned and thus vested right to participate in her graduation ceremony, similarly revoked her earned and thus vested right to VIP reservations at said ceremony, and effectively expelled her there without any right to be heard administratively or judicially nor to appeal in any forum depriving her of counsel and even of the presence of her plaintiffs parents subjecting a minor to a an adjudicative process without the present of her parents all in violation of Article I, Paragraphs, 1, 2, 5, and 6 of the said constitution.

98. By said conduct defendants violated Plaintiffs Bella's right to her civil rights and to the rights guaranteed in the same constitution to life and property.

99. As a proximate consequence thereof Plaintiff Bella has suffered damages proximately caused by the violation of her constitutional rights, she has been injured, continues to be injured, and will be permanently harmed.

100. Defendants' conduct, as pleaded above, was a substantial factor in causing Plaintiffs' harm.

**WHEREFORE**, the plaintiffs demand judgment against the defendants for damages compensatory, consequential, punitive, cost of litigation and reasonable attorney's fees and such other remedies as the court may deem just and equitable

## COUNT IV

## (N.J.S.A 18:6A-2(B) AND TITLE VI OF THE CIVIL RIGHT ACT OF 1964)

101. Plaintiffs incorporate the prior paragraphs of the complaint as if fully set forth herein.

102. Defendant Wardlaw and the Wardlaw defendants as identified above in prior counts know that under the statute of New Jersey a private school is a non-public school that is in compliance with the provisions a guidelines, and criteria of Title VI of the Civil rights Act of 1964. The said guidelines and criteria forbid any de jure or de facto policy that foster or tolerate segregation whether directly or indirectly and the said defendants have intentionally, willfully, wantonly, gross negligent, in willful disregard of the guidelines and criteria tolerated and failed to stop and discipline, members of the student body that have created an organization based on race that was instrumental in the wrongfully, capriciously, arbitrary bullying and harassment of Bella and in the

sabotaging of her college acceptance into athletic programs and scholarship violating the
legal conditions of its operation and causing proximately the damages suffered by Bella
and her parents. This conscious disregard of the guidelines and the toleration and failure
to investigate ended up with the contradictory seeking to enforce and the enforced
imposition on Bella that subjected her to disciplinary sanctions in violation to the
measured approach that they represented falsely and that any way they breached as stated
in the Student and Parents Handbook and in doing so deprived her of her earned and thus
vested right to participate in her graduation ceremony, similarly revoked her earned and
thus vested right to VIP reservations at said ceremony, and effectively expelled her
therewith without any right to be heard with counsel or her parents administratively or
judicially nor to appeal in any forum and also deprive her from the NIL scholarship to
Wagner College, as well as the awards and recognitions in ceremonies for her athletic
prowess, by said conduct, also defendants violated Plaintiffs rights under the New Jersey
Education Code.  On information and belief, the defendant Wardlaw receives benefits
from the educational provisions established by rule and regulation by the State of New
Jersey, the Exhibit # 19)

103.     As a proximate consequence thereof Plaintiff Bella and her parents have been
injured, and Bella continues to be injured and will be permanently harmed.

104.     Defendants' conduct, as pleaded above, was a substantial factor in causing
Plaintiffs' damages.

**WHEREFORE**, Plaintiffs ask the Court:

1.  To enter judgment against defendants jointly and severally;

2.  To award Plaintiffs damages, compensatory, consequential, punitive costs of litigation and reasonable attorney's fees and such other remedies as the court might find fit and just.

## COUNT V

## (NEGLIGENT INFLICTION OF MENTAL, EMOTIONAL DISTRESS AND PSYCHOLOGICAL INJURIES)

105.    The plaintiffs repeat the prior allegations stated in the complaint as if stated here at length.

106.    The defendants Wardlaw, and Wagner College owed a duty of care to the Plaintiffs, and more particularly to Bella. These defendants failed to observe  their duty of care by commission and omissions.

107.    As a direct consequence of that failure and the  concomitant vindictive excessive and unmeasured and not commensurate imposition of sanctions on Bella by the Wardlaw defendants (Wardlaw, Dr. Bowman, Cerminaro, Webster, school personnel and servants) the plaintiff Bella have suffered mental, emotional distress and psychological injuries proximately caused by this negligence that have required , is requiring, and will require medical and psychological attention, treatment, and therapy.

**WHEREFORE**, Plaintiff Bella demands judgment against these defendants jointly and severally, compensatory, consequential, cost of litigation, reasonable attorney's fees, and such other remedies as the court may find just and equitable.

## COUNT VI

## (INTENTIONAL INFLICTION OF MENTAL, EMOTIONAL DISTRESS AND PSYCHOLOGICAL INJURIES)

108.     Plaintiffs repeat and incorporate the prior allegations in the complaint as if stated

herein at length.

109.     Defendant Andrew Webster acting within the scope of his duties for Wardlaw and

on information and belief  under the direction of Dr. Bowman intentionally and with

willful disregard of the rights of Bella inflicted on her mental distress by his series of

vindictive wholly without measure imposition of sanctions on Bella, and his continuing

restrictions on the issuing of transcripts, on the issuing of letter of recommendation , and

on information and believe his communication to the colleges where she applied with his

knowledge, and all of his actions imposed conditions to allow her to graduate, and all of

the coercive actions, when this is coupled with the failure to investigate of this team of

defendants (Bowman, Cerminaro, webster, their intervention to avoid the presentation of

witnesses and the exclusion of family and counsel from the  adjudication proceeding that

only sought admission with contrition and the acceptance of all conditions under the fear

of no graduation and an act of humiliating contrition by which Webster exercised the lack

of measure that would make any of his "penalties" wholly disproportionate to the alleged

act committed.

110.      As a consequence of this coercive oppression and the steps and threat of

destroying utterly her future,  Bella suffered injuries that required, are requiring and will

require, caused proximately, by the wrongful conduct of Webster. In addition both the

Parents of Bella and Bella herself had suffered economic losses caused by the campaign

of vindictive persecution of the defendants and the criminal coercion in violation of

N.J.S.A. 2C:13-5 (Wardlaw, Bowman, Cerminaro and Webster as well as the personnel,

employees, and servants of Wardlaw)

**WHEREFORE,** plaintiffs demand judgment against the defendants jointly and severally for damages, compensatory, consequential, punitive, cost of litigation, reasonable attorney's fees and such other remedies as the court deems just and equitable.

## COUNT VII

## (VIOLATION OF THE NEW JERSEY CIVIL RIGHTS ACT N.J.S.A.10:6-2 (C) AND (E))

111.    Plaintiffs repeat and incorporate the prior allegations in the complaint as if stated herein at length.

112.    The defendant Wardlaw, with the participation of defendants Dr. Bowman, Cerminaro, its personnel, employees, servants and agents, through the acts of defendant Andrew Webster acting within the scope of his duty as a servant and employee of the defendant Wardlaw violated the New Jersey Civil Right Act by depriving and interfering and/or the attempting to interfere, depriving, by intimidation and coercion with the enjoyment of the constitutionally protected rights of Bella in violation of N.J.S.A. 10:6-2 (c) and (e).

113.    The intimidation and coercion of Bella and the acts of interference as described above and in prior alleged facts, have caused directly and proximately damages to Bella and her parents, including, mental and emotional distress and psychological injuries as well as economic and financial damages as per N.J.S.A. 10:6-2(f).

**WHEREFORE**, Plaintiffs demand judgment against defendants jointly and severally for damages, compensatory, consequential, punitive, civil penalty, and injunctive relief commanding the defendant to stop the campaign of interference with the applications to colleges of Bella and further commanding to bestow on her and provide all of the awards and honors earned and won

34

by her during her student years at Wardlaw, cost of litigation and reasonable attorney's fees and such other remedies as the court may deem just and equitable.

## COUNT VIII

## (FRAUD)

114.     Plaintiffs repeat and incorporate the prior allegations of this complaint as if stated herein at length.

115.     The representations made by Wardlaw in The Handbook about the policies, rules, policies, and aims and about those that by incorporating them in the enrollment contract were made part of it and that were breached by defendant Wardlaw were false representations made with the purpose of obtaining enrollment and used to induce the plaintiffs into entering into the enrollment contract, there was no intention from the inception to follow them nor to implement them and throughout the years in which the plaintiffs enrolled Bella Wardlaw were in fact lies to bring them to Wardlaw,  that these representations of the policies and the portrait in the handbook are false had been unmasked by The hell in which Bella is the victim and by the treatment of the defendants of the perpetrators.

116.     Wardlaw's principal, officers, personnel, knew that they were lies created for the plaintiff to rely on then and the plaintiffs in fact relied on them to their detriment.

117.     The plaintiff suffered damages directly and proximately caused by the false representations of Wardlaw its officers, personnel, employees, servants and agents, including but not limited to Dr. Bowman, Andrew Webster, Mrs. Cerminaro.

118.     Dr. Bowman, did not go to the police to report the bullying and harassment, there was no sanctions against Austin Forsythe (See Exhibit 12)  neither  against, Taliyah

Williams (See Exhibits 8 and 9), Nadia Valcourt (See Exhibit 14), the Black Student Alliance that practice reverse segregation tolerated by The Wardlaw defendants,  nor any investigation and disciplining of the Wardlaw Uncensored posting, who was behind it the doctoring of the clip despite the posting including in it pictures and/ or names of students one which was Dr. Bowman's son.

119.     Dr. Bowman was demanded by Racquel that he go to the police for the bullying and harassment of Bella and with knowledge of this demand failed to do it becoming an accessory after the fact of a crime.

120.     The falsity of the representations, the breach of the enrollment agreement is patent. False representation, made knowing their falsity, intended for plaintiffs to rely on them, the plaintiffs relied on them and suffer damages caused by them.

**WHEREFORE**, Plaintiffs demand judgment against the defendants jointly and severally for damages compensatory, consequential, punitive, cost of litigation and reasonable attorney's fees and such other remedies as the court deems just and equitable.

## COUNT IX

## (VIOLATION OF THE NEW JERSEY CONSUMER FRAUD ACT)

121.     Plaintiffs repeat and incorporate the prior allegations in the complaint as if stated herein at length.

122.     Wardlaw advertises to consumers for the purpose of enrollment and the Handbook is used as a means of reaching consumers.

123.     The misrepresentations stated above are part of the advertisement and reach to consumers in this fraudulent practice. The false representations constitute fraudulent business practice.

124.     The plaintiffs had been damaged by this fraudulent business practice as consumers because of their reliance on the false representations and the damages were proximately caused by these fraudulent business practices. These practices are proscribed by the New Jersey Consumers Fraud Act.

125.     The damages to Plaintiffs are ascertainable.

**WHEREFORE**, Plaintiffs demand judgment against the defendants jointly and severally for damages compensatory, consequential, punitive, treble, cost of litigation and reasonable attorney's fees and such other remedies as the court may deem just and equitable.

## COUNT X

## ( VIOLATION OF THE COVENANTS OF GOOD FAITH AND FAIR DEALING)

126.     Plaintiffs repeat and incorporate the prior allegations of the complaint as if stated herein at length.

127.     The defendant Wardlaw violated and breached the implied covenants of good faith and fair dealing and caused proximately damages to the Plaintiffs.

**WHEREFORE**, Plaintiffs demand judgment against the defendant Wardlaw for damages compensatory, consequential, cost of litigation, reasonable attorney's fees, and such other remedies as the court may deem just and equitable.

## COUNT XI

## ( NEGLIGENCE AGAINST WAGNER COLLEGE)

128.     Plaintiffs repeats and incorporates the prior allegations in the complaint as if stated herein at length.

129.     Wagner College, its servants, employees, officers, and agents breach the duty of care that they owed to Bella, failing seriously to investigate in depth the circumstances of

the disciplining of Bella.  And this breach of duty caused Bella the loss of the NIL and

scholarship and her career as a soccer player in Wagner College.

 **WHEREFORE**, Plaintiffs demand judgment against the defendant for damages compensatory,

consequential, cost of litigation and reasonable attorney's fees and such other remedies as the

court may deem just and equitable.

## COUNT XII

### (BREACH OF CONTRACT AGAINST WAGNER COLLEGE)

130.     Plaintiffs repeat the prior allegations in the complaint as if stated herein at length.

131.     The parents of Bella were intended beneficiaries of the NIL agreement with

Wagner.

132.     Wagner College as a higher education institution is based on free statement of

thought and free speech.

133.     The NIL was based on academic performance and athletic performance no on the

subjective views of Bella, Wagner without investigation of the true views of Bella and

without consulting her about the said view repudiated the agreement with Bella and her

family on grounds that were not those on which the agreement with her was based

without any valid serious inquiry about the truth of the charges and in violation of her

constitutional rights under the New Jersey Constitution. The withdrawal and repudiation

of the NIL breached the contractual agreement between Wagner and the Plaintiffs, and

the Plaintiffs have suffered damages caused directly and proximately by this breach.

**WHEREFORE**, Plaintiffs demand judgment against Wagner College for damages

compensatory, consequential and for cost of litigation and reasonable attorney's fees and such

other remedies as the court may deem just and equitable.

## DEMAND OF JURY TRIAL

Plaintiffs demand trial by jury on all issues.

## DESIGNATION OF TRIAL COUNSEL

Pursuant to ***R.4:25-4***, Tomas Espinosa, Esq. is hereby designated as trial counsel.

Dated: 07/15/2021          /s/      ***Tomas Espinosa, Esq.***
                                    Tomas Espinosa, Esq.
                                    Attorney for Plaintiffs

## CERTIFICATION PURSUANT TO R. 4:5-1 AND RULE 1:38-7(b)

The undersigned hereby certifies that this matter is not the subject of any other action

pending in any court or arbitration proceeding. The undersigned hereby certifies that he knows of

no other parties who should be joined in the action at this time.

I certify that confidential personal identifiers have been redacted from documents now

submitted to the court and will be redacted from all documents submitted in the future in

accordance with ***Rule 1:38-7(b)***.

Dated: 07/15/2021                  ***/s/ Tomas Espinosa, Esq.***
                                   Tomas Espinosa, Esq.
                                   Attorney for Plaintiffs

Tomas Espinosa, Esq.
Att. Id. No. 025691985
8324 Kennedy Blvd.
North Bergen, NJ 07047
Tel: (201)223-1803/ Fax: (201)223-1893
E-Mail te@lawespinosa.com
Attorney for Plaintiffs Isabella Wysocki, James Wysocki and Racquel Wysocki

| | |
|---|---|
| Isabella Wysocki, James Wysocki and  Racquel Wysocki<br><br>Plaintiffs<br><br>v.<br><br>The Wardlaw- Hartridge School,<br>Christine Cerminaro,<br>Robert M. Bowman, PhD,<br>Andrew Webster,<br>Austin Forsythe,<br>Wagner College,<br>Nadia Valcourt,<br>John Does (a fictitious designation of 1-10 male persons)<br>Jane Doe (a fictitious designation of females 1-10)<br>Defendants | SUPERIOR COURT OF NEW JERSEY<br>UNION COUNTY- LAW DIVISION<br><br>CIVIL ACTION<br><br>DOCKET NO. UNN-L- 002443- 21<br><br>CIVIL ACTION<br><br><br>**VERIFICATION** |

I, Isabella Wysocki, under oath hereby swear, that the foregoing statements made by me are true

and that this action has been brought in good faith and without collusion.  I am aware that if any

of the foregoing statements made by me are willfully false, I am subject to punishment.

Dated 07/15/2021                                 *Isabella Wysocki*
                                                          Isabella Wysocki

Sworn and executed before me on 07/15/2021

Tomas Espinosa, Esq.
Attorney at Law in the State of New Jersey

40

Tomas Espinosa, Esq.
Att. Id. No. 025691985
8324 Kennedy Blvd.
North Bergen, NJ 07047
Tel: (201)223-1803/ Fax: (201)223-1893
E-Mail te@lawespinosa.com
Attorney for Plaintiffs Isabella Wysocki, James Wysocki and Racquel Wysocki

| | |
|---|---|
| Isabella Wysocki, James Wysocki and Racquel Wysocki<br><br>Plaintiffs<br><br>v.<br><br>The Wardlaw- Hartridge School,<br>Christine Cerminaro,<br>Robert M. Bowman, PhD,<br>Andrew Webster,<br>Austin Forsythe,<br>Wagner College,<br>Nadia Valcourt,<br>John Does (a fictitious designation of 1-10 male persons)<br>Jane Doe (a fictitious designation of females 1-10)<br><br>Defendants | SUPERIOR COURT OF NEW JERSEY UNION COUNTY- LAW DIVISION<br><br>CIVIL ACTION<br><br>**DOCKET NO. UNN-L- 002443- 21**<br><br>CIVIL ACTION<br><br><br><br>**VERIFICATION** |

I, James Wysocki, under oath hereby swear, that the foregoing statements made by me are true

and that this action has been brought in good faith and without collusion. I am aware that if any

of the foregoing statements made by me are willfully false, I am subject to punishment.

Dated 07/15/2021

James Wysocki

Sworn and executed before me on 07/15/2021

Tomas Espinosa, Esq.
Attorney at Law in the State of New Jersey

41

Tomas Espinosa, Esq.
Att. Id. No. 025691985
8324 Kennedy Blvd.
North Bergen, NJ 07047
Tel: (201)223-1803/ Fax: (201)223-1893
E-Mail te@lawespinosa.com
**Attorney for Plaintiffs Isabella Wysocki, James Wysocki and  Racquel Wysocki**

| | |
|---|---|
| Isabella Wysocki, James Wysocki and  Racquel Wysocki <br><br> Plaintiffs <br><br> v. <br><br> The Wardlaw- Hartridge School, Christine Cerminaro, Robert M. Bowman, PhD, Andrew Webster, Austin Forsythe, Wagner College, Nadia Valcourt, John Does (a fictitious designation of 1-10 male persons) Jane Doe (a fictitious designation of females 1-10) <br><br> Defendants | SUPERIOR COURT OF NEW JERSEY UNION COUNTY- LAW DIVISION <br><br> CIVIL ACTION <br><br> **DOCKET NO. UNN-L- 002443- 21** <br><br> CIVIL ACTION <br><br> **VERIFICATION** |

I, Racquel Wysocki, under oath hereby swear, that the foregoing statements made by me are true

and that this action has been brought in good faith and without collusion.  I am aware that if any

of the foregoing statements made by me are willfully false, I am subject to punishment.

Dated 07/15/2021

Racquel Wysocki

Sworn and executed before me on 07/15/2021

Tomas Espinosa, Esq.
Attorney at Law in the State of New Jersey

42

# EXHIBIT # 1





UNN-L-002443-21   07/15/2021 8:36:26 PM   Pg 4 of 54 Trans ID: LCV20211669062
Case 2:21-cv-14132-WJM-CLW   Document   Filed 07/26/21   Page 47 of 186 PageID: 239









Case Name and Number Unknown

# Forensic Video Analysis

Justin Rosander
Video, Image & Audio Analyst
IAOC, IAEC
JSM Studios, LLC
Phone: 559-321-2009
Email: justin.rosander@jsmstudios.com
www.jsmvideoforensics.com
2491 Alluvial Ave STE 88
Clovis, CA 93611

Prepared by Justin Rosander
JSM Studios, LLC
April 5, 2021



## Table of Contents

Qualifications _____ 3

Case Information _____ 14

Authentication Analysis _____ 15

Working Files _____ 28

Conclusion Summary _____ 28



## Qualifications

**<u>Employment History:</u>**

**Video, Image & Audio Analyst**
JSM Studios, LLC
Clovis, CA
2005-Present
Duties:
> Audio engineering, forensic audio enhancement, audio authentication, audio analysis, audio comparative analysis, speaker identification, audio mixing and mastering, live audio recording, film scoring, audio engineering and composing for television networks, video production, forensic video enhancement, video authentication, video analysis, video comparative analysis, image authentication, image enhancement, facial identification, photogrammetry, speed analysis, height analysis, redaction, spotlighting, proprietary format conversion, video post production, narrative report writing, live video recording

**Field Investigator**
Resources West Investigations
Clovis, CA
2011-2015
Duties:
- Collecting video evidence for a variety of cases
- AOE/COE audio interviews
- Private investigations
- Narrative report writing
- Testifying in court

**AOE/COE Investigator**
Universal Insurance Services
Los Angeles, CA
2015-2018
Duties:
- AOE/COE audio interviews
- Private investigations
- Narrative report writing
- Testifying in court

**<u>Education:</u>**

**Bachelors of Arts**
Major in Liberal Studies-Blended Program
California State University, Fresno
Fresno, CA
2005-2010

Page 3



## Training and Qualifications:

**Video evidence training symposium hands-on workshop**
iNPUT-ACE
Online
03/30/2021 (4 CEU)
- Apply course concepts to real world examples that reflect current challenges.
- Hands-on experience working with actual case footage.

**Video evidence training symposium**
iNPUT-ACE
Online
03/22/2021-03/25/2021 (12 CEU)
- Video investigation units – How the media is leveraging open source intelligence to conduct forensic video examinations
- Civilian oversight: The influence of video on public perception
- Video examination and admissibility in the courtroom – Are you an expert?
- Fusion of 3D technologies and imagery
- Advancements in technology for calculating speeds
- From expert to expert witness – A defense attorney's perspective
- Defending against recent challenges to video evidence
- Fast forward: Emerging trends in video evidence

**Forensic analysis and authentication of digital audio**
National Center for Media Forensics, University of Colorado Denver
Online
03/15/2021-03/18/2021 (Valid through 03/18/2024)
- Studying theoretical aspects regarding advanced principals in forensic media authentication, digital signal analysis, and audio authentication.
- Hands-on practice in digital audio recording, seizing evidence, and scientific testing for audio authentication.
- Extensive discussions about data file analysis, compression level analysis, application of the electric network frequency, and forensic expertise in the authentication of digital audio

KNOWLEDGE
- Gain new perspectives to understand:
  - The latest forensic audio authentication techniques.
  - Advanced principles of forensic audio authentication.
  - Limitations of the forensic expert.
  - Digital evidence seizure and acquisition.
- Acquire knowledge that either enhances or is not covered in scientific literature.

SKILLS
- Take entrance and exit exams to gauge course's effectiveness while informing student regarding the advancement of their knowledge.



- Practice audio authentication procedures.
- Work with digital evidence.
- Apply advanced techniques for forensic audio authentication.
- Demonstrate a familiarity with general topics related to forensic audio.

DISPOSITIONS
- Gain an appreciation for advanced issues in forensic audio.
- Be able to critically evaluate different forensic audio equipment, software, and methods.
- Enhance awareness of needs and opportunities in the field of forensic audio.

COURSE CONTENT:
- Foundations for Forensic Audio Authentication
    - Digital Recording Techniques
    - WAV Format
    - Lossy Compression Formats
- Theory, Demonstration, and Practice
    - Digital Evidence Seizure and Acquisition
    - Forensic Audio Authentication
        - Structure and Format Analysis
        - Time Domain Analysis
            - Zero Levels
            - DC
            - Power
            - Butt-Splice
            - Stereo Phase Analysis
        - Frequency Domain Analysis
            - Spectrum
            - Long-Term Average Spectrum
            - Audio Compression Level
            - MDCT
- Audio Clone Detection
- ENF Analysis


**Forensic analysis and authentication of digital images**
National Center for Media Forensics, University of Colorado Denver
Online
03/01/2021-03/04/2021 (Valid through 03/04/2024)
- Studying theoretical aspects regarding advanced principals in digital image authentication, emerging science in media forensics, digital media evidence seizure and acquisition, and related aspects of law.
- Hands-on practice in digital image capture, processing, and authentication.
- Extensive discussions regarding scientific literature forensic expertise, and general digital imaging concepts.

KNOWLEDGE
- Gain new perspectives to understand:
    - The latest forensic image authentication techniques.

Page 5



- ○ Advanced principles of forensic image authentication.
- ○ Forensic techniques, emerging science, and limitations of the forensic expert.
- ○  Digital evidence seizure and acquisition.
- Acquire knowledge which either enhances or is not covered in scientific literature.

<u>SKILLS</u>
- Take entrance and exit exams to gauge course's effectiveness while informing student regarding the advancement of their knowledge.
- Understand the questions that they shall be able to answer as a forensic expert.
- Know how to manipulate digital evidence.
- Know how to apply advanced techniques for forensic image authentication.
- Demonstrate a familiarity with general topics related to forensic imaging.

<u>DISPOSITIONS</u>
- Gain an appreciation for advanced issues in forensic imaging.
- Be able to critically evaluate different forensic image equipment, software, and methods.
- Enhance awareness of needs and opportunities in the field of digital imaging.


<u>COURSE CONTENT:</u>
- Foundations for Forensic Image Authentication
  - ○ Forensic Principals
  - ○ Digital Evidence Seizure and Accusation
  - ○ Digital Photo Algorithms (JPEG)
- Demonstration and Practice
  - ○ Data Analysis
    - ▪ Structure Analysis
    - ▪ EXIF Analysis
    - ▪ Quantization Table Analysis
  - ○ Pixel Level Analysis
    - ▪ Global Analysis
      - Compression Level Analysis
      - Color Filter Array
      - DCT Analysis
    - ▪ Local Analysis
      - DCT Map
      - ELA Map
      - Correlation Map
      - Probability Map
      - PRNU Map
      - Blocking Artifacts Analysis
      - Aligned Double JPEG Analysis
      - Non-Aligned Double JPEG Analysis
      - Clone Detection
    - ▪ PRNU Analysis for Camera Identification



**iNPUT-ACE certified examiner (IAEC)**
iNPUT-ACE
Online
12/08/20, 12/10/20 (Valid through 12/10/2022)
<u>WORKFLOWS AND TECHNICAL CONSIDERATIONS</u>
- Students enrolled in Workflows and Technical Considerations will learn how to adjust frame rates, understand compression and incorporate filters and advanced processes. Students will develop the ability to resize and deinterlace video while preparing workflows and understanding how to properly use enhancement techniques on video evidence.

LEARNING OBJECTIVES
- Frame Rate Adjustments
- Intro to Compression
- Filters and Advanced Processes
- Resizing and Deinterlacing
- Preparing Workflows
- Enhancement

<u>NARRATIVE REPORTS AND DEMONSTRATIVES</u>
- Building on the previous course work, students will learn how to compile demonstrative reports to include embedded Sub Clips, Marked Images and descriptions specifically for sharing information between investigators, prosecutors and when testifying in court.

LEARNING OBJECTIVES
- Advanced Narrative Report Use
- Embedding Images and Video
- Utilizing Narrative Report Text
- Working with Shapes and Arrows
- Aligning Elements
- Report Templates

**iNPUT-ACE certified operator (IAOC)**
iNPUT-ACE
Online
11/05/20, 11/12/20 (Valid through 11/12/2022)
<u>INTRO TO iNPUT-ACE</u>
- Hands-on virtual course exposes students to the latest techniques and methodologies used to accurately interrogate and process digital multimedia evidence for the purpose of furthering a criminal investigation. Students are directed through the processes of recovering valuable evidence from video images using the software solution: iNPUT-ACE.

LEARNING OBJECTIVES
- User-Interface Orientation
- Playback & User Interface
- Creating Markers
- Creating Subclips
- Intro to File Conversion
- Standard Output Node



- Introduction to Projects
- Demonstrative Examples
- Intro to the Narrative Report

CASE MANAGEMENT

- Case Management builds on the Intro to iNPUT-ACE content by exposing students to advanced techniques and methodologies used to accurately interrogate and process digital multimedia evidence. Students will learn how to perform in-depth investigations using the built-in tools inside iNPUT-ACE.

LEARNING OBJECTIVES

- Video Terminology
- Intro to Hashing
- Working with Projects
- Investigation Workflows
- Real Case Walkthroughs
- Creating Demonstrative Exhibits
- Canvas Editor
- Concatenate Node

**Image and video analysis for mobile phone investigations**
Amped Software Inc.
Online
07/22/2020

- The power of Amped Authenticate to investigate an image's provenance and authenticity
- How to reveal the presence of manipulated/concealed areas.
- How Amped FIVE can enhance images and videos to make even more information accessible to investigators.

**For the record: How to quickly process all your videos (and audio) for release in Amped Five**
Amped Software Inc.
Online
06/23/2020

- Obtaining the best evidence from all your video sources: from analysis to enhancement.
- How Amped FIVE can be used for everything:
  - Converting proprietary videos
  - Enhancing a license plate or face
  - Audio and video redaction
- Converting video from nearly any source:
  - Body worn cameras to proprietary CCTV.

**Video evidence training symposium**
iNPUT-ACE
Online
06/01/2020-06/05/2020

- Conducting a video-centric Investigation: preparing for the end-game



- Legal issues and trends related to video admissibility
- Analysis and interviews for force investigators
- Calculating accurate timing from video
- Violent crime digital evidence recovery during Covid-19. How major cities are adjusting workflows.
- DVR evidence recovery-the good, the bad and the ugly
- Photoshop in the video analysis workflow
- Video evidence and photogrammetry-from the field though analysis
- More than meets the eye
- Getting started with iNPUT-AVE v.2.6

**Courtroom testimony for expert witnesses**
Law Enforcement & Emergency Services Video Association International (LEVA)
Columbus, OH
05/01/2019-05/03/2019
The essentials of trial procedure
- Preparing for court
- The role of the prosecutor, defense lawyer, judge and jury in the presentation of evidence
- Becoming qualified as an expert witness for the first time
- The role of the expert witness
- Knowing your limits as an expert witness
- Expert witness bias
- Keys to effective communication with the jury
- Testimonial do's and don'ts
- Handling direct and cross-examination
- Understanding common defense cross-examination strategies and how to work with them
- Daubert and Frye hearings
- Practical moot court training

**Utilizing video evidence in collision investigations**
iNPUT-ACE
Roseville, CA
01/24/2019
- Technical aspects of video evidence and how it is misinterpreted
- How spatial and temporal compression affect the way video appears and how it can affect the way untrained individuals interpret images
- How variable refresh rates affect the calculation of vehicle speeds and how to avoid the common pitfalls of simply 'counting frames' to get timing
- A case study of a recent court case where a forensic engineer's evidence was dismissed due to an inaccurate understanding of video compression and how interlacing affects images
- An introduction to HEX and macroblock analysis
- An overview of integrating video evidence into point cloud data via the new Photo Overlay Tool

**Digital video forensics: video analysis-content authentication-tamper detection**



eForensics-Raahat Devender Singh PhD
Online
2019

- Overview of basic concepts of digital videos: Video capture process, spatial and temporal sampling, motion estimation, frame-rates and bit-rated
- Video encoding standards and formats
- Overview of technical issues related to video recordings: Data losses and impairments, visual distortions and artifacts, video quality evaluation metrics
- Various categories of digital videos, based on the kind of recording device, placement of the camera, mode of capture, and environmental conditions at the time of recording
- Digital videos as forensic evidence and impact of CCTV
- Video evidence: Within and beyond the justice system
- Instances of use of video evidence in criminal investigations and litigations
- Concerns regarding content trustworthiness and examples of suspected footage tampering
- Admissibility of video evidence: Principles of general acceptance, issues and concerns
- Principles of forensic video analysis: collection, recovery, enhancement, analysis and interpretation of video evidence
- Active and passive, blind and non-blind forensics: Brief overview
- Source camera identification
- Active-non-blind methods of content authentication and their limitations
- Timestamp analysis
- Watermarks and digital signatures
- Passive-blind/basic integrity verification schemes and their limitations
- Hash value analysis, metadata analysis, hex editor analysis
- Dubbed video test
- Types of video forgeries
- Specialized passive-blind forgery detection techniques:
- Error Level Analysis
- Re-compression and transcoding detection
- Detection of frame-based tampering (frame-insertion, frame-removal, frame-replication/duplication, and frame-shuffling)
- Detection of copy-paste/splicing and upscale-crop forgeries
- Current research issues and challenges, future research avenues

**Forensic video analysis workflow**
iNPUT-ACE
Irvine, CA
12/06/2018-12/07/2018

- How to accurately and reliably examine digital video evidence for the purpose of furthering a criminal investigation
- How to produce subclips of relevant video data from larger video files
- An introduction to HEX and macroblock analysis
- Techniques to analyze multimedia metadata
- How to test, define, and articulate the technical limitations of proprietary digital video players



- How to build workflows for automating/batch processing multimedia
- Students will demonstrate a proficiency in iNPUT-ACE: A Dynamic Video Workflow Engine for Law Enforcement
- Knowledge of digital video compression in order to accurately interpret the reliability of video evidence
- How to determine accurate image refresh rates for the purpose of determining timing and other issues relating to motion and force, and to speed estimation
- Investigative techniques for the examination of video images to explore issues relating to batch processing, suspect tracking, metadata analysis, Use of Force, Speed Estimation, and Identification

**Facial identification**
Animetrics
Online
08/23/2018
- Facial identification utilizing ForensicaGPS
  - Morphological analysis, photo anthropometry, superimposition

**Speaker identification**
Enhanced Audio Inc.
Online
03/21/2018
- Speaker identification utilizing Speech Pro EVB
  - Audio preparation, voice biometric limitations, false acceptance, false rejection, calculating likelihood ratios, SNR, reverberation, interpretation of EVB results

**Forensic analysis and authentication of digital audio**
National Center for Media Forensics, University of Colorado Denver
Denver, CO
03/08/2018-03/10/2018 (Valid through 03/10/2021)
- Studying theoretical aspects regarding advanced principals in forensic media authentication, digital signal analysis, and audio authentication.
- Hands-on practice in digital audio recording, seizing evidence, and scientific testing for audio authentication.
- Extensive discussions about data file analysis, compression level analysis, application of the electric network frequency, and forensic expertise in the authentication of digital audio

KNOWLEDGE
- Gain new perspectives to understand:
  - The latest forensic audio authentication techniques.
  - Advanced principles of forensic audio authentication.
  - Limitations of the forensic expert.
  - Digital evidence seizure and acquisition.
- Acquire knowledge that either enhances or is not covered in scientific literature.

SKILLS
- Take entrance and exit exams to gauge course's effectiveness while informing student regarding

Page 11



the advancement of their knowledge.
- Practice audio authentication procedures.
- Work with digital evidence.
- Apply advanced techniques for forensic audio authentication.
- Demonstrate a familiarity with general topics related to forensic audio.

DISPOSITIONS
- Gain an appreciation for advanced issues in forensic audio.
- Be able to critically evaluate different forensic audio equipment, software, and methods.
- Enhance awareness of needs and opportunities in the field of forensic audio.

COURSE CONTENT:
- Foundations for Forensic Audio Authentication
  - Digital Recording Techniques
  - WAV Format
  - Lossy Compression Formats
- Theory, Demonstration, and Practice
  - Digital Evidence Seizure and Acquisition
  - Forensic Audio Authentication
    - Structure and Format Analysis
    - Time Domain Analysis
      - Zero Levels
      - DC
      - Power
      - Butt-Splice
      - Stereo Phase Analysis
    - Frequency Domain Analysis
      - Spectrum
      - Long-Term Average Spectrum
      - Audio Compression Level
      - MDCT
- Audio Clone Detection
- ENF Analysis

**Digital image authentication**
Amped Software Inc.
Henderson, NV
01/03/2018-01/04/2018
- Image authentication utilizing Amped Authenticate
  - Visual inspection, file format, JPEG structure, HEX viewer, HEX strings, EXIF, JPEG QT, Social media identification, thumbnails, DCT plot, JPEG ghost plot, correlation plot, histogram, color space, color channels, ELA, DCT map, blocking artifacts, ADJPEG, NADJPEG, correlation map, noise map, PRNU map, LGA, clone blocks, clone keypoints

**Photogrammetry**
Ikena Motion DSP

Page 12



Online
03/09/2017
- Photogrammetry utilizing Ikena Measure
  - Single view metrology, lens distortion correction, geometric planes, reference measurements, advanced measuring, limitations of Ikena Measure and SVM

**Experience**
- Obtained tens of thousands of hours of combined audio and video work since 2005.
- Has worked on thousands of cases.
- Has worked on cases along side law enforcement, FBI, DEA, ATF, GBI, district attorneys, US Department of Homeland Security, lawyers, private investigators, and insurance companies.
- Some cases include homicide, fraud, kidnapping, theft, personal injury, work place fatality, home invasion, child custody, assault, arson, intellectual property theft, identify theft, wrongful death, medical malpractice, missing persons, vehicular manslaughter.
- Has been qualified as an expert and testified at the federal level.
- Obtains over 200 hours of formal forensic training.

**Professional Association Memberships:**

- California Association of Licensed Investigators (CALI)
- Audio Engineering Society (AES)
- International Association for Identification (IAI)

**Most Recent Expert Testimony:**

**US v. Terrick Robinson Criminal Case No. 1:18CR5**
Forensic video analysis and enhancement
Prosecution
01/14/2020



## Case Information

**Retained by:** Racquel Wysocki
**Evidence received from:** imunozjefe@aol.com
**Files received:** IMG_0192.MOV



**Date received:** March 27, 2021
**Time received:** 8:01 AM-PST

**Statement of Duty:**
I understand that my duty as a forensic analyst is to assist the court by providing impartial, objective, unbiased and independent opinions uninfluenced by the party who has retained me.

**Software:**
- iNPUT-ACE, v.2.6.1
- Amped Authenticate, v.19348
- iZotope RX 6 Advanced, v.6.00.1210
- Adobe Audition, v.13.0.11.38
- Speech Technologies Center SISIII, v.3.0.561

**Definitions:**
Global Analysis- Examines the audio for global modifications: for example if traces of audio resaving are observed it can be concluded that the audio is not a device original, however we cannot conclude anything about its informative content as it may or may not be altered.

Page 14



Local Analysis- Examines the audio for local modifications: these are modifications which are only found in a specific area of the audio signal and are more correlated with possible alteration of the informative content, for example adding or removing portions of audio.

Global Analysis- Examines the imagery for global modifications: for example if traces of image resaving or resizing are observed it can be concluded that the image is not a device original, however we cannot conclude anything about its informative content as it may or may not be altered.

Local Analysis- Examines the imagery for local modifications: these are modifications which are only found in a specific area of the imagery and are more correlated with possible alteration of the informative content, for example removing or adding a subject.

**Objective:**
Video authentication analysis

## Authentication Analysis

**Hexadecimal Header:**                               **Hexadecimal Footer:**

     

**Hash Value:**

Filename:   IMG_0192.MOV
Filepath:   C:\Users\JSM Studios LLC\Desktop\CASE FILES\Racquel Wysocki Evidence File\
Filesize:   554284 bytes
MD5:        56670ff6046d81fc9183709f5e28eedf
SHA1:       a1a8b88e474719ab8ef80f39a9d902d10be9028d
SHA256:     4d7df80cf26468a5fc662f4583fd475d8fb42c2344a5405c7ee607bb8974c622

**Metadata:**                                          **File Information:**

Page 15





**GOP-Frame Analysis Header:**          **GOP-Frame Analysis Header:**

**Frame Hash-Frame Rate Up Conversion Header:**          **Frame Hash-Frame Rate Up Conversion Footer:**





*Status- Warning*

Comment:

- ○ The evidence file is not consistent with a device original video and is consistent with a social media screen re-record.

**Waveform Analysis:**                    **Spectrogram Analysis:**

                    

**DC Offset Analysis:**                    **Bit Depth Analysis:**

                    

**Power Analysis:**                    **Signal Zero Level Analysis:**

                    

**Phase Analysis:**                    **Long Term Average Spectrum:**





**Compression Level Analysis:**                    **Clone Detection:**



**Butt Splice Analysis:**

*Status- Warning*

    Comment:
        ○ Butt splices consistent with truncation detected.
        ○ Two recording devices detected.
        ○ Clones detected consistent with copy-move.
        ○ Local inconsistencies detected at the time frames listed below.


Time format: Time


Page 18



| Region 1 | 00:00:00.00000000 | 00:00:01.07396825 |
| Region 2 | 00:00:02.37761905 | 00:00:02.73698413 |
| Region 3 | 00:00:03.08340136 | 00:00:03.55197279 |

Time format: Time

| Region 1 | 00:00:01.07399093 | 00:00:02.37798186 |
| Region 2 | 00:00:02.73700680 | 00:00:03.08297052 |
| Region 3 | 00:00:03.55199546 | 00:00:04.64396825 |

Time format: Time

| Marker 1 | 00:00:01.08263039 |
| Marker 2 | 00:00:02.28859410 |
| Marker 3 | 00:00:03.56115646 |
| Marker 4 | 00:00:04.64136054 |

**Macroblock and Motion Vector Analysis:**          **Quantization Parameter Analysis:**



**Frames Extracted for Spatial Analysis:**

- *Frames with low quantization parameters were utilized for analysis*
  - Frames 00:00:01.064, 00:00:01:613, 00:00:02.814, 00:00:02.915





















**Compression Level Analysis:**



**Compression Level Analysis:**



**Histogram Analysis:**

**Histogram Analysis:**








**Color Space Analysis:**                    Color Space Analysis:




**Ghost Plot:**                              Ghost Plot:






**Discrete Cosine Transform:**

**Discrete Cosine Transform:**





**Error Level Analysis:**

**Error Level Analysis:**







**Correlation Map:**



**Correlation Map:**



**Photo Response Non-Uniformity Map:**



**Photo Response Non-Uniformity Map:**





**Luminance Gradient Analysis:**



**Luminance Gradient Analysis:**



**Clone Blocks:**



**Clone Blocks:**





**Clone Keypoints:**



**Clone Keypoints:**



**Color Channels-CMYK Y:**



**Color Channels-CMYK Y:**





*Status- Warning*
Comment:
- ○ Two recording devices detected.
- ○ A minimum of two recompressions detected.
- ○ Local inconsistences detected in the CMYK and error level analyses . Due to high quantization of the evidence file, further analysis of the original video file will be required in order to verify if the inconsistencies are due to informative content alteration, or high quantization parameters.

## Working Files

Filename:   IMG_0192_Working File.avi
Filepath:   C:\Users\JSM Studios LLC\Desktop\CASE FILES\Racquel Wysocki Evidence File\Working Files\
Filesize:   85961558 bytes
MD5:        9834108afeee8360b184577455b51de7
SHA1:       9f705a4783c6ade51885588eb408a20691acd11e
SHA256:     137285ab3ffede2eab88b8a2faf6a55fa95426d464fd78113f2ebce91829cd18

Filename:   Macroblock and Motion Vector Analysis Working File.avi
Filepath:   C:\Users\JSM Studios LLC\Desktop\CASE FILES\Racquel Wysocki Evidence File\Working Files\
Filesize:   85332102 bytes
MD5:        e31c53fc33a222a080a12648afcdffd7
SHA1:       a9874afd4b7725fca7ab40a8cdedcc9392a606d6
SHA256:     c6c602fb3f30cf86c1130808f01a7fd5c5bd9b7c38b7843b47f3e77f125b7aad

Filename:   Quantization Parameter Analysis Working File.avi
Filepath:   C:\Users\JSM Studios LLC\Desktop\CASE FILES\Racquel Wysocki Evidence File\Working Files\
Filesize:   85332102 bytes
MD5:        cc0aea701265d69bb1a4b3c5a26b9f7b
SHA1:       dd299a5504f98a8d3464cd61780d04b9135cc8ab
SHA256:     9b51b6ed18f7984c86535558668da3b941255cd5c12e1aca62ac4bb95ead9463

## Conclusion Summary

After global analysis it can be concluded that evidence file is not consistent with a device original video, and is consistent with a social media screen re-record. After local analysis, it can be concluded that the evidence file contains several inconsistencies within the audio signal and imagery. Due to high quantization of the evidence file, further analysis of the original video file will be required in order to verify if the inconsistencies are due to informative content alteration, or high quantization parameters. The hypothesis that the evidence file is a device original video file, has no support. The hypothesis that the evidence file contains possible informative content alteration has support.

# EXHIBIT # 3

6/6/2021                                     Mail - Tomas Espinosa, Esq. - Outlook

**Fwd: Email to Wagner college from wardlaw email .**

racquelb81@gmail.com <racquelb81@gmail.com>
Sat 3/20/2021 8:28 PM
**To:** Tomas Espinosa, Esq. <TE@lawespinosa.com>

This email was sent to the admission department at Wagner College  in Staten Island
with a 2sec clip from wardlaw Hartridge email students name is Nadia Valcourt.

### Email to Wagner

Email that was written to Wagner from wardlaw email along with a 2 second
clip .

Sent from my iPhone

Begin forwarded message:

> **From:** Bob Bowman <bbowman@whschool.org>
> **Date:** January 7, 2021 at 2:32:09 PM EST
> **To:** racquelb81@gmail.com
> **Subject: Email to Wagner**

To whom it my concern,

I feel it is appropriate Wagner College knows the types of
students and players they recruit and admit. For years, I have
endured racism at school, a lot of which being at the hands of
Bella Wysocki. It wasn't until yesterday that I finally received
proof. I know Wagner values respectful students who aren't
racists who are comfortable addressing black people as the n-
word. I trust that you will take necessary action as this is going
viral and do not want this connected to Wagner.

Thank you.

--
**Robert M. Bowman, Ph.D.**
**Wardlaw + Hartridge | Pioneering. Thinkers.**
Head of Upper School
1295 Inman Avenue
Edison NJ 08820

# EXHIBIT # 4

Main Form                                                    Page 1 of 3



**EDISON POLICE DEPARTMENT**
**EDISON, NJ**

| INCIDENT # / REPORT # | OFFICER | RANK | REVIEW STATUS |
|---|---|---|---|
| 21001231 / 1 | GHAFOOR, MOHAMMAD | PATROLMAN | APPROVED |

---

### INCIDENT #21001231 DATA

As Of 01/28/2021 13:44:52

---

#### BASIC INFORMATION

| CASE TITLE | LOCATION | APT/UNIT # |
|---|---|---|
| HARASSMENT | 1295 INMAN AVENUE | |

| DATE/TIME REPORTED | DATE/TIME OCCURRED |
|---|---|
| 01/08/2021 12:43:14 | On or about 01/08/2021 12:43 |

INCIDENT TYPE(S)/OFFENSE(S)
(2C:33-4A)HARASSMENT

---

#### PERSONS

| ROLE | NAME | SEX | RACE |
|---|---|---|---|
| REPORTING PERSON | WYSOCKI, RACQUEL | FEMALE | WHITE |
| VICTIM | WYSOCKI, ISABELLA | FEMALE | WHITE |

[ NO OFFENDERS ]

[ NO VEHICLES ]

[ NO PROPERTY ]

---

#### OFFICER REPORT: 21001231 - 1 / GHAFOOR, MOHAMMAD (445)

| DATE/TIME OF REPORT | TYPE OF REPORT | REVIEW STATUS |
|---|---|---|
| 01/08/2021 12:48:18 | INCIDENT | APPROVED |

---

#### NARRATIVE

On 07/07/2020 at approximately 1330 hours I spoke with Racquel Wysocki mother of victim Isabella Wysocki who states that her daughter has been targeted with harassment at Ward Law Hartridge High School. I spoke

with victim who responded to Headquarters with her mother and she states she received a soccer scholarship to Wagner University on 11/11/2020. On this date a fellow classmate by the name of Austin Forsyte had been rumored to state he was going to sabotage Isabella Wysocki's college career. A Taraas Erachshaw spoke with victim confirming that this was Austin Forsytes intentions.

Victim states the harassment began when she had posted a "Tik Tok" video of herself on 01/01/2021 that was copied by a possible suspect by the name of Aum Mehta and manipulated. The Video was then posted on to a Instagram account by the the of "Wardlaw_uncensored" on 01/03/2021. The video is of the victim dancing with suggestions that the victim is the type of individual to cheat while in relationships. The Instagram page was subsequently taken down by the suspect on 1/04/2021. It is assumed by the victim that Mehta is the suspect that created the account and posted the video. Fast forward to 01/04/2021, an e-mail was sent to Wagner Universities admissions department under e-mail account Nvalcourt2whschool.org. The e-mail contained a video of the victim stating a racial slur towards African American's. The video was also forwarded to the head coach of the soccer team of Wagner University a Phillip Casella. Due to the nature of the video, Wagner has advised the victim that her scholarship may be retracted. It is important to note that the scholarship is worth $250,000.00. Wagner University is currently contemplating whether they're going to accept the victim into their scholarship program. Understandably the victim and her family has

suffered from severe emotional distress over these recent incidents. I notified Detective Williams of the case. Total estimated loss for victim is $250,000.00.

**REPORT OFFICERS**

| | | |
|---|---|---|
| Reporting Officer: | GHAFOOR, MOHAMMAD | 445 |
| Reviewing Officer: | ZAVODA,DOUGLAS | 333 |
| Approving Officer: | WHEELER,EDWARD | 259 |

# EXHIBIT # 5



# The Wardlaw-Hartridge School

1295 Inman Ave
Edison NJ  08820
(908) 754-1882
FAX (908) 754-9678

**Isabella Wysocki**
150 Patricia Ave
Colonia, NJ 07067 USA

Birthdate ███003
Gender    Female
Parent/Guardian Mr. James Wysocki Mrs. Racquel
Enrolled 06/06/2017

## TRANSCRIPT

| School Year 2017/2018 | Grade | | 9 | | |
|---|---|---|---|---|---|
| | 1T | 2T | 3T | Final | Credit |
| English I | | | | 85 | 3.00 |
| Geometry | | | | 82 | 3.00 |
| Biology | | | | 90 | 3.00 |
| Global Humanities | | | | 91 | 3.00 |
| Spanish I | | | | 84 | 3.00 |
| Art I | | | | A- | 3.00 |
| Global Awareness T2 | | | | 94 | 1.00 |
| Physical Ed (YR) | | | | P | 1.00 |
| Health and Wellness | | | | P | 0.50 |
| Design for Scientific Thinking | | | | P | 0.00 |

**9th Grade GPA  87.68**

| School Year 2018/2019 | Grade | | 10 | | |
|---|---|---|---|---|---|
| | 1T | 2T | 3T | Final | Credit |
| English II | | | | 89 | 3.00 |
| Algebra II | | | | 88 | 3.00 |
| Chemistry | | | | 74 | 3.00 |
| Mod World History | | | | 87 | 3.00 |
| Spanish II | | | | 81 | 3.00 |
| Introduction to World Religion | | | | 86 | 2.00 |
| Physical Ed (YR) | | | | P | 1.00 |
| Health | | | | 96 | 1.00 |

**10th Grade GPA  84.72**

| School Year 2019/2020 | Grade | | 11 | | |
|---|---|---|---|---|---|
| | 1T | 2T | 3T | Final | Credit |
| English III | | | | 90 | 3.00 |
| Pre-Calculus | | | | 79 | 3.00 |
| Physics | | | | 93 | 3.00 |
| US History | | | | 87 | 3.00 |
| Spanish III | | | | 94 | 3.00 |
| Physical Ed (YR) | | | | P | 1.00 |
| Healthy Lifestyles | | | | 99 | 3.00 |

**11th Grade GPA  90.33**

| School Year 2020/2021 | Grade | | 12 | | |
|---|---|---|---|---|---|
| | 1T | 2T | 3T | Final | Credit |
| Senior English | 79 | 81 | | | 2.00 |
| Financial Literacy | | 93 | | | 0.25 |
| Statistics | 86 | 90 | | | 2.00 |
| Engineering Your World | 91 | 90 | | | 2.00 |
| AP Psychology | 99 | 95 | | | 2.00 |
| Spanish IV | 96 | 94 | | | 2.00 |
| Physical Ed (YR) | | | | | 0.00 |

**12th Grade GPA  91.07**

**Cumulative GPA  88.12   Earned Credits  68.75**
**Cumulative Unweighted GPA  87.97**

# EXHIBIT # 6



New Jersey High School Sports

# Girls Soccer: Greater Middlesex Conference player of the week, Oct. 2

Posted Oct 02, 2019



Bella Wysocki of Wardlaw-Hartridge takes a shot on goal in front of Chiara Catarinicchia of Gloucester Catholic during the NJSIAA North Jersey, Non-public B girlss soccer quarterfinals between Wardlaw-Hartridge and Gloucester Catholic at the Wardlaw-Hartridge School in Edison , NJ on 11-2-18. Wardlaw-Hartridge won 1-0. Scott Faytok | For NJ Advance Media

    249 shares

By Brandon Gould | NJ Advance Media for NJ.com

**Isabella Wysocki, Wardlaw-Hartridge, Jr.**

The junior scored five times last week as Wardlaw-Hartridge picked up a pair of wins and continued its great start to the season. The Middlesex County squad's lone loss this year came against St. Thomas Aquinas. In the rematch, Wardlaw-Hartridge won 4-1. Wysocki was one of four players, along with her sister Gabriella, to score in that game. Freshman Angelina Vargas had a big showing last week too, including a goal and three assists in that win over St. Thomas Aquinas.

Advertisement



**Recommended for You**



Everyone Wants To Retire Comfortably. Here's Our List of Top Advisors
SmartAsset

N.J. man charged with beating his 4-week-old son unconscious
NJ.com



This Game Can Train Your Brain To Think Strategically
Total Battle - Tactical Game Online

New Jersey High School Sports

# Wysocki nets 100th goal to lead Wardlaw-Hartridge girls soccer

Updated Oct 05, 2020; Posted Oct 05, 2020




Advertisement

I'm doing it
for our kids.

Vaccines work. Stay healthy

ENGLEWOOD
HEALTH         Ages 12+

Isabella Wysocki (2) of Wardlaw-Hartridge pushes the ball upfield in front of Jillian Visceglia (13) of St. Rose during the girls soccer South, Non-Public B semifinal between St. Rose and Wardlaw-Hartridge at the Edward J Brown Complex in Wall, NJ on 11-4-19. St. Rose won 3-2. Scott Faytok | For NJ Advance Media

 

By Mak Ojutiku | NJ Advance Media for NJ.com

Isabella Wysoki tallied a hat trick and earned her 100th career goal as Wardlaw-Hartridge rolled to a 7-0 win over Iselin Kennedy, in Iselin.

The senior striker reached the milestone just 11 minutes into the first game of the 2020 season.

Wysoki racked up 33 goals as a junior last year.

Angelina Vargas added on two goals and an assist for Wardlaw-Hartridge (1-0). Gabriella Wysocki tallied a goal and two assists, while Izabel Korycki scored once.

Recommended for You


New Jer
To Your
You Ow
North Be
EnergyBi


Police c
asked t
officer's
daught
NJ.com


Everyon
Retire C
Here's C
Advisor
SmartAs



# Season leaders

## GOALS

| | | |
|---|---|---|
| Isabella Wysocki | Wardlaw-Hartridge | 43 |
| Halley Russell | Riverside | 38 |
| Kristina Akseisen | Calvary Christian | 37 |
| Ashley Georgevich | Saddle Brook | 37 |
| Nina Verdecchio | Penns Grove | 37 |
| Titilayo Afolabi | Science Park | 35 |
| Gabriella Garita | Fort Lee | 34 |
| Hannah Cooksey | Pennsville | 32 |
| Savannah Smith | North Arlington | 31 |
| Naomi Delbury | Veritas Christian | 30 |
| Kayla Rozanski | Woodbury | 30 |
| Samantha Moxie | Edison | 29 |
| Kelli McGroarty | Eastern | 29 |
| Kelly DeGaetano | North Brunswick | 29 |
| Olivia Gouldsbury | New Milford | 28 |
| Alexis Pacheco | McNair | 28 |
| Gia Girman | Nottingham | 28 |
| Megan Donne | St. Dominic | 27 |
| Shannon Goodwin | Pascack Hills | 26 |
| Chisom Onyewuenyi | Orange | 26 |
| Briana Esteves | Science Park | 26 |
| Allanna Eucker | Bergen Tech | 24 |
| Julianne Leskauskas | St. Rose | 24 |
| Kayla Neves | Newark East Side | 23 |
| Madisyn Pitia | Pingry | 23 |
| Julianna Farina | Gateway | 23 |
| Madeline Labance | Vernon | 22 |
| Mya Stolarski | Matuchen | 22 |
| Sierra May | Belvidere | 22 |
| Bridget Dudziec | Lenape Valley | 22 |
| Mariana Valencia | Bayonne | 21 |
| Isabelle Kuzy | Holy Cross Prep | 21 |
| Peyton Gilmore | Delsea | 21 |
| Alyana Gonei | Teaneck | 21 |
| Skyler Matusz | Kearny | 21 |
| Sophia Ridoito | Buena | 21 |
| Briana Andreoli | Hawthorne | 20 |
| Katie Volpert | Highland Park | 20 |
| Emily Toresi Mary | Help of Christians | 20 |
| Sofia Milevski | Elmwood Park | 20 |
| Marianna Quinchia | Dwight-Morrow | 20 |
| Madison Smith | Kittatinny | 20 |

## ASSISTS

## Wysocki becomes Wardlaw's all-time leading scorer in historic GMCT upset



Bella Wysocki became Wardlaw-Hartridge's all-time leading scorer with 63 goals. She beat the mark of 62 held by Alex Garces and current assistant coach Valentina Margiottiello (pictured), who made the poster. Photo courtesy of Wardlaw-Hartridge.

By The Star Ledger
on October 18, 2018 9:34 PM, updated October 18, 2018 10:28 PM

6/6/2021                                    Mail - Tomas Espinosa, Esq. - Outlook



Scott Faytok | For NJ Advance Media

Bella Wysocki of Wardlaw-Hartridge takes a shot on goal in front of Chiara
Catarinicchia of Gloucester Catholic during the NJSIAA North Jersey, Non-public B
girlss soccer quarterfinals between Wardlaw-Hartridge and Gloucester Catholic at
the Wardlaw-Hartridge School in Edison , NJ on 11-2-18. Wardlaw-Hartridge won 1-0.

                    Comment                          0
                                                  shares

By Branden Gould | NJ Advance Media for NJ.com

### Isabella Wysocki, Wardlaw-Hartridge, Jr.

The junior scored five times last week as Wardlaw-Hartridge picked up a pair of wins and continued its great start to the seas
Middlesex County squad's lone loss this year came against St. Thomas Aquinas. In the rematch, Wardlaw-Hartridge won 4-1 \
one of four players, along with her sister Gabriella, to score in that game. Freshman Angelina Vargas had a big showing last we
including a goal and three assists in that win over St. Thomas Aquinas.

Sent from my iPhone

# EXHIBIT # 7

**Personal Counseling Services, LLC**
**215 Elm Avenue**
**Rahway, NJ 07065**
**(908) 347-4897**

June 3, 2021

Mr. Tomas Espinosa, Esq.
8324 Kennedy Boulevard 2nd Floor
North Bergan, NJ 07047

Dear Mr. Espinosa:

My name is Leo Battenhausen, and I am a Licensed Clinical Social Worker who has been
working with Isabella Wysocki and her family since early January 2021 when allegations arouse
regarding her making derogatory racial statements that were reported to her high school
administrators and subsequently created extreme emotional turmoil, upset, anxiety, Post
Traumatic Stress Disorder and severe depression. My understanding from her parents is that
the allegation was proven to be unsubstantiated by a technical expert in the field of tele-
forensics making matters even more terrifying and disturbing to Isabella and her family.

Isabella has been seeing me two to 3 times per week due to the amount of helplessness she is
experiencing. She was banned from attending classes, her senior prom and graduation, and
even though she diligently followed every instruction her school expected, has fallen into an
emotional desperation as she believes she has not been heard or fairly treated. She is a highly-
skilled soccer player and has been a model student all of her life. This incident was
unprecedented for such a dedicated young lady and has resulted in severe emotional damage
that will require perhaps years of psychiatric treatment or more.

The alleged incident has also caused extreme discord in Isabella's family, and disturbed their
sense of peace and equilibrium. Her college plans and scholarships that she earned have
become void because of these allegations, leaving not only emotional but tremendous financial
stress and burden on the entire family. It's my clinical opinion and observation that a stable
personality such as Isabella's could only be damaging, disturbing and even lead to much more
frightening actions if not treated fully and carefully as long as it is deemed medically necessary.

I am writing you this letter to offer any help and assistance I can regarding her case that I
understand you are managing from a legal standpoint. Please feel free to contact me at (908)
347-4897 if I can help support Isabella's case. Thank you.

Sincerely,
Leo J. Battenhausen, LCSW, LCADC

# EXHIBIT # 8

3:39

<



# Join the Black Student Union!! Inbox

☆

**Taliyah Williams** 3:31 PM

to 2021@whschool.org, 2022, 2023, 2024 ⌄

Hi everyone,

Clubs are starting soon, so I invite you to join the newly formed Black Student Alliance. The BSA is an affinity group meant to uplift the Black voice here at school. In the club, we'll talk about different topics and issues pertaining to Black students at Wardlaw, and Black students in general. The BSA will be responsible for advocating for Black students, promoting Black culture, and creating a sense of community to unity students working toward a positive change.

**Please keep in mind that since this is a race-based affinity group, only those with this particular identity are invited to join.**

If you are interested in joining, please fill out the Google Form or email me. I'm super excited to get things rolling!

Thanks!
Taliyah *(she/her)*



↩ Reply    ⏴⏴ Reply all    ➦ Forward

# EXHIBIT # 9

## Fwd: Join the Black Student Union!!

racquelb81@gmail.com <racquelb81@gmail.com>

Tue 6/8/2021 2:54 PM

**To:** Tomas Espinosa, Esq. <TE@lawespinosa.com>

Sent from my iPhone

Begin forwarded message:

> **From:** Isabella Wysocki <iwysocki@whschool.org>
> **Date:** June 8, 2021 at 2:52:43 PM EDT
> **To:** racquelb81@gmail.com
> **Subject: Fwd: Join the Black Student Union!!**
>
>
>
> ---------- Forwarded message ---------
> From: **Taliyah Williams** <twilliams@whschool.org>
> Date: Thu, Jan 21, 2021 at 3:31 PM
> Subject: Join the Black Student Union!!
> To: 2021@whschool.org, <2021@whschool.org>, <2022@whschool.org>,
> <2023@whschool.org>, <2024@whschool.org>
>
>
> Hi everyone,
>
> Clubs are starting soon, so I invite you to join the newly formed Black Student Alliance. The BSA is an affinity group meant to uplift the Black voice here at school. In the club, we'll talk about different topics and issues pertaining to Black students at Wardlaw, and Black students in general. The BSA will be responsible for advocating for Black students, promoting Black culture, and creating a sense of community to unity students working toward a positive change.
>
> **Please keep in mind that since this is a race-based affinity group, only those with this particular identity are invited to join.**
>
> If you are interested in joining, please fill out the Google Form or email me. I'm super excited to get things rolling!
>
> Thanks!
> Taliyah *(she/her)*

# EXHIBIT # 10

# The Wardlaw ~ Hartridge School



Student
&
Parent
Handbook

2019~2020

## Table of Contents

Wardlaw ~ Hartridge ..............................................................................1
  School ..............................................................................................1
    Student ........................................................................................1

# ALL-SCHOOL HANDBOOK
## Mission Statement and Core Values

<u>Mission Statement</u>

The Wardlaw-Hartridge School prepares students to lead and succeed in a world of global interconnection. We provide an educational atmosphere characterized by academic challenge, rigorous inquiry, support for individual excellence, diversity, and a familial sense of community

<u>Core Values</u>

The core values of The Wardlaw-Hartridge School community are:

- Integrity – our bedrock value, *sine qua non*

- Opportunity – Wardlaw-Hartridge develops academic and intellectual excellence in its students through programs that stretch their creative imaginations, improve their athletic and artistic skills, engage their sense of discovery, and develop a social conscience.  In the process, students take on leadership roles and learn how to work effectively in teams.

- Support – Every member of the Wardlaw-Hartridge faculty believes in a personal approach to educating and developing the whole child.  Wardlaw-Hartridge educators take the time, care, and interest in each student to call forth his or her best work.

- Diversity – The diversity of thought, background, and culture at Wardlaw-Hartridge distinguishes us among independent schools, strengthens the global orientation of our curriculum, and enriches the daily experience of every member of the school community, inside and outside the classroom.

- Community – When faculty members, students, parents, or graduates walk through the doors of Wardlaw-Hartridge, they have entered a home.  Our community is distinguished by an ethos of care and mutual respect, and a strong partnership with families.

- Sustainability – Wardlaw-Hartridge prepares students to become citizens whose beliefs and actions will create a more humane and sustainable global society.

## History of the School

The Wardlaw-Hartridge School traces its history to the founding of The Leal School for Boys in 1882 and The Misses Scribner and Newton's School for Girls in 1884 in Plainfield, New Jersey. These later became the Wardlaw Country Day School and the Hartridge School, respectively, and were merged in 1976 to form The Wardlaw-Hartridge School.  The Hartridge (Oakwood) campus became the K-7 Lower School, while the former Wardlaw Upper School campus three miles away in Edison became home to grades 8-12.  After extensive planning, the two campuses consolidated at Inman Avenue early in 1997. The school now includes Pre-Kindergarten through Grade 12. When the Vail-Deane School closed in 1991, Wardlaw-Hartridge accepted its students and perpetuated the Vail-Deane name by allowing its alumni to affiliate with Wardlaw-Hartridge. The 1882 Gallery on B Deck and the Vail-Deane Art Room and Courtyard on A Deck are visible reminders of the school's heritage.

## The Emblem and Colors

During the year of the merger, 1976, students were asked to design a new school emblem. The emblem, as depicted on the front cover, is a composite of ideas.  The oak tree symbolizes the sign of strength and harkens back to the Oakwood campus; the book represents learning; the torch, the sign of wisdom; and the scales represent equality found in and through education. The 28 olive tree leaves were used to show that we strive for perfection. To the Greeks, the number 28 was one of the perfect numbers; i.e., numbers that equal the sum of their factors. The motto on the emblem*, "Cognoscere et Conficere"* ("To Learn and To Achieve") joins those from Hartridge and Wardlaw, as do the school colors: green comes from the original Hartridge school colors and gold comes from the original Wardlaw school colors. *Tempora et Mor*es was adopted from Hartridge as the yearbook and *The Beacon* from Wardlaw as the name for the school newspaper.

## Core Team

The Core Team consists of the Division Head at each level, the School Nurse, the Learning Specialist, and the School Counselor. This team meets weekly within each division, Lower, Middle, and Upper, to discuss students who may need assistance of an academic, behavioral, social, or emotional nature. Individual teachers and advisors may be part of the Core Team meetings as needed. The team concept is designed to foster communication and group problem-solving skills on behalf of the student.

## Language/Learning Specialist

The learning process involves many developmental factors, and the Learning Specialist helps the school, students and parents understand how this process works for specific children. If children are emotionally secure and receive age appropriate challenge and encouragement, the prospect of academic success is enhanced as their cognitive skills develop over time. The responsibilities of the Language/Learning Specialist are as follows:

- to conduct academic screening for those students experiencing academic difficulties
- to act as a resource person to faculty, parents, and administration for Pre-Kindergarten through twelfth grade
- to provide recommendations for remediation

While the school can help identify for families how their children learn best, Wardlaw-Hartridge does not provide a Special Needs Program. The school may not be a good match for every student and will on occasion insist that an educational and/or psychological evaluation be carried out by a family to identify whether or not the school can meet a student's learning needs. Mild learning differences can be accommodated in the classroom as long as the student's family is willing to secure outside support for the child. The school provides extra help but not extensive individual tutoring and cannot meet the needs of students who need significant mediation or alteration of our college preparatory program.

## School Counselor

A normal part of the growth and development of children and adolescents is uncertainty and confusion about a myriad of issues. While in many instances the individual is able to sort things out for him or herself, or to do so with the aid of a peer or adult advisor, there are times when a trained counselor can be of help in the process. The role of the School Counselor is to provide short term individual and group counseling, to serve as a resource for parents, teachers and administrators, to support student success and wellness in all grades, PreK through 12, and to make referrals to mental health professionals.

Individuals or student groups are encouraged to bring personal concerns regarding social, behavioral, emotional or academic issues to the counselor. Parents are welcome to contact the counselor at any time regarding their child(ren). Faculty and staff can refer students or consult about a student. All discussions are confidential except in the following situations: if permission is granted to discuss the concern with specific parties or if the safety of the student or of others is involved. Parents of young students will always be informed if the counselor is working with their child over an extended period.

## School Nurse

The school nurse supports student success by providing health care assessment, intervention, and follow-up for all children within the school setting. The school nurse provides care to students or staff who has been injured or who present with acute illnesses. The school nurse is responsible for medication administration and the performance of health care procedures that are within the scope of nursing practice and are ordered by an appropriately licensed health care provider. In order to address potential health problems that are barriers to learning or symptoms of underlying medical conditions, the school nurse often engages in screening activities such as vision and hearing. Wardlaw-Hartridge requires each student to have an annual exam by his/her doctor. Scoliosis, height and weight, and blood pressure annual checks are therefore expected to be done by a private physician.

All fund raising by the Parents' Association, the Booster Club, and others must be coordinated through the Development Office.

## Guests

All visitors to the school must register at the Receptionist's desk.  Anyone not properly registered will be considered a trespasser and will be asked to leave the campus. Wardlaw-Hartridge students are expected to be courteous and welcoming at all times, and helpful whenever possible.

Student guests do not normally visit Wardlaw-Hartridge during the academic day. However, in order for such a visit to be permitted, the hosting student must receive permission from the Division Head at least one day before the guest visits the school and then inform the Admission Office of the upcoming visitation.  In addition, the hosting student must make arrangements for the visit with his or her teachers.  The guest of a Wardlaw-Hartridge student must be in proper school attire, upon arrival must register in Admission Office, be introduced to the Division Head, and abide by the school's rules.

## Jurisdiction of the School

Students are under the jurisdiction of the school while on school property, on school-sponsored trips, in school vans or buses, or on a private bus going to or from school. It is expected that students will exhibit good behavior in these situations.

## Medical and Emergency Contact Forms

State regulations require that schools have complete records of immunization <u>every year</u>. If these records are not on file prior to the opening of school, a student will be denied admission to class until the proper records are received.

In addition, all **students must have an up to date, signed Emergency Contact Form on file in PCR**, our online data system. This information is accessed by the Nurse, the Division Office, and the Athletic Department in cases of emergency. For safety reasons, participation in school activities or practices is not allowed until this online form has been completed. Please notify the Division Office if a change has been made to an Emergency Contact Form.

Wardlaw-Hartridge respects the privacy of sensitive material.  By signing the enrollment contract, the parent is aware and considered in agreement with the appropriate sharing of confidential medical information on a need-to-know-basis only. This will be determined by the School Nurse, and/or the Administration, and/or the "Core Team" members.

## Lost and Found

Students should check with the appropriate division administrative assistant or the gym lost and found for any misplaced books, valuables, or clothing.

## Re-enrollment Contracts

Wardlaw-Hartridge issues student reenrollment contracts for the following year in the winter. A re-enrollment contract will be withheld from any student on academic or social probation or for families with an unpaid tuition balance or in instances where parent lack of cooperation undermines the school's ability to work with the student. Partnership with parents is paramount; the school anticipates full support if disciplinary and/or academic issues arise.

The School reserves the right not to issue an enrollment contract. Previous enrollment does not guarantee the right to subsequent re-enrollment at Wardlaw-Hartridge. The enrollment contracts are subject to all policies and regulations of the School.

## School Closings, Delayed Openings, and Early Dismissals

*Honeywell Instant Alert®* will distribute the notification of any school closings, delayed openings, early dismissals, or any unexpected emergency in the Wardlaw-Hartridge community. Prior to the start of the school year, parents will receive instructions on how to indicate their notification preferences (telephone, cell phone, email). This should be done upon receipt of the instructions.

It is impossible to accurately predict what complications the weather may create for our families, faculty and staff. We try to hold school whenever possible, but we must also all be concerned with safety. If we do have school on a day when the driving conditions in your area are treacherous, please feel comfortable making the decision not to send your child or to

arrive late (particularly if your student is the driver). Please call the appropriate division office to let the division assistant know.

### School closings

School closings will be announced by *Honeywell Instant Alert®*. Beginning at 6:30 a.m. school closing information will be available by calling 908-754-1882 or viewing the home page's bulletin on the school's website at www.whschool.org.

### Delayed Opening

School will begin at 10:00 a.m. Students using school/public transportation will be picked up at their regular pick-up areas two hours later than their regularly scheduled pick up time. For example, if your regular pick-up time is 7:15 a.m., then your delayed opening pick-up time will be 9:15 a.m.

### Early Dismissal

On rare occasions it is necessary to call an Early Dismissal due to rapidly deteriorating weather. *Honeywell Instant Alert®* will distribute the notification. You will be asked to come and sign out your student with the division assistant. Any parents with students on afternoon transportation will also be contacted by phone to ensure that someone will be home to receive the student. We will send children in the Lower and Middle School home early only if we have had contact with an adult as identified on the student's Emergency Contact Form. If no such contact has been made, the child will stay in Encore and must be picked up at the parent's earliest convenience.

**School Trips**

Each year, the school sponsors day and overnight trips for students at every level, for both educational and recreational purposes. Parents provide permission for their children to go on any day trips when they sign the enrollment contract. Additional permission may be required for particular trips, and all overnight trips require specific parental permission. Students are expected to abide by all school rules on school-sponsored trips.

**Snowdon Library / Sonawalla Center for Global Learning (CGL)**

The Snowdon Library is housed on two levels and is staffed by a professional librarian.  The collection of books, magazines, and online resources are accessible on both levels for the use by the entire school community.

Lower School students have a scheduled library time in Lower Snowdon where students find material carefully selected and keyed to the Lower School curriculum.  All grade levels have access to a vast array of online resources which give the students access to scholarly periodicals, newspapers, books, and databases, all which are accessible 24/7.  Middle and Upper School students have access to a core collection of print materials housed in Upper Snowdon in the Sonawalla Center for Global Learning (CGL) with larger subject specific collections located in each discipline's department.  Research and investigative skills are strengthened as the student progresses through the Middle and Upper School.  The use of information gleaned from a variety of the Center's resources is stressed for students to complete assignments designed to meet specific curricular needs.

The CGL operates to inspire all students to explore new ideas.  Space in the Global Learning Center is available for students of all grade levels to do collaborative work but also includes quiet study rooms for individual work.  Smart board, Smart TV and Skyping capabilities are available in the larger conference/classroom space.

**Student Drivers and Passengers**

In order to ensure the safety of our students, the school prohibits students from driving other students in their cars without explicit written permission from the parents/guardians of the driver and the parents/guardians of the passenger(s). Student drivers who violate this rule will lose driving privileges and may face additional disciplinary action. Passengers who violate this rule may face disciplinary action as well.

**Summer Assignments**

Each year the school provides a comprehensive list of both required and optional choices for summer reading in order to encourage the development of reading skills in our students. The preponderance of evidence shows that the more a child reads and is read to, the more likely that child will develop higher level reasoning skills, writing ability, and vocabulary. Assignments for the summer reading will depend on grade levels. In the Upper School additional assignments in mathematics, history, and science are common.

**Transportation**

The Wardlaw-Hartridge School contracts with a school bus service to provide transportation to and from school for students living in nearby areas. This service is available at additional cost and must be arranged for an entire school year. In addition, some public-school districts provide transportation to Wardlaw-Hartridge at no cost to families in their districts. Further information, as well as the form necessary to qualify for public school district reimbursements, is available from the transportation office at extension 143.

All students riding on school buses are required to abide by the same rules of conduct that would apply to them if they were in school. Violations of those rules, or unsafe conduct of any kind, will be reported by the driver and will result in appropriate disciplinary action.  In addition, students must abide by the following rules:

- Students are required to remain seated with seatbelts on at all times.
- Students are to leave nothing (including refuse) on the bus when they leave.
- Written permission from parents is required when students are to be taken to a different location or when they will be taking a friend home.

# Behavioral Expectations

This section provides the academic and behavioral rules and guidelines by which the school expects its students to abide. Each division enumerates its own age appropriate way of responding to infractions in its own section.

**Disciplinary Policy**

Our disciplinary system is intended to hold students accountable for a high standard of conduct in all ways and to provide students with the opportunity to learn from their mistakes and earn renewed good standing in the school, except in the most egregious cases where expulsion is merited. We also believe that our internal punishment should be commensurate to the violation, and that when good standing is renewed the incident should be complete.

**Academic Honesty**

In a learning environment, it is important to be able to have a free exchange of ideas. There are occasions when homework, laboratory reports and certain projects may necessitate collaboration. While we encourage collaborative work when appropriate, students are responsible for completing assignments and assessments independently (unless otherwise specified by the teacher). When a student affixes his or her name to a homework assignment, paper, test, or exam, he/she is attesting to the originality of the work.  Plagiarism is the act of using without attribution or taking credit for someone else's work (e.g. another student, an author, the Internet, etc.).

We begin introducing these concepts in the earliest grades and hold students increasingly accountable as they progress through our program. Plagiarism is explained in detail in appropriate Middle and Upper School classes. The principle of academic honesty is held in the highest esteem by the faculty and administration; acts of plagiarism or cheating are considered major disciplinary infractions and may result in serious disciplinary action. See divisional section for complete discussions.

**Alcohol, Drugs, Tobacco**

As an institution of learning, the Wardlaw-Hartridge School is committed to providing an environment in which students can further their own intellectual, social, moral and physical development and in which students and instructors can work together in pursuit of knowledge and understanding. Wardlaw-Hartridge believes that a student's health and well-being are essential elements necessary for optimal learning. We believe that the use of alcohol and other drugs during adolescence is unhealthy and dangerous and undermines the learning process. The school incorporates drug and alcohol education into its health program and complies with state and federal statutes.

***Specific Rules***

Regardless of whether or not they are on campus or involved in a school-related activity, students enrolled at Wardlaw-Hartridge are not to engage in the use, possession, or distribution of illegal drugs or alcohol, and are not to abuse over-the-counter drugs or inhalants. Regardless of age, students are not allowed to use any form of tobacco on school grounds or at any school function. Furthermore, students are not to knowingly remain in the presence of any of the activities mentioned in this paragraph.

### Consequences of Violations

A student who violates the alcohol and/or drug rules as outlined above will be subject to disciplinary action, which may include expulsion, regardless of the student's previous disciplinary record. In addition, a student who violates the above policy may be required to undergo drug and/or alcohol counseling and/or random testing at parents' expense in order to remain at the school. Any student who chooses to remain in the presence of someone engaging in any of the prohibited activities may also be subject to disciplinary action.

### Drug and Alcohol Evaluation and Treatment

The school reserves the right, as a condition of continued enrollment at the school, to require drug or alcohol testing of any student who has engaged in drug or alcohol use or is suspected of doing so. Students who are referred for a drug/alcohol evaluation or testing must be seen at a school-sanctioned treatment center at parents' expense. This requirement may occur under the following circumstances:

- When a student violates or is suspected of violating the previously enumerated rules
- When the school believes that the student's behavior is indicative of drug or alcohol use. We believe that early intervention is critical to avoiding dependence or addiction.

The school must receive the results of the evaluation and the student must follow the recommended treatment in order for the student to remain in school.

### Self-referral and Referral by Friend(s)

A student who voluntarily confides in school personnel that he or she has a drug or alcohol problem will be referred to the school counselor and then to a drug evaluation and treatment facility that the school believes will provide the assistance needed. In order to ensure that the student is getting help, the school must receive the results of the evaluation, as well as all of any of their reports, recommendations, and ongoing reviews; and the student must follow the recommended treatment in order to remain in school. Referrals are held in the confidence of the Core Team (School Counselor, School Nurse, Learning Specialist, and Division Head) and the student's advisor; information will not be shared with the general faculty without permission of the student and family.

Students who want to help a friend with a drug or alcohol problem should feel free to confide in any faculty or staff member with whom he or she feels comfortable. That staff member will work confidentially with the school counselor to provide assistance as needed. This may be done anonymously. **In any self-referral or referral by friends, disciplinary measures will be secondary to the importance of securing help for the user.**

## Conduct in Common Areas

Each member of the Wardlaw-Hartridge community has the responsibility to help create a pleasant atmosphere conducive to learning. Whether in the library, the A.P. Room, in hallways, on athletic fields, or in the gym, conduct should reflect this ideal. Students are to help maintain a sense of decorum in all common areas of the school. As members of the Wardlaw-Hartridge family, we are all expected to respect our property, the property of others, and the campus we share.

## Deportment and Social Expectations

As stated in its mission, Wardlaw-Hartridge is committed to cultivating a deep respect for diversity of talents, interests, and backgrounds and is united by a shared commitment to excellence within an environment that encourages the personal growth of all in the community.

In order to provide an environment that fosters these goals and promotes mutual respect, tolerance and sensitivity to other people's rights and dignity, it is important that every member of the community — students and employees — adheres to guidelines for appropriate behavior. Behavior that exhibits respect for individual differences in culture, race, gender, ethnic origin, religion, sexual orientation, and opinion is encouraged. Those behaviors that inhibit these goals are abhorrent.

Our rules exist to promote these values and are reminders while self-discipline is being established. The ultimate goal of school discipline is self-discipline and maintaining the health, safety, and wellbeing of each member of our community. To assure the partnership among school, student, and parents in this regard, the school requires that all families read this *Handbook*. The rules are reviewed by advisors with Middle and Upper School students. A signature on the enrollment contract indicates that the parent has read the handbook as well.

Because violence, alcohol, drugs, stealing, unexcused absences, and dishonesty erode the possibility of excellence, our school takes a strong stand against them. Accumulation of offenses or repeated disregard for school rules, depending on their nature, may lead to major disciplinary action. See divisional section for complete discussion.

**Fire and Possession of Dangerous Objects**

Setting fires or threatening to set one is prohibited, and any student who participates in such activity will face dismissal from school and will be reported to the proper authority. Tampering with fire-fighting equipment or fire alarms is prohibited as well. No object which can kill or cause serious bodily harm shall be brought to school or used in school without the expressed permission of the Head of School. Furthermore, no item that is a "look-a-like" for illegal substances, alcohol, or weapons may be possessed, used, or distributed on the school premises or during any school-related activities.

**Harassment**

Wardlaw-Hartridge will not tolerate verbal, physical, texting or other online conduct that creates an intimidating, offensive or hostile environment or harasses, disrupts or interferes with another's ability to work, learn and play. Every member of the community has the right not to be harassed. Harassment can take many forms.

### *Bullying*

The school recognizes and will protect the rights of all members of the school community to be treated with respect, courtesy and tact. Actions or comments by students or adults that result in bullying of any member of the school community will not be tolerated. Such actions or comments include deliberate, cruel, repeated or unsolicited verbal comments, gestures, or physical actions.

In accordance with New Jersey state law (NJSA 18A:37-13 et seq) bullying is defined as " any gesture or written, verbal, or physical act that is reasonably perceived as being motivated either by any actual or perceived characteristic such as race, color, religion, ancestry, national origin, gender, sexual orientation, gender identity and expression, or mental, physical or sensory handicap, or by any other distinguishing characteristic, that takes place on school property, at any school sponsored function, or on a school bus that:

- a reasonable person should know, under the circumstances, will have the effect of harming a student or damaging the student's property or placing a student in reasonable fear of harm to his person or damage to his property or
- has the effect of insulting or demeaning any student or group of students in such a way as to cause substantial disruption in or substantial interference with, the orderly operation of the school."

### *Cyber Bullying*

Cyber Bullying is discussed as part of the Acceptable Usage Policy for Computers and Technology.

### *Sexual Harassment*

Sexual Harassment includes unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature when:

- an individual's submission to such conduct is explicitly or implicitly a term of the individual's education or employment;
- an individual's submission to or rejection of such conduct is used as the basis for decisions affecting the individual's academic standing or employment; or
- such conduct has the purpose or effect of unreasonably interfering with an individual's learning or work performance or of creating an intimidating, hostile, or offensive learning or working environment.

### *Responding to Harassment*

If a person believes he or she has been harassed or bullied in any way or has observed another being harassed or bullied, he or she should consider the following options:

- Tell the offending party that you do not like the behavior and that you want it to stop.
- Write a letter to the offending party or enlist the aid of a parent or friend who can help you speak to that person.
- Keep a record of the offenses, dates, what was said and/or done, who witnessed it, and keep any evidence.

- Speak to an advisor, teacher, counselor, nurse, coach, department head, or administrator about the behavior in question; this person can help you examine options.

Observation of possible illegal conduct of harassment or bullying should be immediately reported to the School's administration.

The close and positive relationships that exist among adults and students at The Wardlaw-Hartridge School are an important strength of the school. Students can feel comfortable seeking advice about any school related concern, including harassment or bullying, with their teacher, advisor, school counselor, or an administrator. Working with the student, the teacher or counselor must refer a complaint of harassment or bullying to the appropriate administrator.

In most instances complaints of harassment or bullying by a member of our community will be dealt with directly by the administration.  If deemed necessary, a special committee of faculty and staff will be appointed by the Head of School for thorough and prompt investigation.

The administration or the committee will consider all related information in determining whether the alleged improper conduct occurred and whether that conduct constitutes harassment or bullying. To the maximum extent possible, The Wardlaw-Hartridge School will protect the privacy of the parties involved.  Any attempt to interfere with or influence the investigation of a complaint of harassment or bullying is strictly prohibited. Retaliation for making such complaints will be treated as a serious violation of the standard of conduct expected in the Wardlaw-Hartridge School and can result in serious disciplinary action.

In all cases, those making such a complaint will be advised promptly of the results of any investigation and any remedy taken to address the complaint.

## Probation - Suspension - Expulsion

A student may be placed on probation or suspended by either the Division Head or the Head of School and will be notified of that decision in writing by the Division Head. Prior to re-admission from a suspension, a parent or guardian must meet with the Division Head.

Suspension, either in-school or at home, is a forced absence from school for major infractions.  A student on suspension might not be allowed to make up any academic work missed.

Expulsion is the permanent separation of a student from the school by the Head of School. A pattern or accumulation of disciplinary infractions - or any one offense deemed severe enough by the Administration - may result in a student's expulsion from school.

## Spectators at Events

Attendance at concerts, plays, and games means a great deal to students and helps us all know and support them more broadly.  Particularly at plays and concerts, audience members are asked to respect all performers by remaining until the conclusion of the performance and by turning off cell phones.

Spectators at athletic events play an important role in supporting and encouraging our teams, while also representing Wardlaw-Hartridge's values to our opponents, officials, and others. As such we expect them to "respect the game" by following the sportsmanship guidelines contained in the New Jersey Independent School Athletic Association (NJISAA) Sportsmanship Code:

- All spectators must conduct themselves in a positive manner, reflecting sportsmanship and the educational values of interscholastic athletics;
- Noisemakers and handmade banners are prohibited;
- Harassment in any form will not be tolerated;
- Spectators must remain in designated areas for the safety and enjoyment of the game for all. Failure to comply with the above rules may result in ejection from the premises.

### Unacceptable Uses

The following types of access are considered to be inappropriate uses:

- Accessing profane or obscene material, material suggesting illegal acts and material advocating violence or discrimination
- Using the access for illegal acts
- Attempts to access any resources that are restricted, confidential or privileged
- Posting chain letters
- Internet Relay Chat, news groups, or mailing list participation unless directed and supervised by a staff member for a classroom assignment
- Granting Internet or Network access to unauthorized persons intentionally or unintentionally, or failing to notify a teacher or administrator if you suspect someone of using your password
- Posting personal contact information. See Safety section below
- Agreeing to meet in person someone met online without parental approval or under the supervision of a teacher or authorized adult
- Attempts to disrupt access
- Causing damage to, detaching, or changing function, operation or design of the technology
- Using obscene, profane, lewd, vulgar, rude, inflammatory, threatening language
- Harassing another person
- Posting false or defamatory information
- Plagiarizing information found on the Internet
- Disregarding the rights of copyright owners on the Internet
- Causing or permitting material protected by copyright, trademark, or confidential data to be uploaded, published or broadcast in any way without permission of the school administration
- Posting web pages without the consent of a teacher or authorized adult
- Downloading large files (over 10 MB) without permission from an authorized adult
- Using the Internet for financial or commercial gain (ex. gambling)
- Using the school internet for non-educational purposes such as playing games of any kind
- Using proxy servers, port mappers, anonymous e- mailers or anonymous web surfing utilities is strictly prohibited and considered a major offense. Bypassing the W-H network, using network scripts and/or hacking into network devices will lead to serious disciplinary action

### Privacy

Network storage and email will be treated like school lockers. School administrators may review communications to maintain integrity system-wide and ensure that students are using the system responsibly.

### Illegal Copying

Students should never download or install any commercial software, shareware, or freeware onto network drives or computer hard drives, unless they have written permission from the Network Administrator; nor should students copy other people's work or intrude into other people's files.

### Inappropriate Materials or Language

No profane, abusive, or impolite language may be used to communicate, nor should materials be accessed which are not in line with the rules of school behavior. Should students encounter such material by accident, they should report it to their teacher immediately.

### Social Network Policy / Cyberbullying (including texting)

Advances in telecommunications and computer technology extend our school community beyond the border of our campus and beyond the hours of our school day. Students' off-campus technology use is not generally a subject we involve ourselves with unless this conduct adversely affects our school culture. Ways in which our school culture could be affected include defaming any identified member of the Wardlaw-Hartridge community; threatening, bullying or harassing a community member; or damaging the school's reputation. Wardlaw-Hartridge will not monitor the web for these offenses and cannot control the off-campus communications by students on various social networking sites, by text messaging or by other means. These matters must be resolved in most instances between students, their families or other sources. However, if an off-campus communication is brought to the school's attention, and we determine that it may adversely affect or disrupt the normal operation of the school, Wardlaw-Hartridge reserves the right to take disciplinary action against that individual.

The faculty and staff of the Wardlaw-Hartridge School believe that connecting with current students of any age or former students under the age of 18 through social networking websites is inconsistent with our desire to maintain an appropriate professional distance between our lives and our student's lives.  The faculty and staff will not make or maintain such connections.

### Cell Phones, Cameras, and Recording Devices

We recognize that cell phones can be invaluable in emergencies and can make it easier for parents to communicate with their children.  Thus, we allow students to bring cell phones to school. Each division enumerates its own age appropriate way of responding to infractions in its own section.

Electronic devices that capture still images, sound, or video are not to be used on campus or during any school-sponsored activities without written permission from the appropriate faculty or staff member. This would include but is not limited to the following: cameras, cell phones that capture still images, wearable "smart" technology, tape recorders, camcorders, and computer software (such as One Note), or any such device that captures images, sound, or video.  Violation of this policy will result in immediate confiscation of the device and may lead to further disciplinary action.

### Headphones, Wireless Devices, Music, Computer, and Video Games

During school hours, the use of headphones and any device playing music and/or computer-video games is prohibited in class. Additionally, wearing or using headphones is prohibited in the hallways. Headphones, music, and games may be used as a component of instruction with a teacher's consent.

### Safety

To be safe, it is important never to give out over the Internet personal information (address, phone number, etc.) to a stranger, just as one would not do so over the telephone. Remember, when emailing, instant messaging or surfing the web, personal information is NEVER 100% SECURE. The school also encourages parents to talk with their children about computer usage and monitor it as they might monitor their children's TV usage.

## Student iPad User Policy

*In the Middle School Participation in the iPad program is mandatory.

The focus of the middle school iPad program at The Wardlaw-Hartridge is to provide tools and resources to our students so that they may maximize their learning by fully integrating relevant technology into the academic arena. At all times students will be expected to use their iPads respectfully, maturely, and professionally.

The policies, procedures, and information laid out within this document apply to all iPads used at The Wardlaw-Hartridge, and they also extend to include any other technological devices considered by the Administration to come under this policy. The Wardlaw-Hartridge School retains sole ownership of the iPad and related equipment (i.e. case and charger).

Beyond these policies, teachers may set additional requirements for use in the classroom. It is each student's responsibility to familiarize him/herself with each of his/her teacher's specific policies. The Technology Department and the faculty retain the right to collect and/or inspect the iPad at any time and to alter, add, or delete installed software or hardware at any given time without notice.

### Damage or Loss

- If an iPad is found in an unsupervised area it should be taken to the division office or the Technology Department.
- Damage or loss must be reported to the Technology Department or the divisional office immediately. In the event that the iPad needs repair, the Technology Department has a limited number of loaner iPads.
- If a student forgets to bring the iPad or power charger to school a substitute will not be provided.
- All damage will be charged as necessary.
- Lost iPads must be replaced as soon as possible with a comparable iPad 2 or a newer model.
- The iPad policy remains in effect for the loaner.

Athletes should take responsibility for communicating to the coach special circumstances (family conflicts, school activities) that may interfere with team commitments.  They should never assume that someone else will tell the coach.

**Coach-Parent Communication**

Parents and coaches should establish channels of communication that respect the role that each of them play in the athlete's life.  These arrangements will vary according to the individuals involved, but a couple guidelines can be stated:
- Coaches should establish email or text distribution lists to communicate quickly with all team parents
- Mutual respect should be the norm in all parent-coach communication
- Coaches may establish rules that certain topics will only be discussed with athletes, never with parents
- A parent should never contact a coach to question personnel use or game strategy (if the coach is willing to entertain such topics at all) until 24 hours have passed since the end of the game.
- Coaches should respond to all parent calls or emails within 24 hours, more promptly when possible.

**Awards & Recognition**

### *Upper School Awards*

#### *Captains*

Captains are selected by the coach and the team. It is an honor to be selected as a team captain and a position that we value very highly. A team captain is expected to meet all eligibility requirements and demonstrate leadership, character, service and integrity.  An ideal captain is will be:

- A link between players and coaches
- Approachable and outgoing with teammates
- A positive role model who is able to lead by example
- Respectful to coaches, teammates and opponents
- Someone who demonstrates sportsman-like behavior at all times
- A well-respected, law-abiding good citizen at all times
- A good motivator
- A clear communicator
- An advocate and mentor for new team members
- A hard worker
- A leader who demonstrates honesty, punctuality, commitment, reliability, confidence and the ability to organize others on a daily basis

#### *Captains' Council*

The varsity captains (Upper School) will meet on a regular basis to identify the ways they can improve the athletic experience at W-H.  Among their achievements in recent years:
- Leadership training
- Community Service
- Mentoring and encouragement of Middle School athletes
- Writing and approving Athletic Mission Statement
- Promoting fan support for W-H teams

#### *The Varsity Letter (US only)*

The letter will be presented the first year an athlete earns it for a particular varsity sport. In the following seasons, a gold bar or sport specific pin will be presented.

Requirements for earning a varsity letter are as follows:
- The athlete must finish the season as a member of the varsity team.
- The athlete must consistently demonstrate commitment to the team through full attendance, participation and a positive attitude. (In 2019-20, the coaches and athletic department will inaugurate a trial run of a system to better track student participation and contribution to their team, establishing minimum standards for a varsity letter.  In 2020-2021 and beyond, coaches will be able to make the standards for their sport's letter more

demanding than the Department minimum and the system will produce statistical data that will be mandatory for all teams' calculation of varsity letter eligibility.
- The athlete must be in good academic standing at the conclusion of the season.
- Athletic Department will keep a record of each sport's expectations.

### Team Awards

In the Upper School, the coach will be permitted to choose three of the following awards for their team:

- Coaches' Award
- Player of the Year
- Rookie of the Year
- Defensive Player of the Year
- Offensive Player of the Year
- Most Improved Player of the Year

### Athletic Department Awards

#### The Wigton Cup (US only)
Awarded to the most outstanding senior female athlete.

#### The Chambliss Trophy (US only)
Awarded to the most outstanding senior male athlete.

#### The Robert B. Vietor Award (US only)
Given by the Booster Club to a senior who made the largest intangible contributions (including commitment, dedication, and sportsmanship) in support of his/her teammates and all W-H athletes.   Like all our other awards, the Vietor rewards excellence, but it emphasizes the excellence of competitive spirit above other athletic attributes.

#### The Wardlaw-Hartridge Scholar-Athlete Award (US only)
Can be awarded to both a male and female or just one person in the senior class who has the highest cumulative GPA and meets the athletics requirement (member of two or more teams all four years and has received at least one varsity letter). The student must have a cumulative GPA of at least 90 percent to be considered for this award.  Therefore, it may not be given every year.

#### Career Awards
Those that have shown commitment to their team by playing  that sport for four years will also be recognized at the end of year banquet, as will the athletes who have earned nine or more varsity letters during their W-H careers.

Rams Recognition Night will be held for all Upper School teams, coaches, parents and relatives at the conclusion of the spring season. **This banquet is a mandatory event for all student-athletes.** In 2019 the date of this event is Thursday, May 23.

All teams may also hold their own event at the conclusion of their particular season. However, varsity letters, team awards and special recognitions will be presented at Rams Recognition Night. The Wigton, Chambliss, Vietor and Scholar-Athlete Awards are presented at the Senior Farewell Dinner.

#### Letter Jackets
Varsity Athletes who have won their first varsity letter may choose to order the Wardlaw-Hartridge letter jacket from Leisure Sports in Iselin.   The order form is available on the main Athletics landing page on the W + H website, under "resources", and it contains most of the information you would need.   Below are some answers to frequently asked questions:

**Is there a team or athletic department requirement to buy a letter jacket?** *No, students who wish to own the jacket should have the opportunity to do so.  Those students who prefer to remember their accomplishments in other ways do not need to buy one.*

**When will I receive my varsity letter?** *The Athletic Department gives out letters for all 3 seasons at Rams Recognition Night in May (the department awards only one letter per student, for their first season meeting the criteria – subsequent seasons of varsity play in other sports are rewarded by a pin indicating the sport).  If a student who has earned their first letter in the fall or winter season wishes to have their letter sewn onto their jacket at the time of purchase, they may ask the Athletic Director for it.   The letter can also be sewn onto the jacket at a later date.*

**How do I ensure proper sizing?** *The supplier (Leisure Sports) strongly recommends that the athlete visit their store to be fitted, as sizing may differ from clothing made by different manufacturers.*

**Do I need to purchase the "options" listed on the order form?** *The options are just that; "optional" and should be considered according to the student's desire to personalize their jacket.   Please note that the school will give students pins when they earn a letter in a 2nd sport; thus, the additional sport logo patch may be seen as an unnecessary duplication.*

### *Middle School Awards*

Middle School sports assemblies are held at the conclusion of each season to recognize team accomplishments. These dates are published in the school calendar.

### *Lum Award (8th Grade)*
Presented to the outstanding female athlete. The recipient must demonstrate outstanding ability and good sportsmanship.

### *Elwell Award (8th Grade)*
Presented to the outstanding male athlete. The recipient must demonstrate outstanding ability and good sportsmanship.
### *Three-Year Award (8th Grade)*
The three-year pin will be given to those athletes who have earned a certificate for their play on a particular team every year of Middle School.

The Lum and Elwell awards are given at the Middle School

# EXHIBIT # 11

**From:** racquelb81@gmail.com
**Date:** October 11, 2020 at 12:40:15 PM EDT
**To:** Racquel Buglioli <racquelb81@gmail.com>

Mr Miran & Coach Romeo

I would like to address an ongoing issue that has
been bothering me regarding my daughter, Isabella.
I'd like to start off by saying she has given nothing
less than 100% effort and dedication to her team and
coaches, as well as her academics. Isabella always
does what is asked of her by all staff. Having to do
with soccer, last year was not a good season for my
daughter due to the actions of her teammates and
the coaching staff which you all were aware of.
Isabella has always been a team player but,
unfortunately, not all of her teammates act
accordingly. A perfect example of this is refusing to
acknowledge her on the field even when she is wide
open. The coaching staff not only lets this happen
quite frequently without correction, but they have
targeted my daughter on their own as well. Isabella,
at the end of last year, was awarded the captains
badge. She earned this badge and the opportunity to
lead her team as a senior through hard work,
dedication, and outstanding leadership qualities.
Instead of standing by their decision, the coaching

staff crumbled under the pressure brought on by
other team parents who were upset that their
"babies" weren't selected. Let me be clear, not every
child has the same level of leadership qualities and
the position of captain is a difficult one.  I mean Bella
sophomore year was a good year but the captains
during that year were not been roll models  that year
Bella was called many names by the captains and so
were the other girls and nothing happened to them
and they remained captain .Isabella, who has been
captain on numerous teams, has already proven that
she can handle it. A captain is supposed to know the
game and be able to guide her teammates.
Unfortunately, the child who

replaced Isabella does not have the same level of
knowledge of the game. Aside from this main issue,
my daughter was also called a "Bitch" by the coaching
staff, which is beyond inappropriate and nothing was
done. I did have many conversations with my
daughter prior to the start of this season. I told her to
go into this season with nothing but positivity and
that those who turn negatives into positives and still
give it her all, are rewarded for their effort and
leadership. During the covid season, Isabella started
her own training program for kids that wanted to
learn how to play soccer along with keeping her own
training schedule. She also kept in contact with her
Wardlaw team during the summer to give inspiration
and keep everyone motivated for their upcoming
season. I know that every parent believes that their
child is the best, but let's be honest, Bella is one of
the best. She has brought positive attention to the
school and, whether you agree or not, she has
become the face of Wardlaw Soccer. Isabella, even as
a freshman, has proven to be a team leader. Prior to
this year's season, my daughter came to me stating
she didn't want to play soccer. She explained that this
was due to being treated unfairly, As a parent, I am
beyond upset. I have witnessed this mistreatment first
hand and I have tried to find a resolution without
success last year. The worst part is that we turned to
you for help and you swept it under the rug. In the
four years she has played at Wardlaw, Isabella has
given direction on the field as well as 110% percent.
Unfortunately, her

teammates refuse to pass to her and will ignore her calls. On October 5th, Bella got her 100th career goal and she may as well have been booed by her own team and parents. Aside from a few teammates who congratulated her on the field, no one else even acknowledged her achievement and they got into a picture becuase coach said they were doing a picture. As a soccer mom, I know what an achievement 100 high school career goals is. I would never sit back and remain silent if my daughters' teammate hit that milestone. They are a team, after all. After not one parent even clapped for Bella, I realized that I may be the odd man out. My daughter has never felt so disrespected by the parents of this school. As for her teammates, the current captain of the team was overheard telling a player not to pass the ball to Isabella and one of them was a parent. What does this tell you about the severity of this situation and how my child is being treated in this school? I pay money just like everyone else in this school and I demand fair treatment for my child. We all know the real world because we live in it , the best gets recognized, and in this school, it seems you don't have to do your best, because everyone is equal and gets a trophy, which is not reality. This school is not fair to their leaders who actually do what they need to do, I would like to know what we are teaching these kids and I also would like to thank the coaching staff for making my daughters senior year in high school on her soccer team a miserable one .

Regards,

Racquel Wysocki

Sent from my iPhone

# EXHIBIT # 12

6/8/2021                                                    Mail - Tomas Espinosa, Esq. - Outlook

## New attack

racquelb81@gmail.com <racquelb81@gmail.com>
Thu 5/13/2021 10:35 PM

**To:** Tomas Espinosa, Esq. <TE@lawespinosa.com>

The senior Austin attacks Bella again this is the kid  who started this video this was on snap chat ,
this clip for the year book through snap chat . The girl in the picture is African-American and Bella is
white so he is making a racist gesture as a dynamic duo . This went to the entire class of 2020
Wardlaw kids .



The senior Austin attacks Bella again this is the kid who started this video this was on snap chat, this clip for the year book through snap chat . The girl in the picture is African-American and Bella is white so he is making a racist gesture as a dynamic duo. This went to the entire class of 2020 Wardlaw kids. 5-13-21 email

# EXHIBIT # 13

**From:** racquelb81@gmail.com
**Date:** March 21, 2021 at 10:30:31 AM EDT
**To:** Andrew Webster <awebster@whschool.org>
**Subject: Re: Isabella Wysocki - scoir Account**


Andy ,

 I appreciate you reaching out to Mr Teare I will tell Bella to look out of any Communications from him.

Thank you
Racquel Wysocki

Sent from my iPhone


> On Mar 20, 2021, at 3:57 PM, Andrew Webster <awebster@whschool.org> wrote:


> Racquel,
>
> I'll text him. I have not heard back from Wagner. Where do things stand with them? Mr. Teare shared that Bella had requested a final transcript to be sent to Wagner, which would normally indicate that she's enrolling there.
>
> Regards,
> Andy
>
> Sent from my iPhone
>
>
> > On Mar 20, 2021, at 3:47 PM, racquelb81@gmail.com wrote:

Mr Webster,

   Good afternoon please see the emails below Bella has sent Mr Teare emails for him to fill out with transcripts and we are getting no response this is critical that this gets done for my daughter. Please let me know if this can be priority and this can be done as soon as possible.
Thank you in advance,
Racquel Wysocki

Sent from my iPhone

Begin forwarded message:

> **From:** Isabella Wysocki <iwysocki@whschool.org>
> **Date:** March 20, 2021 at 3:42:13 PM EDT
> **To:** racquelb81@gmail.com
> **Subject: Fwd: Isabella Wysocki - scoir Account**

---------- Forwarded message ---------
From: **Isabella Wysocki** <iwysocki@whschool.org>
Date: Thu, Mar 4, 2021 at 4:35 PM
Subject: Fwd: Isabella Wysocki - scoir Account
To: Chris Teare <cteare@whschool.org>

Hi Mr. Teare,

Just following up, the school is asking me about the documents and my transcripts so please send them to Caldwell university ASAP.

Thank you,
Isabella Wysocki

---------- Forwarded message ---------
From: **Isabella Wysocki** <iwysocki@whschool.org>
Date: Wed, Mar 3, 2021 at 2:20 PM
Subject: Isabella Wysocki - scoir Account
To: Chris Teare <cteare@whschool.org>

Good Afternoon Mr. Teare,

I was wondering if you would be able to check my scoir account. I did apply to one more school as a safety school, and if it is possible for you to just send over my documents I would greatly appreciate it.

Thank You,
Isabella Wysocki

# EXHIBIT # 14

**From:** Bob Bowman <bbowman@whschool.org>
**Date:** January 7, 2021 at 2:32:09 PM EST
**To:** racquelb81@gmail.com
**Subject: Email to Wagner**

To whom it my concern,

I feel it is appropriate Wagner College knows the types of students and players they recruit and admit. For years, I have endured racism at school, a lot of which being at the hands of Bella Wysocki. It wasn't until yesterday that I finally received proof. I know Wagner values respectful students who aren't racists who are comfortable addressing black people as the n-word. I trust that you will take necessary action as this is going viral and do not want this connected to Wagner.

Thank you.

--
**Robert M. Bowman, Ph.D.**
**Wardlaw + Hartridge | Pioneering. Thinkers.**
Head of Upper School
1295 Inman Avenue
Edison NJ 08820
(T) 908.754.1882, Ext. 104
(F) 908.754.9678
www.WHschool.org



# EXHIBIT # 15

UNN-L-002443-21   07/15/2021 8:36:26 PM   Pg 32 of 62 Trans ID: LCV20211669062

**From:** Andrew Webster <awebster@wcnorther.com>
**Date:** June 14, 2021 at 1:38:51 PM EDT
**To:** racquelb81@gmail.com
**Subject: Re: Ram Recognition June 11, 2021**

Racquel,

There is too much here, and in a previous email, to reply to via email.  A few of the items are ones where I need some more facts before I can reply (such as the All GMC certificates, for which honor she was recognized a the RRN, and the goalscoring record ball, both of which she will definitely still receive).  I am willing to meet with you sometime in the week after graduation and will hear out all of your concerns, as long as you are also willing to listen to my responses.

Regards,
Andy

On Sat, Jun 12, 2021 at 2:48 PM <racquelb81@gmail.com> wrote:

> Mr Webster,
>
> I would like to take a minute to express my feelings and concerns.
>
> Yesterday was Rams Recognition night where athletes are recognized for their achievements.
>
> My daughter Isabella has made an indelible contribution to WH sports achievements, including
>
> - She has broken every record possible
> - Isabella has attended every game the school ever held.
> - Isabella has attended every practice at the school for four years. I don't think there are many kids who can attest to the same.
> - Isabella scored 106 career goals.
> - Isabella broke all records at the WH school.

This is her senior year and I quote your words she will not be white washed from the school. ????

Yesterday, Isabella was not recognized by the school. "Coach Romeo" had promised Isabella that her senior award night would be special; that she would receive her ball for scoring 106 Career goals, and that she would receive an award for breaking all records which has never been done by any soccer player at wardlaw Hartridge. Let's not forget Bella even stuck it out after being called a (Bitch) and bullied from your coaching staff.

I like to quote "Coach Romeo" who had stated that "...he could never get the press to come to this school until Bella came here to play."

I also want to address my both children made the blue division and Bella made (All GMC) and we have not even received their certificates.

Is this a Wardlaw issue or do I have to contact GMC for their certificates?

My last issues I would like to express is that I have complained and shown proof of the bullying / harassment by Austin Forsyte , a student at the Wardlaw Hartridge; on top of it, he was allowed to attend Rams Recognition and get his award. This seems very unfair to my daughter and retaliative by the school. Bella was in tears when we got home and had to explain that she didn't receive anything for her accomplishments and doing her best. I hope you all are happy with yourselves to destroy and damage a child once again.

As a parent, I deeply believe this is beyond vindictive on your part; and when I say "your" I am referring to the whole school staff under your leadership.

"It's a sad day to be a Ram"

Racquel Wysocki

--

Andrew Webster
Head of School
Wardlaw + Hartridge | Pioneering. Thinkers.
1295 Inman Avenue
Edison NJ 08820
908.754.1882, Ext. 107
www.WHschool.org

**Letter to College counselor at wardlaw Hartridge.**

racquelb81@gmail.com <racquelb81@gmail.com>

Sat 6/12/2021 12:18 PM

**To:** Tomas Espinosa, Esq. <TE@lawespinosa.com>

Sent from my iPhone

Begin forwarded message:

> **From:** racquelb81@gmail.com
> **Date:** June 11, 2021 at 10:20:23 PM EDT
> **To:** Chris Teare <cteare@whschool.org>
> **Subject: College**

Mr. Teare
At this moment, I don't feel that disclosing that information would be in Bella's best interest. As of what has been done negatively/ to destroy her already I will not chance it. What insurances can we have that if we disclose the university(ies) we are considering for Bella, that this won't be jeopardized again?
I thank you for your concern, but for now we are choosing to keep this information confidential. All I am asking for is the transcripts so that I will give it to the college myself , I've asked many of times already for the final transcripts and haven't received them . So if you can let me know when I could pick them up I'd appreciate it .

Thank you,
Racquel Wysocki

Sent from my iPhone

# EXHIBIT # 16

Amy Svec
Mathematics Teacher
Rahway 7th & 8th Grade Academy
Kline Place
Rahway, NJ 07065
732-396-1025
January 7, 2021

To Whom It May Concern,

I have had the pleasure of knowing Isabella Wysocki for the last five years. We first met when she was placed in my class as a seventh grader. We have been in touch since, and I have kept tabs on her academic and athletic career.

I quickly came to realize that Isabella was an exceptional student and person. She was always mature beyond her years and one of the hardest working students I have encountered in my 23 year teaching career. When faced with a challenge, she always rose to the occasion and put forth her best effort. Where others would give up, Isabella seemed to thrive and push herself even harder. This is evident in not only her academics, but her success as an athlete.

Isabella is a natural born leader who is able to adapt to any environment or situation. I believe this stems from her athletic experience and position on a variety of teams throughout the years. She takes all she can from every experience and uses what she learns to apply to other aspects of her life.

Finally, Isabella Wysocki is a kind, caring individual. She is well adapted and shows the utmost respect to everyone she encounters. Her natural ability to get along with others and her concern for community are evident in her daily actions. Isabella is a unique and genuine individual who stands out among her peers.

Sincerely,

Amy Svec

**From:** Katherine Sy <sykate1@gmail.com>
**Date:** January 7, 2021 at 11:17:30 AM EST
**To:** isabellawysocki2@gmail.com
**Subject: Bella Wysocki**


When it comes to Bella Wysocki, the first thing that comes to your mind is dedication and love for the game. I find myself lucky to have met her through soccer. I've been at PDA since the very beginning and never have I met someone so committed to the sport than Bella. Although I have not known her very long, it wasn't hard to know what she was all about. When something is important to her, she will do anything to show it. I know her life isn't easy and a lot of things don't go her way, but that never deters her from her goals. She spends every spare minute of free time focusing on bettering herself. Whether it be mentally, physically, or emotionally, she always looks for new ways to improve and I admire that so much about her. Her hard work shows effortlessly through her game.

Aside from soccer, her character and personality is what makes her truly amazing. She is such a likeable person to be around. You can always count on her to make you laugh or smile when you're not feeling well, even if she had a rough day herself. That's the kind of person she is. Someone you can rely on. Bella never gives up and always puts in her all. Whether it be in the classroom, on the field, or with her relationships, she is everything you look for in a person. She is honest and humble. I know she will go far in her future, simply because of how bad she wants and how hard she works to prepare for it.

Katie Sy

# EXHIBIT # 17

**Isabella Wysocki – scoir Accoun**

racquelb81@gmail.com <racquelb81@gmail.com>

Mon 3/22/2021 12:21 PM

**To:** Ralph <ralphmontague@gmail.com>; Tomas Espinosa, Esq. <TE@lawespinosa.com>

Isabella wrote in March two times asking for transcripts . I had to write Andy Webster to get him to answer Bella . I'm done !!!!!

Sent from my iPhone

Begin forwarded message:

> **From:** racquelb81@gmail.com
> **Date:** March 21, 2021 at 10:30:31 AM EDT
> **To:** Andrew Webster <awebster@whschool.org>
> **Subject: Re: Isabella Wysocki – scoir Account**
>
> Andy ,
>
>  I appreciate you reaching out to Mr Teare I will tell Bella to look out of any Communications from him.
>
> Thank you
> Racquel Wysocki
>
> Sent from my iPhone
>
> > On Mar 20, 2021, at 3:57 PM, Andrew Webster <awebster@whschool.org> wrote:
> >
> > Racquel,
> >
> > I'll text him. I have not heard back from Wagner. Where do things stand with them? Mr. Teare shared that Bella had requested a final transcript to be sent to Wagner, which would normally indicate that she's enrolling there.
> >
> > Regards,
> > Andy
> >
> > Sent from my iPhone
> >
> > > On Mar 20, 2021, at 3:47 PM, racquelb81@gmail.com wrote:
> > >
> > > Mr Webster,
> > >
> > >    Good afternoon please see the emails below Bella has sent Mr Teare emails for him to fill out with transcripts and we are getting no response this is critical that this gets done for my daughter. Please let me know if this can be priority and this can be done as soon as possible. Thank you in advance,
> > > Racquel Wysocki
> > >
> > > Sent from my iPhone
> > >
> > > Begin forwarded message:

**From:** Isabella Wysocki <iwysocki@whschool.org>
**Date:** March 20, 2021 at 3:42:13 PM EDT
**To:** racquelb81@gmail.com
**Subject: Fwd: Isabella Wysocki - scoir Account**

---------- Forwarded message ---------
From: **Isabella Wysocki** <iwysocki@whschool.org>
Date: Thu, Mar 4, 2021 at 4:35 PM
Subject: Fwd: Isabella Wysocki - scoir Account
To: Chris Teare <cteare@whschool.org>

Hi Mr. Teare,

Just following up, the school is asking me about the documents and my transcripts so please send them to Caldwell university ASAP.

Thank you,
Isabella Wysocki

---------- Forwarded message ---------
From: **Isabella Wysocki** <iwysocki@whschool.org>
Date: Wed, Mar 3, 2021 at 2:20 PM
Subject: Isabella Wysocki - scoir Account
To: Chris Teare <cteare@whschool.org>

Good Afternoon Mr. Teare,

I was wondering if you would be able to check my scoir account. I did apply to one more school as a safety school, and if it is possible for you to just send over my documents I would greatly appreciate it.

Thank You,
Isabella Wysocki

# EXHIBIT # 18



**Kyle Modes**  3:27 PM

to me

Bella,

Mr. Webster emailed me that he and I would be in touch so that a letter (to be given to him) would not be necessary.  If he reaches out to me, I will absolutely share with him what you mentioned regarding you as a person, student, and athlete.

Be well,

**Kyle Modes**

**Wardlaw** + **Hartridge** | Pioneering. Thinkers.
Upper School Chemistry Teacher
12th Grade Class Dean
1295 Inman Avenue
Edison NJ 08820
908-754-1882  Ext. 124
www.whschool.org

•••



Sent from my iPhone

# EXHIBIT # 19

Skip to main content │ About Us (/about/) │ Contact Us (/about/contacts/gen/) │ FAQs (https://www.ed.gov/answers/) │

Language Assistance ▾

[                                                                    🔍 ]

**ABOUT ED (/ABOUT/LANDING.JHTML?SRC=LN)  /  INITIATIVES**

# New Jersey State Regulations

*Updated December 9, 2016*

State Regulation of Private and Home Schools — Map (/about/inits/ed/non-public-education/regulation-map/index.html)

# Private Schools

## Accreditation, Registration, Licensing, and Approval

**Note:** The following does not apply to approved private schools for students with disabilities (APPSD), which operate under contract with local school districts to place students with special needs. APSSDs have their own approval requirements, which can be found in *New Jersey Administrative Code (N.J. Admin Code)* title 6A:14-7.

- *Accreditation*: no requirements
- *Registration*: required
  - Per the New Jersey Department of Education (NJDOE) (http://www.state.nj.us/education/nonpublic/state/), only if the school is registered will the school's eligible students receive state funded services, which include:
    - Auxiliary and Handicapped Services for Nonpublic Schools (Chapters 192 and 193) (http://www.state.nj.us/education/nonpublic/state/auxiliary.htm), *New Jersey Revised Statues (N.J. Rev. Stat.)* §18A:46A-1 et seq. and §18A:46-19.1 et seq.
    - Basic nursing services, *N.J. Rev. Stat.* §18A:40-23.
    - Textbooks, *N.J. Rev. Stat.* §18A:58-37.3.
    - Technology, authorized by language in the state's *FY 2016 Appropriations Act.*
    - Security aid, authorized by language in the state's *FY 2016 Appropriations Act.*
- A nonpublic school must register as a business in order to operate per NJDOE policy (http://www.state.nj.us/education/nonpublic/faq.htm#open_new).
- *Licensing*: no requirements
- *Approval*: no requirements

## Teacher Certification

- No state policy currently exists.

## Length of School Year and Days

- No state policy currently exists.

## Curriculum

- The compulsory education law requires attendance at a public school or a day school in which there is given instruction equivalent to that provided in the public schools for children of similar grades and attainments. N.J. *Rev. Stat*. §18A:38-25.
- Private schools must provide regular courses of instruction in the constitution of the United States from the seventh grade through high school. *N.J. Rev. Stat*. §18A:6-3.
- Private schools must provide regular courses of instruction in accident and fire prevention. *N.J. Rev. Stat*. §18A:6-2.
- An educational services commission may enter into contracts to provide educational services and programs to nonpublic schools. *N.J. Rev. Stat*. §18A:6-63.
- The local boards of education have a duty to loan educational materials developed by the commissioner of education on the nature and effects of drugs, alcohol, anabolic steroids, tobacco and controlled dangerous substances to pupils attending nonpublic schools. *N.J. Rev. Stat*. §18A:40A-5.
- The New Jersey Commission on Holocaust Education provides assistance and advice to private schools on the implementation of Holocaust education and awareness programs. *N.J. Rev. Stat*. §18A:4A-3.
- Private secondary school students are eligible to participate in a legislative internship program operated in cooperation with the New Jersey Association of High School Councils. *N.J. Rev. Stat*. §52:13G-2.
- A local education agency will establish information and resource centers that will provide the following services: "a lending library of educational and instructional materials; preparation of media and materials for informational and instructional purposes; an educational information storage and retrieval system; special topic seminars and conferences; and consultant advice, information and expertise." *N.J. Rev. Stat*. §18A:6-95.1.

## Recordkeeping and Reports

- Private schools must annually report statistics relating to the conduct of the institution as required by the commissioner on or before August 1. No private schools may be required to report expenses or finances; nor shall any such report prepared by the school be made public. *N.J. Rev. Stat*. §18A-6-4.
- The Office of Student Assistance prepares an annual report listing all sources of financial assistance available to New Jersey students attending any institution of higher education. The report is distributed to each private secondary school in the state. *N.J. Rev. Stat*. §§18A:3-14.1 and 18A:3-14.2.
- Private school officials must provide a voter registration form and related nonpartisan materials to each eligible high school pupil in conjunction with the voter registration drive. *N.J. Rev. Stat*. §18A:36-27.

## Health and Safety Requirements

- Private schools must insure compliance with the State Sanitary Code governing immunizations required for attending school. *N.J. Rev. Stat*. §26:1A-9.
- A child is exempt from pertussis (whooping cough) vaccine as a condition for admission to a private school if the child's physician states in writing that the vaccine is medically contraindicated. *N.J. Rev. Stat*. §26:2N-4.
- Private schools may close due to an epidemic. *N.J. Rev. Stat*. §26:4-5.
- The administrator of a nonpublic school must develop a policy governing the emergency administration of epinephrine via an auto-injector to a pupil for anaphylaxis. This includes having a supply of auto-injectors prescribed by a licensed physician or advanced practice nurse to be administered by a school nurse or trained personnel to a student without a known history of anaphylaxis when it is believed the student is having an anaphylactic reaction. New Jersey can provide funds for this policy to nonpublic schools to encourage compliance. *N.J. Rev. Stat*. §§18A:40-12.5–18A:40-12.6, and 18A:40-12.6e.
- Each nonpublic school must have and maintain for the use of pupils at least one nebulizer in the office of the school nurse or a similar accessible location. *N.J. Rev. Stat*. §18A:40-12.7.
- Each nonpublic school must have and maintain an automated external defibrillator (AED). The AED must be accessible during the school day and any other time when a school-sponsored athletic event or team

practice is taking place. A staff member trained in cardiopulmonary resuscitation and the use of the AED must be present during each athletic event or team practice. *N.J. Rev. Stat.* §18A:40-41a.

- Each nonpublic school must have a person who coaches an interscholastic sport or cheerleading complete the NJDOE interscholastic athletic head injury safety training program. In addition, each nonpublic school that participates in an interscholastic sports program or cheerleading program must distribute annually to the parents or guardians of its student-athletes and cheerleaders the educational fact sheet and shall obtain a signed acknowledgement of the receipt of the fact sheet by the student-athlete or cheerleader and his/her parent or guardian. *N.J. Rev. Stat.* §18A:40-41.2.

- All nonpublic schools with students participating on interscholastic and intramural athletic teams must comply with the requirements of the *Scholastic Student-Athlete Safety Act* (P.L. 2013, c.71).

  ○ Each nonpublic school must distribute a pamphlet on sudden cardiac arrest from the commissioner of education to the parents or guardians of students participating in athletic activities. The parents or guardians, and students must sign a form acknowledging a review of the pamphlet each year. *N.J. Rev. Stat.* §18A:40-41.

  ○ A physical exam using a pre-participation physical evaluation form is required for student-athletes who participate in interscholastic or intramural athletics and cheerleading, *N.J. Rev. Stat.* §18A:40-41.7.

  ○ Any physician, advanced practice nurse, or physician's assistant who performs a nonpublic school student-athlete's annual physical examination prior to the student's participation on a school-sponsored interscholastic or intramural athletic team must complete the student-athlete cardiac screening professional development module. Each health care provider must certify that they received this training when signing a student's pre-participation physical evaluation form. *N.J. Rev. Stat.* §18A:40-41d.

  ○ Nonpublic schools must distribute annually to parents or guardians an educational fact sheet on sports-related eye injuries, *N.J. Rev. Stat.* §18A:40-41.9.

- Schools of two or more rooms or of one room located on a second floor or higher, must have at least one fire drill and one security drill each month, including the summer if the school is providing instruction during that time. If provided, fire escapes must be used during the drill. Teachers must keep all doors and exits of their rooms and buildings unlocked during the school hours. *N.J. Rev. Stat.* §18A:41-1.

- Schools having a furnace room, hallway, or stair-tower fire or smoke doors must keep them closed when the building is occupied. *N.J. Rev. Stat.* §18A:41-2.

- Nonpublic schools may require applicants for positions involving regular contact with pupils to have a criminal history record check for information that would disqualify the individual for employment. *N.J. Rev. Stat.* §18A:6-4.13.

- Substitute employees rehired annually at nonpublic schools that require a criminal history record check need only undergo a record check upon initial employment. *N.J. Rev. Stat.* §18A:6-4.17.

- Any private school personnel who in good faith reports a person, including pupils, in an attempt to help cure his or her dependency on a controlled substance will not be liable for civil damages. *N.J. Rev. Stat.* §§2A:62A-4 and 18A:40A-14.

- School bus drivers used by private schools for transportation to and from school must submit to a medical exam for the presence of alcohol, narcotics or habit-producing drugs. *N.J. Rev. Stat.* §39:3-10.1a.

- A municipality may authorize the chief executive officer to close any portion of a street within a block of a private school to resolve a safety problem for ingress and egress to the school or for the provision of recreational facilities for children attending the school. Closure must not exceed one hour between 7:30 and 10 a.m., two hours between 11 a.m. and 2 p.m., and one hour between 2:30 and 4:30 p.m. when school is in session. *N.J. Rev. Stat.* §40:67-16.7.

- Employees of private schools are prohibited from inflicting corporal punishment upon a pupil attending school. However, employees may use reasonable and necessary force to quell a disturbance or a threat of physical injury to others, to obtain a weapon from a student, for self-defense, and for the protection of persons or property. *N.J. Rev. Stat.* §18A:6-1.

- It is illegal for a municipality or county to discriminate between public and private nonprofit elementary or high schools accredited by the state Department of Education regarding zoning ordinances governing the use of land. *N.J. Rev. Stat*. §40:55D-66.
- The New Jersey Nonpublic Security Aid Program is authorized by language in the state's FY 2016 Appropriations Act appropriating state aid to school districts for allocation to nonpublic schools within the district to help ensure a safe and secure school environment for nonpublic school students.
  - The program requires the board of education in each public school district to provide security services, equipment and technology to all qualifying nonpublic schools located in the public school district. The security services, equipment and technology may be provided directly by the board of education, by contracts with an educational services commission or an independent contractor.

## Transportation

- The New Jersey Constitution declares that the state legislature may, within a reasonable distance, provide student transportation (ages 5–18) to and from any school. *New Jersey Constitution* Art. 8, 4, par. 3.
- Pupils attending nonprofit, nonpublic schools not more than 20 miles from their residence are entitled to transportation if the school district provides transportation for public school pupils. If the cost of the transportation exceeds a set amount ($884 for FY 2016) or the amount determined for subsequent years pursuant to N.J. Rev. Stat §18A:39-1a, the allocation will be given to the parent/guardian toward the cost of the transportation. *N.J. Rev. Stat*. §18A:39-1.
- The governing body of a nonpublic school may authorize qualified personnel or parents to transport school children to related school activities in a private vehicle with a capacity of eight people or less. The transportation will be exempt from any additional requirements imposed on the transportation of pupils by school bus. *N.J. Rev. Stat*. §18A:39-20.1.

## Textbooks

- Each local board of education has the responsibility to purchase and loan textbooks to all nonpublic students in the district on individual request. *N.J. Rev. Stat*. §18A:58- 37.3.
- There is an educational information and resource center to provide support and services to nonprofit, nonpublic schools on request. The services provided by the center include "a lending library of educational and instructional materials; preparation of media and materials for informational and instructional purposes; an educational information storage and retrieval system; special topic seminars and conferences; and consultant advice, information and expertise." *N.J. Rev. Stat*. §18A:6-95.1.

## Testing

- No state policy currently exists.

## Special Education

- Local boards of education must provide for the identification of nonpublic school students, ages 5–21, who cannot be accommodated through the school facilities usually provided because of handicaps. *N.J. Rev. Stat*. §18A:46-6.
- The examination and classification of disabled nonpublic school children occurs in a location determined by the local board and approved by the commissioner. *N.J. Rev. Stat*. §18A:46-8.
- New Jersey provides for the public placement of handicapped children in accredited nonpublic schools if a child study team determines that 1) a suitable special education program cannot be provided otherwise; 2) the nonpublic school is the most appropriate placement for the child; 3) services are nonsectarian; 4) the school is not specifically approved for the education of handicapped pupils; and 5) the board of education

place the child with the consent of the commissioner or by a court order. *N.J. Rev. Stat.* §18A:46-14 and *N.J. Admin. Code* title 6A:14-4.2 and 6A:14-6.5.

- Tuition rates at private schools may not exceed the actual cost per pupil determined under rules prescribed by the commissioner and approved by the state board of education. *N.J. Admin. Code* title 6A:14-7.8.
- The board of education of a district in which a nonpublic school is located is required to provide remedial services to eligible nonpublic school students residing in the state and enrolled full-time in a nonpublic school located within the district. *N.J. Rev. Stat.* §18A:46-19.1 et seq.
  - Remedial services, commonly referred to as Chapter 193 programs, provide nonpublic school students with evaluation for determination of eligibility for special education and attendant services that are supplemental to both regular and federal *Individuals with Disabilities Education Act* programs, including speech-language services. N.J. Rev. Stat. §18A:46-19.1 et seq. Remedial services are provided only upon the consent of the parent or guardian and will be provided in a location determined by the local board pursuant to rules and regulations of the state board. *N.J. Rev. Stat.* §18A:46-19.5. If student transportation is necessary to receive services, the local board of education will provide transportation. *N.J. Rev. Stat.* §18A:46-19.6.
- The board of education of a district in which a nonpublic school is located is required to provide auxiliary services, commonly referred to as Chapter 192 programs, to eligible nonpublic school students residing in the state and enrolled full-time in a nonpublic school located within the district. *N.J. Rev. Stat.* §18A:46A-3.
  - Auxiliary services provide nonpublic school students with services designed to assist pupils who have academic needs that prevent them from succeeding in regular school programs, including compensatory education (supplemental to the regular programs) for the improvement of math and language arts literacy skills, English as a second language and home instruction. *N.J. Rev. Stat.* §18A:46A-1 et seq. Auxiliary services are provided only upon the consent of the parent or guardian in a location determined by the local board of education. *N.J. Rev. Stat.* §18A:46A-5. If student transportation is necessary to receive services, the local board of education will provide transportation. *N.J. Rev. Stat.* §18A:46A-6.

## Nursing and Health

- Local boards of education provide nursing services for pupils enrolled full-time in nonpublic schools. The services include, but are not limited to, medical examinations, dental screening, hearing examinations, and maintenance of student health records. In addition, the emergency care provided to public school pupils is extended to nonpublic school students who are injured or become ill at school or during athletic activities. *N.J. Rev. Stat.* §18A:40-23 et seq.
- Nonprofit nonpublic schools participating in the National School Lunch Program will be reimbursed with federal funds, and if insufficient for the cost, may be supplemented with state funds. (Nonpublic schools are defined within this provision as schools offering K–12 education, fulfilling compulsory school attendance requirements, and complying with *Title VI of the Civil Rights Act of 1964.) N.J. Rev. Stat.* §18A:58-7.1 et seq.

## Technology

- The New Jersey Nonpublic School Technology Initiative Program is authorized by the state's FY 2016 *Appropriations Act*, and authorizes aid to be paid to school districts and allocated for nonpublic school pupils to: (1) provide nonpublic school students with computers, educational software, distance learning equipment and other technologies that can improve their education by meeting their specific educational needs; and (2) give nonpublic school teachers the skills, resources and incentives to use educational technologies effectively to improve teaching and learning in the classroom.
- County educational audiovisual commissions may contract with nonprofit private schools within the county to provide educational audiovisual aids to such schools. *N.J. Rev. Stat.* §18A:51-6.

## Professional Development

- By statute, nonprofit, nonpublic schools are represented by two members on the board of directors governing the educational information and resource center. *N.J. Rev. Stat.* §18A:6-97.

## Reimbursement for Performing State and Local Functions

- No state policy currently exists.

## Tax Exemption

- The New Jersey Constitution provides that tax exemptions cannot be repealed for real and personal property owned by a corporation/association organized for religious, educational, or charitable purposes and used exclusively for those purposes. *New Jersey Constitution* Art. 8, 1, par. 2.
- Corporations operated exclusively for educational purposes are exempt from sales tax if the earnings do not benefit any private individual, and the organization's activities do not attempt to influence legislation or intervene in any political campaign. *N.J. Rev. Stat.* §54:32B-9.
- Private or parochial schools conducting a course in driver education approved by the state department of education are not charged license fees. *N.J. Rev. Stat.* §39:12-2.

## Public Aid for Private Education

- **Constitutional Provisions:** The *New Jersey Constitution* does not have a provision related to public aid for private education.
- **Programs for financial assistance for attendance at private schools:** There are no such programs at this time.

## Other

- Parents of any minor who injure any nonpublic school property are liable for all damages incurred. *N.J. Rev. Stat.* §18A:37-3.
- "Private school" is defined under New Jersey's education provisions as "a school, under college grade, which does not derive its support entirely or in part from public funds." *N.J. Rev. Stat.* §18A:1-1.
- The New Jersey Constitution makes games of chance legal for education or religious organizations when the net proceeds are devoted to educational or religious uses. *New Jersey Constitution* Art. 4, 7, par. 2A.

# Home Schools

- If a parent or guardian does not appeal a school's refusal to enroll a student, or if a parent or guardian removes a student from his or her school in order to homeschool that child, then the parent or guardian is required to inform the local board of education per the NJDOE's Frequently Asked Questions: Homeschooling (http://www.state.nj.us/education/genfo/faq/faq_homeschool.htm).
- The NJDOE encourages parents or guardians to notify the local boards of education of the intent to homeschool a student so that questions do not arise about compliance with the compulsory education law per the NJDOE's Frequently Asked Questions: Homeschooling (http://www.state.nj.us/education/genfo/faq/faq_homeschool.htm).
- Responsibility for enforcing the compulsory education law rests with the local board of education. When a school board has reason to believe that a parent or guardian is not complying with the compulsory education law, the local board of education can initiate truancy proceedings in municipal court, requiring parents or legal guardians to document their activities in providing "equivalent instruction." Per the NJDOE's

Frequently Asked Questions: Homeschooling
(http://www.state.nj.us/education/genfo/faq/faq_homeschool.htm).

## Curriculum and Instruction

- New Jersey's compulsory education law states that "every parent, guardian or other person having custody and control of a child between the ages of six and 16 years shall cause such child regularly to attend the public schools of the district or a day school in which there is given instruction equivalent to that provided in the public schools for children of similar grades and attainments or to receive equivalent instruction elsewhere than at school." *N.J. Rev. Stat.* §38A: 38-25.

## Assessment and Diplomas

- A homeschooled student may obtain a New Jersey state high school diploma by passing the General Educational Development test; or by completing 30 general education credits leading to a degree at an accredited institution of higher education and meeting current state assessment graduation requirements per the *NJDOE's Frequently Asked Questions: Homeschooling*.

## Public School Access

- Per the NJDOE's Frequently Asked Questions: Homeschooling (http://www.state.nj.us/education/genfo/faq/faq_homeschool.htm), a local board of education has no obligation to allow a home-schooled student to participate in regular school curriculum or in extracurricular or sports activities. Such determinations are at the discretion of the school board.

# Web Resources

## Information and Legislation

- New Jersey Department of Education: Nonpublic School Services (http://www.state.nj.us/education/nonpublic/)
- New Jersey Department of Education: Frequently Asked Questions: Homeschooling (http://www.state.nj.us/education/genfo/faq/faq_homeschool.htm)
- New Jersey Department of Education: Nonpublic School Textbook Program (http://www.state.nj.us/education/nonpublic/state/textbook.htm)
- New Jersey Department of Education: Auxiliary and Handicapped Services for Nonpublic Schools (Chapters 192 and 193) (http://www.state.nj.us/education/nonpublic/state/auxiliary.htm)
- New Jersey Department of Education: Nonpublic School Health Services (http://www.state.nj.us/education/nonpublic/health/)
- New Jersey Department of Education: New Jersey Nonpublic School Technology Initiative Program (http://www.state.nj.us/education/techno/nptech.htm)
- New Jersey Department of Education: Nonpublic School Security Aid Program (http://www.state.nj.us/education/nonpublic/state/security.htm)
- New Jersey Legislature (http://www.njleg.state.nj.us/)

# Contact Information--State and Federal Departments of Education

- New Jersey Department of Education
  P.O. Box 500
  100 Riverview Plaza

Trenton, NJ 08625-0500

Phone: (609) 292-4469

Fax: (609) 777-4099

Website: http://www.state.nj.us/education/ (http://www.state.nj.us/education/)

- U.S. Department of Education, New Jersey (http://www2.ed.gov/about/contacts/state/nj.html)

---

🖨 Printable view
(/print/about/inits/ed/non-public-
education/regulation-
map/newjersey.html)

Last Modified: 08/19/2019

# How Do I Find...

- Student loans, forgiveness (/fund/grants-college.html?src=rn)
- College accreditation (https://www.ed.gov/accreditation?src=rn)
- Every Student Succeeds Act (ESSA) (https://www.ed.gov/essa?src=rn)
- FERPA (/policy/gen/guid/fpco/ferpa/index.html?src=rn)
- FAFSA (https://fafsa.ed.gov/?src=edgov-rn)
- 1098, tax forms (https://www.ed.gov/1098-e?src=rn)

More > (/about/top-tasks.html?src=rn)

# Information About...

- Transforming Teaching (https://www.ed.gov/teaching?src=rn)
- Family and Community Engagement (https://www.ed.gov/family-and-community-engagement?src=rn)
- Early Learning (/about/inits/ed/earlylearning/index.html?src=rn)

## Related Topics

**Mission
(/about/overview/mission/mission.html?
src=rt)**

---

Student Loans

(/fund/grants-college.html?src=ft)

Repaying Loans (https://studentaid.ed.gov/repay-loans?src=ft)

Defaulted Loans (https://studentaid.ed.gov/repay-loans/default?src=ft)

Loan Forgiveness (https://studentaid.ed.gov/repay-loans/forgiveness-cancellation?src=ft)

Loan Servicers (https://studentaid.ed.gov/repay-loans/understand/servicers?src=ft#who-is-my-loan-servicer)

Grants & Programs

(/fund/grants-apply.html?src=ft)

Apply for Pell Grants (https://www.fafsa.ed.gov/?src=ft)

Grants Forecast (/fund/grant/find/edlite-forecast.html?src=ft)

Apply for a Grant (/fund/grant/apply/grantapps/index.html?src=ft)

Eligibility for Grants (/programs/find/elig/index.html?src=ft)


## Laws & Guidance

(/policy/?src=ft)

Every Student Succeeds Act (ESSA) (https://www.ed.gov/essa?src=ft)

FERPA (/policy/gen/guid/fpco/ferpa/index.html?src=ft)

Civil Rights (/about/offices/list/ocr/know.html?src=ft)

New IDEA Website (https://sites.ed.gov/idea/?src=ft)


## Data & Research

(/rschstat/?src=ft)

Education Statistics (https://nces.ed.gov/?src=ft)

Postsecondary Education Data (https://nces.ed.gov/ipeds/?src=ft)

ED Data Express (https://eddataexpress.ed.gov/?src=ft)

Nation's Report Card (https://nces.ed.gov/nationsreportcard/?src=ft)

What Works Clearinghouse (https://ies.ed.gov/ncee/wwc/?src=ft)


## About Us

(/about/?src=ft)

Contact Us (/about/contacts/gen/?src=ft)

ED Offices (/about/offices/list/?src=ft)

Jobs (https://www.ed.gov/jobs/?src=ft)

Press Releases (https://www.ed.gov/news/?src=ft)

FAQs (https://www.ed.gov/answers/?src=ft)

Recursos en español (/espanol/bienvenidos/es/index.html?src=ft)

Budget, Performance (/about/overview/focus/performance.html?src=ft)

Privacy Program (/privacy?src=ft)

Subscribe to E-Mail Updates (https://public.govdelivery.com/accounts/USED/subscriber/new?topic_id=USED_5)


 (https://www.facebook.com/ed.gov)  (https://twitter.com/usedgov) 

(https://public.govdelivery.com/accounts/USED/subscriber/new?topic_id=USED_5)  (https://www.ed.gov/feed)

---

Notices (/notices/index.html?src=ft)    FOIA (/policy/gen/leg/foia/foiatoc.html?src=ft)    Privacy Policy (/notices/privacy/index.html)
Accessibility (/notices/accessibility/index.html)    Security (/notices/security/index.html?src=ft)
Information quality (/policy/gen/guid/infoqualguide.html?src=ft)    Inspector General (/about/offices/list/oig/index.html?src=ft)
Whitehouse.gov (https://www.whitehouse.gov/)    USA.gov (https://www.usa.gov/)    Benefits.gov (https://www.benefits.gov/)
Regulations.gov (https://www.regulations.gov/)

# EXHIBIT # 20

### Isabella Wysocki letter back from Wagner

racquelb81@gmail.com <racquelb81@gmail.com>

Mon 3/22/2021 5:09 PM

**To:** Tomas Espinosa, Esq. <TE@lawespinosa.com>; Ralph <ralphmontague@gmail.com>

Sent from my iPhone

Begin forwarded message:

> **From:** Jennifer Sansevero <jennifer.sansevero@wagner.edu>
> **Date:** March 22, 2021 at 4:59:32 PM EDT
> **To:** racquelb81@gmail.com, Walter Hameline <whamelin@wagner.edu>
> **Cc:** Philip Casella <philip.casella@wagner.edu>
> **Subject: Re: Isabella Wysocki**

Good Afternoon,

Thank you for your email, document, and response.

I can imagine your frustration and disappointment in Wagner's decision to rescind Isabella's athletic aid agreement and therefore declare her NLI null and void.

This decision was reached with extensive consideration over the course of three months.  The College went through a thorough process of investigation, discussions, and deliberations with all parties involved in the incident, and, who had an interest in the outcome.

In coming to our decision, The Department of Athletics consulted with the office of Admissions, Student Life, General Counsel, the Northeast Conference, the Head of School at Wardlaw-Hartridge High School, the club coach of Isabella's soccer program, and colleagues in the field of intercollegiate athletics.

Wagner has evaluated Isabella's responsibility and accountability associated with this incident.  During the course of our meeting on Friday, March 12th, Isabella admitted to using a racial epithet and that it was her in the video.

Wagner believes the decision to rescind her athletic aid agreement is justified due to her engaging in this serious misconduct.  It is in direct violation of the terms of her athletic aid agreement.

While I understand it is an unfavorable decision from Isabella's perspective, the decision is within the right of the Department of Athletics and is final.

Thank you for your cooperation throughout this process.  Once Isabella's NLI is declared Null and Void, she is able to begin the recruiting process to find another school to attend.

If you would like to follow up with our Director of Athletics, Walt Hameline, you may contact him at whamelin@wagner.edu.

Thank you.

Jen

On Sun, Mar 21, 2021 at 7:27 PM <racquelb81@gmail.com> wrote:
> Please see enclosed document.
> >
> >
>
> >
> >
> > Sent from my iPhone

--



**JENNIFER SANSEVERO, J.D.**
Associate Athletic Director for Compliance, Equity, & Inclusion
Senior Woman Administrator
Wagner College
One Campus Road | Staten Island, NY 10301
P: 718.390.3199 | F: 718.390.3347

Letter from Wagner Taking away the scholarship.

racquelb81@gmail.com <racquelb81@gmail.com>

Sat 3/20/2021 9:04 PM

**To:** Tomas Espinosa, Esq. <TE@lawespinosa.com>; Ralph <ralphmontague@gmail.com>

Sent from my iPhone

Begin forwarded message:

**From:** Jennifer Sansevero <jennifer.sansevero@wagner.edu>
**Date:** March 19, 2021 at 5:27:41 PM EDT
**To:** Isabella Wysocki <isabellawysocki2@gmail.com>, racquelb81@gmail.com
**Cc:** Philip Casella <philip.casella@wagner.edu>
**Subject: Re: Checking in**

Dear Isabella,

Thank you for taking the opportunity to speak with Coach Casella and myself last week. It was important we had an opportunity to hear from you and your family and discuss our concerns.

We understand the last few months have been extremely difficult for you and your family.  I know you have learned from this experience and will continue to do the work to understand the significance of your words/actions and the impact they have had on others.

After much consideration, Wagner has unfortunately decided to rescind your Athletic Aid Agreement due to the serious misconduct which resulted in the sanctions at your high school.  As a result, your National Letter of Intent will become null and void.

Wagner is required to notify the NCAA your NLI is null and void.  Once this occurs, you will be released from your commitment to Wagner College and will be able to engage in recruiting conversations with other institutions.

Please let me know if you have any questions.

Thank you.

Jen

On Fri, Mar 19, 2021 at 12:51 PM Isabella Wysocki <isabellawysocki2@gmail.com> wrote:
> Good Afternoon Jennifer,
>
> Just wanted to check in. It's been a week since our zoom meeting and I was wondering if you guys came to a decision because I can barely sleep at night since my future is still out there just hanging right now.
>
> Thank you,
> Isabella Wysocki

--



**JENNIFER SANSEVERO, J.D.**
Associate Athletic Director for Compliance, Equity, & Inclusion
Senior Woman Administrator
Wagner College
One Campus Road | Staten Island, NY 10301
P: 718.390.3199 | F: 718.390.3347



**2021-2022**

Administered by the NCAA on behalf of the Collegiate Commissioners Association (CCA).

**Do not sign prior to 7 a.m. (local time) on the following dates or after the final signing date listed for each sport.**

| SPORT (Place an "X" on the proper line.) | INITIAL SIGNING DATE | FINAL SIGNING DATE |
|---|---|---|
| ___ Division I Basketball (Early Period) | November 11, 2020 | November 18, 2020 |
| ___ Division I Basketball (Regular Period) | April 14, 2021 | May 19, 2021 |
| ___ Division I Football (Early Period) | December 16, 2020 | December 18, 2020 |
| ___ Division I and II Football (Midyear JC Transfer) | December 16, 2020 | January 15, 2021 |
| ___ Division I and II Football (Regular Period) | February 3, 2021 | April 1, 2021(Division I) |
|  |  | August 1, 2021 (Division II) |
| _X_ All Other Division I and II Sports | November 11, 2020 | August 1, 2021 |

## IMPORTANT - READ CAREFULLY

It is important to read this entire document before signing it. One copy is to be retained by you and the other copy is to be returned to the institution which will file a copy with the appropriate conference office. **It is permissible to transmit copies electronically.** The National Letter of Intent (NLI) is a voluntary program with regard to both institutions and prospective student-athletes. No prospective student-athlete or parent is required to sign the NLI for a prospective student-athlete to receive athletics aid and participate in intercollegiate athletics.

1. **Initial Enrollment in Four-Year Institution.** This NLI applies only to prospective student-athletes who will be entering four-year institutions for the first time as full-time students. It is permissible for 4-2-4 transfer student-athletes to sign the NLI provided a previous valid NLI does not apply. The terms of the previous NLI are satisfied if a student-athlete graduates from the two-year college.

2. **Financial Aid Requirement.** At the time I sign this NLI, I must receive a written offer of athletics financial aid for the entire 2021-22 academic year from the institution named in this document. The offer must list the terms, conditions and amount of the athletics aid award. (A midyear football two-year college transfer student-athlete must receive a written offer of athletics financial aid for the remainder of the 2020-21 academic year. If the institution does not renew the athletics aid for the following academic year, the student-athlete must be released of the NLI. In order for this NLI to be valid, my parent/legal guardian and I must sign the NLI and I must also sign the offer of athletics aid (see institutional policy for parent/legal guardian signature) prior to submission to the institution named in this document, and any other stated conditions must also be met. If the conditions stated on the financial aid offer are not met, this NLI shall be declared null and void.

   - **Professional Sports Contract.** If I sign a professional sports contract in the sport in which I signed the NLI, I remain bound by the NLI in all other sports, even if NCAA rules prohibit the institution named in this document from providing me with athletics financial aid for the sport in which I signed the NLI.

3. **Provisions of Letter Satisfied.**

   a. **One-Year Attendance Requirement.** The terms of this NLI shall be satisfied if I attend the institution named in this document for one academic year (two semesters or three quarters) as a full-time student.

   b. **Two-Year College Graduation.** After signing this NLI while in high school and if I later attend a two-year college, the terms of this NLI will be satisfied if I graduate from the two-year college.

4. **Basic Penalty.** I understand that if I do not attend the institution named in this document for one full academic year and I enroll in another institution participating in the NLI program, I may not compete in intercollegiate athletics until I have completed one full academic year in residence at the latter institution. Further, I understand I shall be charged with the loss of one season of intercollegiate athletics competition in all sports. This is in addition to any seasons of competition used at any institution.

5. **Early Signing Period Penalties.** Prospective student-athletes who will participate in football are prohibited from signing an NLI prior to the initial signing date for Division I or II football. A prospective student-athlete who signs an NLI in a sport other than football prior to the initial signing date for Division I or II football will be ineligible for competition in football during the first year of enrollment at an NLI member institution and shall forfeit one season of competition in football. In circumstances where a prospective student-athlete's primary sport is not football, but anticipates participating in football, the prospective student-athlete should delay signing an NLI until the initial signing date for Division I or II football.

6. **Release Request and Appeal Process.** In the event I wish to be released from my NLI obligation, the NLI release request and appeal process information can be reviewed on the NLI Web site at www.national-letter.org. I understand that the NLI Policy and Review Committee has been authorized to issue interpretations, settle disputes and consider appeals for complete release from the provisions of the NLI when extenuating circumstances are determined to exist and the signing institution denies my request for release. I further understand the Committee's decision may be appealed to the NLI Appeals Committee, whose decision shall be final and binding.

**Letter Becomes Null and Void.** This NLI shall be declared null and void if any of the following occur:

a. **Admissions Requirement.** This NLI shall be declared null and void if the institution named in this document notifies me in writing that I have been denied admission or, by the opening day of classes in fall 2021, has failed to provide me with written notice of admission, provided I have submitted a complete admission application. It is my obligation to provide, by request, my academic records and an application for admission to the signing institution. If I fail to submit the necessary academic credentials and/or application to determine an admission decision prior to September 1, the NLI office per its review with the institution will determine the status of the NLI. If I am eligible for admission, but the institution named in this document defers my admission to a subsequent term, the NLI will be declared null and void; however, this NLI remains binding if I defer my admission.

b. **Eligibility Requirements.** This NLI shall be declared null and void if, by the opening day of classes in fall 2021, I have not met NCAA initial eligibility requirements; NCAA, conference or institution's requirements for athletics financial aid; or two-year college transfer requirements, provided I have submitted all necessary documents for eligibility determination.

   (1) This NLI shall be rendered null and void if I become a nonqualifier per the NCAA Eligibility Center. This NLI remains valid if I am a partial qualifier per NCAA Division II rules unless I do not meet the institution's policies for receipt of athletics aid.

   (2) It is my obligation to register with and provide information to the NCAA Eligibility Center. If I fail to submit the necessary documentation for an initial-eligibility decision and have not attended classes at the signing institution, the NLI office per its review with the institution will determine the status of the NLI.

   (3) This NLI shall be rendered null and void if I am a midyear football two-year college transfer and I fail to graduate from two-year college at midyear, if required per NCAA, conference or institutional rules. The NLI remains binding for the following fall term if I graduated, was eligible for admission and financial aid and met the two-year college transfer requirements for competition for the winter or spring term, but chose to delay my admission.

c. **One-Year Absence.** This NLI shall be declared null and void if I have not attended any institution (two-year or four-year) for at least one academic year, provided my request for athletics financial aid for a subsequent fall term is denied by the signing institution. *Service in active duty with the U.S. armed forces or an official church mission for at least 12 months can use the One-Year Absence to null and void the NLI.* I may still apply this provision if I initially enrolled in an NLI member institution but have been absent for at least one academic year. To apply this provision, I must file with the appropriate conference office a statement from the director of athletics that such athletics financial aid will not be available for the requested fall term.

d. **Discontinued Sport.** This NLI shall be declared null and void if the institution named in the document discontinues my sport.

e. **Recruiting Rules Violation.** If eligibility reinstatement by the NCAA student-athlete reinstatement staff is necessary due to NCAA and/or conference recruiting rules violations, the institution must notify me that I have an option to have the NLI declared null and void due to the rules violation. It is my decision to have the NLI remain valid or to have the NLI declared null and void, permitting me to be recruited and not be subject to NLI penalties.

8. **Recruiting Ban After Signing.** I understand all participating conferences and institutions are obligated to respect my signing and shall cease contact with me and my family members after my signing this NLI which includes me and my family members not initiating contact with athletic staffs at other institutions. Any contact in excess of an exchange of a greeting is not permitted regardless of the conversation. The conversation does not have to result in recruiting discussion for a recruiting ban violation to occur. I shall notify any coach who contacts me that I have signed an NLI. Once I enroll in the institution named in this document, the NLI Recruiting Ban is no longer in effect and I shall be governed by applicable NCAA bylaws or if I submit an NLI release request, the NLI Recruiting Ban is no longer in effect.

9. **7-Day Signing Deadline.** If my parent/legal guardian and I do not sign this NLI and accompanying offer of athletics aid within 7 days after the date of issuance (noted on the signing page) it will be invalid. The 7-day signing deadline does not apply if the NLI is received on the last day of a signing period (e.g., August 1). In this case, the 7-day signing deadline only applies if there are 7 days remaining for the signing period. Additionally, the institution must file the NLI with its conference office within 14 days of the date of final signature; otherwise, the NLI is invalid. The 7-day signing deadline does not apply to the Division I football early signing period.

10. **Statute of Limitations.** I am subject to the NLI penalty if I do not fulfill the agreement; however, if I do not attend an NLI member institution to fulfill the agreement or penalty and four years has elapsed since my signing date, the NLI is no longer binding. Therefore, this NLI is in full force and effect for a period of four years, commencing with the date I sign this NLI, if I do not attend an NLI member institution during the period of four years.

11. **Coaching Changes.** I understand I have signed this NLI with the institution and not for a particular sport or coach. If a coach leaves the institution or the sports program (e.g., not retained, resigns), I remain bound by the provisions of this NLI. I understand it is not uncommon for a coach to leave his or her coaching position.

12. **Coaching Contact Prohibited at Time of Signing.** A coach or an institutional representative may not hand deliver this NLI off the institution's campus or be present off campus at the time I sign the NLI per NCAA rules. This NLI may be delivered by courier service, express or regular mail, email, fax, app or any other electronic means. An NLI submitted to an institution electronically is permissible.

It is important to read more information about the NLI at www.national-letter.org.

# NATIONAL LETTER of INTENT

**2021-2022**

Name of Prospective Student-Athlete  WYSOCKI _____   ISABELLA _____   _____ Middle Initial
_____ Last   First

Permanent Address  RAHWAY _____   NJ _____   07065 _____   US
_____ City   State   Postal Code   Country

Prospective Student-Athlete's NCAA ID  1912770071 _____   Date of Birth  04/02/2003 _____
(must be registered with the NCAA Eligibility Center and on the Institutional Request List)

Submission of this NLI has been authorized by

SIGNED  _Watts C. Hall_ _____   11/11/2020 _____
Director of Athletics (or designee)   Date Issued to Prospective Student-Athlete

For Institutional Use Only:
Two-year college transfer ☐

_____ WOMEN'S SOCCER _____   Two-year college expected graduation date _____
Sport   (if required to graduate)

This is to certify my decision to enroll at _____   Wagner College _____
Name of Institution

I certify that I have read all terms and conditions included in this document. I have discussed them with the coach and/or other staff representatives of the institution named above, and I fully understand, accept and agree to be bound by them. I understand that signing this NLI is voluntary and I am not required to sign the NLI to receive athletics aid and participate in intercollegiate athletics. Additionally, I give my consent to the signing institution, to disclose to authorized representatives of its athletics conference, the NCAA and the NLI Office any documents or information pertaining to my NLI signing. Further, I give my consent to the NLI Office to disclose my name and personally identifiable information from my education records to a third party (including but not limited to the media) as necessary to correct any inaccuracies reported by the media or related to my NLI signing, without such disclosure constituting a violation of my rights, including my rights under the Family Educational Rights and Privacy Act.

If I falsify any part of this NLI, or if I have knowledge that my parent or legal guardian falsified any part of this NLI, I understand I shall forfeit the first year of my athletics competition at any NLI member institution.

My signature on this NLI nullifies any agreements, oral or otherwise, which would release me from the conditions stated within this NLI.

SIGNED  _Isabella Wysocki_ _____   11/11/20 _____   3:48 pm _____
Prospective Student-Athlete Signature   Signing Date (Mth/Day/Yr)   Time (Designate - A.M./P.M.)
Do not sign prior to 7:00 a.m.
(local time) on the initial
signing date.

Parent/ legal guardian signature required if prospective student-athlete has not reached his or her 21st birthday.

SIGNED  _Racquel Wysocki_ _____   11/11/20 _____   3:48 pm _____
(Check one) ☒ Parent or ☐ Legal Guardian Signature   Signing Date (Mth/Day/Yr)   Time (Designate - A.M./P.M.)
Do not sign prior to 7:00 a.m.
(local time) on the initial
signing date.

_Racquel Wysocki_ _____   9084874501 _____   isabellawysocki2@gmail.com _____
Print Name of Parent/Legal Guardian   Telephone Number (including area code)   Email Address

Copyright @ National Letter of Intent

Rev. 10/01/2020

# WAGNER COLLEGE ATHLETICS AWARD AGREEMENT
## Office of Financial Aid
### (718) 390-3183
### 2021-2022 NCAA Division I Grant Agreement

Isabella Wysocki
986 Pierpont St.
Rahway, NJ 07065

**Sport: Women's Soccer**

*Amount of Award: **$40,000 Athletic Grant in Aid** (Divided in two equal payments for the fall and spring semesters.)
Award cannot be applied to the new student enrollment deposit not one-time housing contract fee.

| | | |
|---|---|---|
| *(signature)* | | *(signature)* |
| Theresa Weimer | 11/11/2020 | Walter C. Hameline | 11/11/2020 |
| Director of Financial Aid | Date | Director of Athletics | Date |

## *Conditions of Grant*

*I understand that to qualify for this award, I must*
- *Fulfill the admission requirements of Wagner College and the NCAA Eligibility Center*
- *Meet and maintain the eligibility requirements and rules for athletics participation and financial aid established by the Federal Government, the NCAA, the NEC, and Wagner College.*
- *Per Wagner College policy, complete a FAFSA on an annual basis even though the athletic grant-in-aid is not federally funded.*

*NCAA regulations and institutional financial aid policy restrict the total amount of financial aid a student-athlete can receive. **If I receive additional scholarships or financial aid, I will notify the financial aid office and the Assistant Athletic Director for Compliance.** Those funds may replace a portion of my athletics grant to meet NCAA, conference, and institutional regulations.*

*My athletics award will not be increased, reduced or canceled during the period of its award on the basis of my athletic ability, performance, or contribution to my team's success, because of an injury or illness that prevents me from participating in athletics, or for any other athletics reason.*

*I am aware that the amount of this award **may** be immediately reduced or canceled during the term of award if:*
- *I become ineligible for intercollegiate competition.*
- *I fraudulently misrepresent any information in my application, letter of intent or financial aid agreement.*
- *I engage in serious misconduct that brings disciplinary action from this institution.*
- *I engage in misconduct leading to an arrest, and the Athletic Department determines that under the circumstances, it would be inappropriate to continue my financial aid.*
- *I voluntarily withdraw from the sport for personal reasons.*

*I am also aware that this aid **must** be reduced or canceled if:*
- *I sign a professional sports contract for this sport.*
- *I accept money for playing in an athletics contest.*
- *I agree to be represented by an agent or accept money from the agent or anyone associated with him or her.*
- *I receive other aid that causes me to exceed my individual limit.*

*My total financial aid may not exceed the limits set by the NCAA and the conference.  **This grant offer becomes void a week after date of issuance.**  This grant is for one academic year and is subject to renewal on an annual basis.*

Accepted  *Isabella Wysocki*                    *Racquel Wysocki*         11/11/20
         Student-Athlete                         Parent (if student under 18)        Date
**This letter replaces any previous Wagner College athletic grant-in-aid offers issued for this year

# EXHIBIT # 21



**12:04**

◀ Search

Caldwell University  Inbox

**Chris Teare**  12:01 PM
to me, Racquelb81 ⌄

Hi Bella,
I hope you are well.  I did not respond to your earlier emails because I was waiting to hear from Mr. Webster.  I have now sent your documents to Caldwell.  The Secondary School Report form asks if the applicant has ever had a disciplinary situation, so we have answered Yes.  We did not include any specifics but wrote that they could call Mr. Webster if they have any questions.
Stay healthy and safe,
Chris Teare

**Christopher M. Teare**

Director of College Counseling

**Wardlaw** + **Hartridge** | Pioneering. Thinkers.

1295 Inman Avenue

Edison NJ 08820

(T) 908.754.1882, Ext 299

(F) 908.754.9678

www.WHschool.org

Thank you for the update.

Thank you so much!

Great, thank you so much!

↩ Reply     ⇜ Reply all     → Forward

Sent from my iPhone



**WAGNER COLLEGE**

One Campus Road
Staten Island, NY 10301
718.390.3183 phone
718.390.3203 fax
finaid@wagner.edu
www.wagner.edu/financial-aid

February 18, 2021

Isabella Wysocki
986 Pierpont St
Rahway, NJ 07065-3115



Your estimated financial aid offer for the 2021-2022 academic year is listed below. Your offer may consist of a combination of college, federal, state, and private sources of aid.  For additional information about the types of aid listed, please refer to wagner.edu/financial-aid/finaidtypes/

Your offer is based upon your anticipated housing status for Fall 2021 as a Resident and Spring 2022 as a Resident.

**Review each item carefully.**  If you are *not interested* in a specific award, please *circle* the item and initial in the decline column.

| Award Type* | Fall 2021 | Spring 2022 | Decline |
|---|---|---|---|
| Alumni Award | $5,000.00 | $5,000.00 | |
| Athletic Grant in Aid | $20,000.00 | $20,000.00 | |
| Federal Subsidized Loan | $167.00 | $168.00 | |
| Fed. Unsubsidized Loan | $2,582.00 | $2,583.00 | |
| Totals | $27,749.00 | $27,751.00 | $55,500.00 |

*Note: If College Work-Study is included in your offer, the funds are not deducted from your charges; they must be earned. A College Work-Study offer, however, does not constitute guarantee of a job.

| Estimated Full-time Direct Costs (Fall + Spring)** | Undergraduate | Graduate |
|---|---|---|
| Tuition | $48,730.00 | $22,230.00 |
| Comprehensive Fee | $1,600.00 | $950.00 |
| Room & Board (resident students only) | $15,022.00 | $15,022.00 |
| Total Estimated Costs | $65,352.00 | $38,202.00 |

**Additional information about estimated costs and costs or various programs may be found at wagner.edu/financial-aid/aid-basics/costs/.

Please sign and return a copy of your aid offer and keep the other for your records. If a signed copy is not returned, it is an indication that you accept your aid offer in its entirety. By signing below, I affirm that I have read and understand the eligibility requirements listed at wagner.edu/financial-aid/aid-basics/.

*Isabella Wysocki*
Student's Signature

2/24/21
Date

# EXHIBIT # 22

## Fwd: letter, with Zoom invite to follow for disciplinary actions.

racquelb81@gmail.com <racquelb81@gmail.com>

Sat 3/20/2021 9:01 PM

**To:**  Tomas Espinosa, Esq. <TE@lawespinosa.com>; Ralph <ralphmontague@gmail.com>

📎 1 attachments (17 KB)

Wysocki Letter.docx;

Letter from head to school Andy Webster with disciplinary actions.

Sent from my iPhone

Begin forwarded message:

> **From:** Andrew Webster <awebster@whschool.org>
> **Date:** March 7, 2021 at 12:21:03 PM EST
> **To:** Isabella Wysocki <iwysocki@whschool.org>, racquelb81@gmail.com
> **Cc:** Bob Bowman <bbowman@whschool.org>, Christine Cerminaro <ccerminaro@whschool.org>
> **Subject: letter, with Zoom invite to follow**
>
>
> Dear Isabella,
>
> I'd like to share my condolences at the tragic loss of your friend, which I know has made this time so much harder for you.
>
> I am attaching a lengthy letter that will take a little while to read and reflect on.  You may have strong emotional reactions to it, but I hope you will read it through carefully more than once.  It will take some maturity to sit with it and truly try to digest it in full.  I go into much more detail about our reasoning than I ordinarily would, because I truly want you to understand it.  I am counting on you to keep this letter confidential among us and not share it with others in the school community.
>
> I will send an invitation for a 5 pm Zoom meeting, where we can discuss it more fully and we can answer questions you may have to the best of our ability.
>
> Sincerely,
> Mr. Webster
>
>
> --
>
> **Andrew Webster**
> **Head of School**
> **Wardlaw** + **Hartridge** | Pioneering. Thinkers.
> 1295 Inman Avenue
> Edison NJ 08820
> 908.754.1882, Ext. 107
> www.WHschool.org

March 7, 2021

Dear Isabella,

Dr. Bowman and Mrs. Cerminaro have devoted a lot of time and attention to determining the facts of the case involving the video that was posted and distributed, as you know, and I have joined them in thinking through carefully how the school needs to respond. Unfortunately, there are two main actions you have taken that have made things more difficult for yourself. As you read further, keep in mind that the behavior any school community tolerates becomes seen as the cultural norms of the school, which is of real concern to us.

Two years ago, you should have known better than to use that profanity and racial epithet in the AP room (or anywhere else for that matter). Now, as a senior, you should have known once it was posted that you needed to immediately come forward to an advisor, counselor, or administrator to acknowledge that the video was real, that your words were hurtful and unacceptable. You should have expressed deep contrition, and a desire to apologize meaningfully and repair the harm it caused. You did not do so. We understand that the initial reaction when trouble arises is often to protect oneself and try to deny responsibility. However, you had a period of a month prior to the Judiciary Board hearing, and another month following it, where you could have changed your initial course and acknowledge you had not been truthful.

You then compounded the problem by failing to be truthful with the Judiciary Board, which is at least as serious as the original violation. Your lawyer, as I understand it, counseled you to take full ownership, show contrition, and seek to make amends at the Judiciary Board hearing, but for some reason you did none of those things. We cannot take this lightly, and do not wish to convey to the student body that one can be untruthful and mislead the Judiciary Board with impunity. Now, following our Zoom conversation of March 1, you have belatedly taken responsibility and expressed the desire to learn and make amends. That is a welcome step but one that should have occurred long ago.

In determining consequences, we need to recognize the gravity of the video and your response to it up until our Zoom conversation. We also need to recognize that many of our community members have seen the video, heard the racist language, but have not heard of contrition and apology on your part or of any consequences. They could well conclude that neither you nor we take this matter seriously and fail to recognize the impact of such demeaning language. We also want to recognize your desire to learn from the situation and graduate from Wardlaw-Hartridge.

In light of these considerations, there are only two options we could take in good conscience.  One is expulsion, and we have not chosen that consequence.

Instead, we have chosen a separation from the community for the remainder of the school year, which means the following:

· No more attendance of your classes, in-person or virtually.
· Instead, you will complete assignments from home with an altered set of academic requirements, coordinated by Mrs. Clifford who will serve as your point person at school.  This we will explain in a subsequent communication.
· No attendance of school events of any kind, which includes no marching at graduation.
· You will receive your diploma, provided you complete the academic work and meet the requirements spelled out below.

We will withhold judgment on whether to grant you the diploma depending on your conduct over that time and your willingness to meet certain conditions.

You have already begun one important part of learning from this situation by beginning therapy. We hope your therapist will help you see more clearly the impact of your actions and help with your desire to reach out to peers and rebuild connections, which would be an important growth opportunity.  If you had not already sought counseling, that would have been a requirement from the school.  We still wish to verify that you continue with therapy, and for that purpose we need you to grant your therapist the right to share information with Mrs. Congregane, which requires a signed document on your part.  That allows us to verify ongoing attendance and also permits Mrs. Congregane to provide any information the therapist might seek regarding the circumstances of the case.  Any conversations between the therapist and Mrs. Congregane remain entirely confidential.  You will also continue to have access to both of our school counselors if you feel any need or desire to hold discussions with them.

This next section addresses the fact that it is better for the school and you not to promote controversy around this incident and not to feed any talk about the consequences being taken lightly.  We need to be sure that you will not make comments on social media or elsewhere that are derogatory to the school or to any of its employees or students, and that you will make no statements that give the impression that you view the separation as a light, trivial, or comical penalty.  If that were to happen, we would have to impose expulsion.

With those conditions, we will review the situation as of June 18 and inform you whether you will receive a diploma, which we would deliver to you.  If you have completed the academic requirements, met regularly with your therapist, and met the other conditions, we will issue your diploma, as in all other ways you have

earned it. If subsequently, we learn of comments that would have led earlier to expulsion, we would have to rescind the diploma and inform your college of that change.

The latter part of this letter runs the risk of feeling heavy-handed and impersonal. That is not the intention. We would like you to learn from your actions and the consequences, both in the academic work you do, the therapy, and any efforts to rebuild connections with peers. Equally, we do not want others to conclude that we have not taken your infractions with the seriousness they deserve, or for them to observe behavior that indicates that your contrition is insincere. Our hope is that the work you do in the remainder of your senior year will allow you to develop a better understanding of your actions and the impact they have on you and your community.

Sincerely,
Mr. Webster

# EXHIBIT # 23

**From:** Justine Borzumato-Metzler <jborzumato@whschool.org>
**Date:** November 6, 2020 at 8:02:14 AM EST
**To:** Racquel B <racquelb81@gmail.com>, Bob Bowman <bbowman@whschool.org>
**Subject: Re: Bella**


Dear Mrs. Wysocki,

Thank you for resending the original e-mail. Through further investigation I found the e-mail in my spam folder.

The main focus of the senior speech has always been on the student's journey. I felt that I wanted to highlight Bella's amazing soccer career in her speech and that adding in those other experiences took away from her main message. In the past with speech, if a student has wanted to say something negative about the school in their speech, they have been encouraged to do this elsewhere. There are many other platforms that Bella can use to express this particular opinion, but the senior speech is not one of them.

If you have any other questions please feel free to reach out to myself or Dr. Bowman.

Have a great day and weekend.

Best Regards,
Justine Borzumato


On Thu, Nov 5, 2020 at 8:51 PM Racquel B <racquelb81@gmail.com> wrote:
> Mrs Borzumato,
>
>       Good evening I haven't heard back from you since I left you a email Monday so please see my original email below:
>
>
> > On Nov 2, 2020, at 6:56 PM, Racquelb81@gmail.com wrote:
> >
> > Mrs Borzumato,
> >
> >   Good evening , Bella read me her speech and I was very taken back on the changes you made. The negative experience made her a better in person and her views should be heard not changed to appease the school.
> > There were a lot of terrible and unfair  things happen to her which should be heard .  Her speech doesn't even sound like her which I find absolutely crazy. The athletic department should know how to treat there players who made a difference . I feel that Bella should have freedom of speech to voice how she really feels and what made her a better person instead of hiding the truth .
> >
> > Thank you,
> > Racquel Wysocki
> >
> > Sent from my iPhone



--
**Justine Borzumato-Metzler**
Upper School Science Department
12th Grade Class Dean
**Wardlaw** + **Hartridge** | Pioneering. Thinkers.
1295 Inman Avenue
Edison NJ 08820
(T) 908.754.1882,  Ext. 148
(F) 908.754.9678
www.WHschool.org

# EXHIBIT # 24



# New Jersey Compilation of School Discipline Laws and Regulations

Prepared: January 31, 2020

**18A:35-4.27. Instruction on responsible use of social media.**

1. a. Beginning with the 2014-2015 school year, each school district shall incorporate instruction on the responsible use of social media into the technology education curriculum for students in grades 6 through 8 as part of the district's implementation of the Core Curriculum Content Standards in Technology.

   b. The instruction shall provide students with information on:

   (1) the purpose and acceptable use of various social media platforms;

   (2) social media behavior that ensures cyber safety, cyber security, and cyber ethics; and

   (3) potential negative consequences, including cyber bullying, of failing to use various social media platforms responsibly.

   c. The Commissioner of Education shall provide school districts with sample learning activities and resources designed to promote the responsible use of social media.

**18A:36-5.1. "School Violence Awareness Week"; designated.**

The week beginning with the third Monday in October of each year is designated as "School Violence Awareness Week" in the State of New Jersey. School districts shall observe this week by organizing activities to prevent school violence including, but not limited to, age-appropriate opportunities for student discussion on conflict resolution, issues of student diversity, and tolerance. Law enforcement personnel shall be invited to join members of the teaching staff in the discussions. Programs shall also be provided for school board employees that are designed to help them recognize warning signs of school violence and to instruct them on recommended conduct during an incident of school violence. The Department of Education shall provide guidelines and information to boards of education for use in planning the activities in observance of the week and such funds as are necessary to pay the costs of the required activities and programs.

**18A:37-13. Findings, declarations relative to adoption of harassment and bullying prevention policies.**

The Legislature finds and declares that: a safe and civil environment in school is necessary for students to learn and achieve high academic standards; harassment, intimidation or bullying, like other disruptive or violent behaviors, is conduct that disrupts both a student's ability to learn and a school's ability to educate its students in a safe environment; and since students learn by example, school administrators, faculty, staff, and volunteers should be commended for demonstrating appropriate behavior, treating others with civility and respect, and refusing to tolerate harassment, intimidation or bullying.

**18A:37-15. Adoption of policy concerning harassment, intimidating or bullying by each school district.**

b. A school district shall have local control over the content of the policy, except that the policy shall contain, at a minimum, the following components:

   (7) the range of ways in which a school will respond once an incident of harassment, intimidation or bullying is identified, which shall be defined by the principal in conjunction with the school anti-bullying specialist, but shall include an appropriate combination of services that are available within the district such as counseling, support services, intervention services, and other programs, as defined by the commissioner. In the event that the necessary programs and services are not available within the district, the district may apply to the Department of Education for a grant from the "Bullying Prevention Fund" established pursuant to section 25 of P.L.2010, c.122 (C.18A:37-28) to support the provision of out-of-district programs and services;

   (9) consequences and appropriate remedial action for a person found to have falsely accused another as a means of retaliation or as a means of harassment, intimidation or bullying;

**18A:37-17. Establishment of bullying prevention programs or approaches.**

a. Schools and school districts shall annually establish, implement, document, and assess bullying prevention programs or approaches, and other initiatives involving school staff, students, administrators, volunteers, parents, law enforcement and community members. The programs or approaches shall be designed to create school-wide conditions to prevent and address harassment, intimidation, and bullying. A school district may implement bullying prevention programs and approaches that may be available at no cost from the Department of Education, the New Jersey State Bar Foundation, or any other entity. A school district may, at its own discretion, implement bullying prevention programs and approaches which impose a cost on the district.

A school district may apply to the Department of Education for a grant to be used for programs, approaches, or personnel established pursuant to this act, to the extent funds are appropriated for these purposes or funds are made available through the "Bullying Prevention Fund" established pursuant to section 25 of P.L.2010, c.122 (C.18A:37-28). A school district may make an application for a grant only after exploring bullying prevention programs and approaches that are available at no cost, and making an affirmative demonstration of that exploration in its grant application.

b. A school district shall: (1) provide training on the school district's harassment, intimidation, or bullying policies to school employees and volunteers who have significant contact with students; (2) ensure that the training includes instruction on preventing bullying on the basis of the protected categories enumerated in section 2 of P.L.2002, c.83 (C.18A:37-14) and other distinguishing characteristics that may incite incidents of discrimination, harassment, intimidation, or bullying; and (3) develop a process for discussing the district's harassment, intimidation or bullying policy with students.

A school district may satisfy the training required pursuant to this subsection by utilizing training that may be provided at no cost by the Department of Education, the New Jersey State Bar Foundation, or any other entity. A school district may, at its own discretion, implement a training program which imposes a cost on the district.

c. Information regarding the school district policy against harassment, intimidation or bullying shall be incorporated into a school's employee training program and shall be provided to full-time and part-time staff, volunteers who have significant contact with students, and those persons contracted by the district to provide services to students.

**18A:37-28. "Bullying Prevention Fund."**

There is created a special fund in the Department of Education, which shall be designated the "Bullying Prevention Fund." The fund shall be maintained in a separate account and administered by the commissioner to carry out the provisions of this act. The fund shall consist of: (1) any monies appropriated by the State for the purposes of the fund; (2) any monies donated for the purposes of the fund; and (3) all interest and investment earnings received on monies in the fund. The fund shall be used to offer grants to school districts to provide training on harassment, intimidation, and bullying prevention and on the effective creation of positive school climates, and to help fund related personnel expenses.

**18A:37-33. Findings, declarations relative to dating violence policy and education.**

The Legislature finds and declares that: a safe and civil environment in school is necessary for students to learn and achieve high academic standards; a student who is a victim of dating violence suffers academically, and the student's safety at school is jeopardized; and since all students have a right to learn and study in a safe, supportive environment that is free from violence, each school district should have a policy to prevent, and for responding to, incidents of dating violence, and should provide dating violence education to students in order to prevent dating violence and address incidents involving dating violence.

# EXHIBIT # 25

**Date:** May 31, 2021 at 4:53:15 PM EDT
**To:** racquelb81@gmail.com
**Subject: Re: Pictures**

Racquel,

I'll have to look into the social media post.  I have no specific context for it to understand it fully but will try to learn more quickly.  Regarding the grades, the third trimester/end of year grades are not posted yet for anyone. I am not aware of any concerns regarding Bella's completion of her work or her academic standing, and the agreement we offered regarding Bella receiving her diploma remains the same, so please rest assured on that front.

Andy

On Fri, May 28, 2021 at 6:56 PM <racquelb81@gmail.com> wrote:

Andy,

Sorry I thought the pictures were attached into the email . We are so mentally exhausted from all this .  I also am concerned about the grades I have not see anything. Can you tell why there is not any grades updated ?

Sent from my iPhone

--

**Andrew Webster**
**Head of School**
**Wardlaw + Hartridge** | Pioneering. Thinkers.
1295 Inman Avenue
Edison NJ 08820
908.754.1882, Ext. 107
www.WHschool.org

**Isabella Wysocki**

racquelb81@gmail.com <racquelb81@gmail.com>

Fri 5/28/2021 2:52 PM

**To:** Andrew Webster <awebster@whschool.org>

Mr. Webster,

I want to bring to your attention that my daughter, Isabella is still being bullied and harassed  by the students of Wardlaw Hartridge School.

Since January 2021, I have brought this concern up multiple times to both Dr. Bowman and Mrs. Cerm, specifically noting that I knew who was doing this. Nothing appears to have been addressed since this all happened , which is providing the students the opportunity to continue this behaviors without consequences being imposed.

My daughter Isabella has been virtual since January 2021 as a result of this and although she has fulfilled her obligation to Dr. Clifford and Wardlaw Hartridge School, I continue to deal with the repercussions of this issue .

Among my primary concerns are the following:

1.   The Class of 2021 made a racial comment towards my daughter and another student.

2.   Isabella's graduation sign was not placed among her classmate's on the school lawn until my husband called the office to note it was missing.

3.   Shortly after the sign was placed on the lawn, it was vandalized.

As a caring parent, I am no longer able to continue to tolerate the lack of action on behalf of the school. I am both upset and disappointed by the actions taken by the school in regards to this ongoing concern. I strongly urge that you instruct your staff to cease providing false or misleading information about my daughter's character.

 Bella has been at Wardlaw Hartridge for the entirety of her high school career and I am incredibly disappointed in the way this experience is ending for her. She has done nothing to deserve the treatment she is receiving from students, staff, and administration; which I am now concerned are impacting her mental and emotional wellbeing.

 I am attaching photographic evidence below of the sign and insensitive comments from other students:

cid:image001.jpg@01D75353.F4925260

This was on Wardlaw's Class of 2021 Snapchat group from Austyn Forsyte to the whole class of 2021. Please note that his name is in the corner of this photo.

cid:C289FB13-E9E2-4DAB-97DE-9DB73CC6A3F5-L0-001

Sent from my iPhone

## Pictures

racquelb81@gmail.com <racquelb81@gmail.com>

Fri 5/28/2021 6:56 PM

**To:** Andrew Webster <awebster@whschool.org>

Andy,

      Sorry I thought the pictures were attached into the email . We are so mentally exhausted from all this .  I also am concerned about the grades I have not see anything. Can you tell why there is not any grades updated ?





Sent from my iPhone

# EXHIBIT # 26

From Saint Peter's

racquelb81@gmail.com <racquelb81@gmail.com>
Thu 5/27/2021 7:29 AM
**To:** Tomas Espinosa, Esq. <TE@lawespinosa.com>

Sent from my iPhone

Begin forwarded message:

> **From:** Isabella Wysocki <isabellawysocki2@gmail.com>
> **Date:** May 27, 2021 at 7:24:16 AM EDT
> **To:** Racquel B <racquelb81@gmail.com>
> **Subject: Fwd: Isabella Wysocki Recruiting 2021**
>
>
>
> Sent from my iPhone
>
> Begin forwarded message:
>
> > **From:** Brett Axelrod <baxelrod@saintpeters.edu>
> > **Date:** May 27, 2021 at 12:26:50 AM EDT
> > **To:** Isabella Wysocki <isabellawysocki2@gmail.com>
> > **Subject: Re: Isabella Wysocki Recruiting 2021**
> >
> >
> > Hi Bella,
> >
> > Thanks for your patience as we work through our process. I know you're still waiting on a decision from Admissions, but I wanted to give you an update from the soccer side of things. At this time we've decided to go in a different direction with this last spot for the 2021 team. We ultimately decided that we needed to bring in a player who has college playing experience and who is ready to jump into a leadership role with us right away. I know this isn't the news you were expecting, but it is what we feel will give us the best chance to be successful this fall.
> >
> > Good luck in your search; I'm sure you will land somewhere soon!
> >
> > Best,
> >
> > On Tue, May 18, 2021 at 7:01 PM Brett Axelrod <baxelrod@saintpeters.edu> wrote:
> > > Hey Bella,
> > >
> > > Thanks again for taking the time to chat with Coach Julia and myself! Sorry for the delay in getting this link to you; I had to hop on another call right away.
> > >
> > > Here is the application link for first year admission. Remember that they only need an unofficial transcript to process the application...the official one can be sent in later on (but should be soon).
> > >
> > > Let me know if you have any questions!
> > >
> > > Best,
> > >
> > > On Sun, May 16, 2021 at 1:09 PM Brett Axelrod <baxelrod@saintpeters.edu> wrote:
> > > > Sounds good, give you a call then!
> > > >
> > > > On Sun, May 16, 2021 at 1:08 PM Isabella Wysocki <isabellawysocki2@gmail.com> wrote:
> > > > > 4:15 works for me! You can reach out to me at (908)-487-4501.
> > > > >
> > > > >
> > > > > Thank you,
> > > > > Isabella Wysocki

On May 16, 2021, at 1:04 PM, Brett Axelrod <baxelrod@saintpeters.edu> wrote:

Great, how about 4:15pm on Tuesday? What's the best number to reach you?

Best,

On Sun, May 16, 2021 at 12:52 PM Isabella Wysocki <isabellawysocki2@gmail.com> wrote:
> Thank you so much for responding, I am available on Tuesday. Let me know what time best works for
> you. Look forward to speaking with you. Have a great day!
>
> Isabella Wysocki
>
>
>
> On May 16, 2021, at 12:47 PM, Brett Axelrod <baxelrod@saintpeters.edu> wrote:
>
>
> Hi Isabella,
>
> Thanks for reaching out. Do you have some time to hop on a call Tuesday afternoon to
> discuss?
>
> Best,
>
> On Sun, May 16, 2021 at 10:49 AM Isabella Wysocki <isabellawysocki2@gmail.com> wrote:
>> Good Morning Coach Bazi,
>>
>> My name is Isabella Wysocki. I am currently a senior with a GPA of 3.9 at Wardlaw+Hartridge High School
>> located in Edison, NJ. I wanted to reach out to you in the hopes you may still be recruiting for the Saint Peters
>> Class of 2025. I recognize that this is very late in the recruiting process.
>>
>> I played varsity soccer all four years of high-school. Throughout my hs career, I've scored over one hundred
>> goals and currently hold the record for most goals scored at my school. I was named the top goal scorer in New
>> Jersey and had the honor of being named all conference player. Outside of school, I play club soccer for the PDA
>> ECNL White U18/U19 team under Coach Jeremy Beardsley. I play both left and right winger with my dominant
>> foot being my left. I am a very hardworking and competitive player. I've been playing soccer since the age of
>> three and still love setting foot on the field.  I am involved with the sport as not only a player but also with training
>> younger athletes from ages 6-15. I believe in paying it forward by explaining to them all about the game and
>> pushing them to their fullest potential like others have done for me when I was younger. I now remember why I
>> trained and played so hard, to play Division 1 Soccer. I know I have the capability and discipline to be a D1
>> athlete.
>>
>> I can definitely see myself playing with your program hoping to take my game to the next level. If you are still
>> recruiting for 2021 or if it's possible to be a transfer, please do not hesitate to contact me. I have attached my
>> highlight video. Looking forward to hearing from you soon.
>>
>> Thank You,
>> Isabella Wysocki
>>
>> Highlight Tape:
>>
>>    📹 PDA ECNL .mp4
>>
>>
>>
>> --
>> *Brett Axelrod*
>>
>> Assistant Coach, Women's Soccer
>>
>> Saint Peter's University
>>
>> 2641 John F. Kennedy Blvd.
>>
>> Jersey City, NJ
>>
>> [p] 908-361-6167
>>
>> www.saintpeterspeacocks.com

# EXHIBIT # 27

**From:** racquelb81@gmail.com
**Date:** March 2, 2021 at 12:30:22 PM EST
**To:** Andrew Webster <awebster@whschool.org>
**Subject: Bella Wysocki**


Mr Webster,

    Good afternoon I just wanted to reach out and add something to our conversation that I did not add yesterday due to the overwhelming emotions of the situation. I would like to address that yes Bella is in the video and the words are coming out of her mouth but the video is 2 years old . She has no recollection on what and why I've drilled her and asked her over and over and she starts to cry and says mom I do not remember. Unfortunately the music the kids listen to these days that harmful / hurtful word is used quit often . I mean when I turn on the radio that's all I hear . Is it right absolutely no , but again this is the world we live in and this is what is out there for our teens.  I also would like you to take into consideration that Bella never posted this video from 2 years ago, and someone has viciously went after her to destroy her future and destroy everything she worked for. Bella in my opinion has been a target and bullied I have idea why and it's hurtful when this is happening to your child  . Bella is also very upset that when your granted letters from the teachers she only heard from 1 teacher . This is a very hurtful situation for her and it's changed her very much. She is currently  seeing a psychiatrist that is considering meds for the anxiety  attacks and the post traumatic stress . I know it's a lot but I needed you to know . I am very sorry we are at this point and I wish we weren't but I needed to add these points as a parent I have to make sure all points are heard before anyone makes a decision.

Sincerely,

Racquel Wysocki

Sent from my iPhone

**From:** racquelb61@gmail.com
**Date:** February 27, 2021 at 6:49:10 PM EST
**To:** Andrew Webster <awebster@whschool.org>
**Subject: Letter**


Mr Webster,

   Good evening , thank you for your concern for Gabby and our family's health right now during this difficult time.  Sorry for the misunderstanding and confusion , Bella was just trying to get letters on how she is as a student and how her teachers and administrators viewed her. These letters were gonna be presented to you to review for our zoom meeting Monday.

Thank you
Racquel Wysocki




   On Feb 26, 2021, at 5:28 PM, Andrew Webster <awebster@whschool.org> wrote:


   Raquel,

   I was sorry to learn of Gabby's test results and hope she continues to feel well. Bella has been reaching out for letters of reference, though I am not sure what they are for. We've been advised to hold off on such letters, and so that's what I have told the three people who inquired with me.  I can raise that question again this weekend to verify, but once the lawyers are involved I need to follow their counsel, as I hope you'll understand.

   I look forward to meeting with you Monday.

   Regards,
   Andy

   Sent from my iPhone

On Feb 24, 2021, at 5:49 PM, Andrew Webster <awebster@whschool.org> wrote:


Raquel,

Yes, this letter was shared with me, and I have in turn shared it with Dr. Bowman and Mrs. Cerminaro.  I look forward to meeting with you as well.

Regards,
Andy

On Wed, Feb 24, 2021 at 4:51 PM <racquelb81@gmail.com> wrote:
> Mr Webster,
>
>     Good afternoon I just wanted to make sure you have seen this letter before we meet tomorrow . We look forward to meeting with you .
>
> Thank you
> Racquel Wysocki
>
>
> Sent from my iPhone


--

**Andrew Webster**
**Head of School**
**Wardlaw + Hartridge** | Pioneering. Thinkers.
1295 Inman Avenue
Edison NJ 08820
908.754.1882, Ext. 107
www.WHschool.org

# EXHIBIT # 28

**Bella Wysocki**

racquelb81@gmail.com <racquelb81@gmail.com>
Sat 7/3/2021 4:52 PM

**To:** Andrew Webster <awebster@whschool.org>

# Mr. Webster,        7/3/2021

I read your email and frankly, it's sad, I was not going to respond to the lies and carelessness on your part until again this school gave me Bella's official transcripts that did not show a graduation date for that even graduated and this is my last straw.

Let me start by saying that having Mrs. Cerm call my husband 30 minutes before the graduation ceremony went live was absolutely petty, distasteful, and disgraceful.
We did not agree, whether in writing or verbally, that her name wouldn't be read at graduation. You made this decision on your own and now are simply making up excuses to cover it. Do you know the psychological damages that all of these have caused to my daughter?

Doesn't it seem obvious that you are trying to hide that my daughter graduated?

Now, Let me address the beacon… I will not share or disclose where my daughter is going to college. I do not need any of your so-called "pioneer thinkers" or administration going after her to destroy her once again.

This has been all negligence; it seems to have been deliberately planned by you and your staff to destroy and hurt my daughter.

There has been a lot of  "oops" on your part that we have learned lately so let's count them:

1. Bella's Senior sign did not get put out with all the other graduation signs until we called and complained

2. Ram Recognition night all awards were there but Bella's ball for scoring 106 goals was not after coach
    Romo and Karl knew a month prior that we were attending Rams Recognition night.

3. Last-minute her name was not read during the graduation ceremony.

4. I came to the school for official transcripts on Tuesday, June 22, 2021, to give to Bella's college that did not have her as graduate and there was no date on her transcript.

After all of the above, this is why I didn't trust you or your staff with knowing where my Bella was attending. This is the last step taken by Wardlaw Hartridge to smear and destroy Bella.

Racquel Wysocki

# EXHIBIT # 29

